**2015-1237, -1270**

# United States Court of Appeals for the Federal Circuit

EON CORP. IP HOLDINGS LLC,

*Plaintiff – Cross-Appellant,*

*v.*

SILVER SPRING NETWORKS, INC.,

*Defendant – Appellant.*

*Appeals from the United States District Court for the Eastern District of Texas in Case No. 6:11-CV-00317-JDL, Judge John D. Love*

## NON-CONFIDENTIAL OPENING BRIEF FOR DEFENDANT-APPELLANT SILVER SPRING NETWORKS, INC.

MARK A. LEMLEY
ELIZABETH OFFEN-BROWN KLEIN
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
mlemley@durietangri.com
eklein@durietangri.com

ALAN HODES
SILVER SPRING NETWORKS
555 Broadway
Redwood City, CA 94063
(650) 839-4786
ahodes@silverspringnet.com

*Counsel for Appellant, Silver Spring Networks, Inc.*

*Counsel Continued on the Inside Cover*

March 9, 2015

*Counsel Continued*

ROBERT KRAMER
BONNIE LAU
C. GIDEON KORRELL
DENTONS US LLP
1530 Page Mill Road, Suite 200
Palo Alto, CA 94304
(650) 798-0300
robert.kramer@dentons.com
bonnie.lau@dentons.com
c.gideon.korrell@dentons.com

*Counsel for Appellant, Silver Spring Networks, Inc.*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a)(1) and Federal Rule of Appellate Procedure 26.1, counsel for Plaintiff-Appellant Silver Spring Networks, Inc. certifies the following:

1. The full name of every party represented by us is:

   Silver Spring Networks, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

   The following entities affiliated with Waddell & Reed collectively own 10 percent or more of Silver Spring Networks, Inc.: Waddell & Reed Financial Services, Inc., Waddell and Reed, Inc., Waddell & Reed Investment Management Company, and Ivy Investment Management Company.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

   DURIE TANGRI LLP: Mark A. Lemley and Elizabeth O. Klein

   SILVER SPRING NETWORKS, INC.: Alan S. Hodes

   DENTONS US LLP: Robert F. Kramer, Bonnie Lau, and C. Gideon Korrell

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................i

TABLE OF CONTENTS ......................................................................ii

TABLE OF AUTHORITIES ..............................................................iv

STATEMENT OF RELATED CASES ..................................................1

JURISDICTIONAL STATEMENT ......................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................3

STATEMENT OF THE CASE..............................................................4

INTRODUCTION ................................................................................5

STATEMENT OF THE FACTS ..........................................................6

    I.    EON'S '101, '546, AND '491 PATENTS ....................................6

        A.    EON's '101 and '546 patents. ..............................................6

        B.    EON's '491 patent. ..............................................................9

    II.    THE ACCUSED SILVER SPRING PRODUCTS AND SERVICES ................................................................................11

    III.    CLAIM CONSTRUCTION ........................................................14

        A.    The district court declined to construe the meaning of "portable" and "mobile" during claim construction. ........................................................................14

        B.    The district court did not construe the meaning of "transmitting . . . and receiving . . . multiplexed synchronously related digital data messages of variable lengths" in the '491 and '546 patents during claim construction. ..............................................15

IV.    TRIAL ...................................................................................16

V.    POST-TRIAL ............................................................................19

SUMMARY OF THE ARGUMENT ..................................................20

ARGUMENT ......................................................................................22

I.    STANDARD OF REVIEW ..........................................................22

II.    SILVER SPRING'S METERS ARE NOT "MOBILE"
AND "PORTABLE" ...................................................................23

III.    SILVER SPRING DOES NOT INFRINGE THE '491
PATENT .....................................................................................33

IV.    SILVER SPRING IS ENTITLED TO A NEW TRIAL
ON DAMAGES ...........................................................................41

CONCLUSION ...................................................................................49

ADDENDUM ......................................................................................A1

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted in the addendum on pages A0012, A0015–16 describes and/or characterizes how Silver Spring's technology works; the material omitted in the addendum on pages A0019–23, describes the monetary amounts of royalty agreements between EON and third parties and identifies those third parties; the material omitted in the addendum on pages A0027–32, describes the terms of a settlement agreements between EON and a third party and identifies that third party.

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Accentra, Inc. v. Staples, Inc.*,
 500 Fed. App'x 922 (Fed. Cir. 2013) ...................................................43

*Apple Inc. v. Motorola, Inc.*,
 757 F.3d 1286 (Fed. Cir. 2014) ..........................................................46

*DDR Holdings, LLC v. Hotels.com, L.P.*,
 773 F.3d 1245 (Fed. Cir. 2014) ..........................................................43

*Fenner Investments, Ltd. v. Cellco P'ship*,
 No. 2013-1640, __ F.3d __, 2015 WL 570730 (Fed. Cir. Feb. 12, 2015) .... 22, 37

*Fresenius USA Inc. v. Baxter Int'l, Inc.*,
 733 F.3d 1369 (Fed. Cir. 2013) ..........................................................43

*Genentech, Inc. v. Novo Nordisk A/S*,
 108 F.3d 1361 (Fed. Cir. 1997) ..........................................................23

*In re Papst Licensing Digital Camera Patent Litig.*,
 No. 2014-1110, __ F.3d __, 2015 WL 408127 (Fed. Cir. Feb. 2, 2015) .............22

*Kearns v. General Motors Corp.*,
 94 F.3d 1553 (Fed. Cir. 1996) ...........................................................45

*Markman v. Westview Instruments, Inc.*,
 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370 (1996) ...................26

*Memphis Cmty. Sch. Dist. v. Stachura*,
 477 U.S. 299 (1986) .......................................................................43

*Miller v. Raytheon Co.*,
 716 F.3d 138 (5th Cir. 2013) .............................................................22

*Newport v. Fact Concerts, Inc.*,
 453 U.S. 247 (1981) .......................................................................43

*NTP, Inc. v. Research In Motion, LTD.*,
    418 F.3d 1282 (Fed. Cir. 2005) ...........................................................43

*O2 Micro Int'l, Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) .................................................... 27, 37

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
    No. 2014-1396, __ F.3d __, 2015 WL 668828 (Fed. Cir. Feb. 18, 2015) ..........40

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    757 F.3d 1366 (Fed. Cir. 2014) ...........................................................43

*Seidman v. Am. Airlines, Inc.*,
    923 F.2d 1134 (5th Cir. 1991) .............................................................23

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) .............................................................33

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ................................................................. 22, 37

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) .................................................... 42, 43

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
    No. 2013-1577, 2013-1576, __ F.3d __, 2015 WL 859503
    (Fed. Cir. Mar. 2, 2015) .....................................................................48

**Statutes**

28 U.S.C. § 1295(a) ...................................................................................2

28 U.S.C. § 1331 .........................................................................................2

28 U.S.C. § 1338 .........................................................................................2

35 U.S.C. § 284 .........................................................................................45

**Other Authorities**

7 Donald S. Chisum, *Chisum on Patents* § 20.07 (2011) ........................................46

**Rules**

Fed. R. Civ. P. 59 .....................................................................................43

## STATEMENT OF RELATED CASES

Plaintiff-Cross-Appellant EON Corp. IP Holdings, LLC has filed a cross-appeal, which is consolidated with this appeal.  Counsel for Defendant-Appellant Silver Spring Networks, Inc. is unaware of any other pending case that directly will affect or be affected by this Court's decision.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. Final judgment was entered on December 4, 2014.  An amended final judgment was entered on December 19, 2014.  Defendant-Appellant Silver Spring Networks, Inc. ("Silver Spring") appealed on December 29, 2014.  Plaintiff-Cross-Appellant EON Corp. IP Holdings, LLC ("EON") cross appealed on January 9, 2015.  This Court has jurisdiction under 28 U.S.C. § 1295(a).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Are electric power meters that can operate only when securely attached to a building "mobile" and "portable," as required by the claims, rather than "fixed" and "stationary"?

2.      Did the district court err in permitting the jury to resolve issues of claim construction rather than doing so itself?

3.      Did the district court err in applying diametrically opposed claim interpretations for nearly identical claim elements?

4.      Did the district court err by failing to order a new trial on damages after having determined that one of the three patents on which the jury based its award was not infringed?

## STATEMENT OF THE CASE

In June 2011, Plaintiff-Cross-Appellant EON filed the underlying action for infringement of three patents against Defendant-Appellant Silver Spring. A0100. Following a five-day trial in June 2014, a jury found five of the twelve remaining asserted patent claims infringed and valid, and awarded EON $18,800,000. A0068–70. The district court then ruled on a bench issue regarding Silver Spring's implied license defense to decrease damages, based on the parties' post-judgment motions. A0032. Specifically, Silver Spring moved for judgment as a matter of law that the patents were not infringed, moved in the alternative for a new trial, and sought a remittitur in damages. The district court granted in part and denied in part Silver Spring's motion on October 21, 2014, and remitted damages to $12,990,800. *Id.* Silver Spring moved for reconsideration of the district court's order, which was denied on December 3, 2014. A0035. Silver Spring appealed on December 29, 2014. EON cross-appealed on January 9, 2015.

# INTRODUCTION

EON acquired patents directed to a "two-way interactive video network" for sending video data messages to and from hand-held devices. It filed this lawsuit asserting that these patents were infringed by, of all things, electric power meters. This was the latest in a series of cases brought by EON beginning in September 2008 in which it asserted these same patents against nearly 50 companies across numerous technologies. EON persuaded a jury in the Eastern District of Texas to find infringement by convincing the district judge not to construe certain claim terms and then presenting testimony and legal argument to the jury — not the judge — about what those terms meant. The result was a jury verdict that found fixed electric meters secured and electrically wired to houses to be "portable" and "mobile" rather than "fixed" and "stationary," and found that the phrase "transmitting . . . and receiving . . . digital data messages" did not require that the digital data messages be both transmitted and received. The district court erred by not resolving these claim construction disputes itself, and instead improperly delegated those disputes to the jury. No reasonable adjudicator — judge or jury — could conclude that the terms of the patent mean what the jury apparently found them to mean.

## STATEMENT OF THE FACTS

I.    **EON'S '101, '546, AND '491 PATENTS**

A.    **EON's '101 and '546 patents.**

U.S. Patent Nos. 5,388,101 ("'101 patent) and 5,481,546 ("'546 patent") share an identical specification and describe identical technologies.  A0163–82; A0183–206.  The '101 and '546 patents are directed towards an interactive two-way data services network for conveying synchronously timed digital messages point to point throughout the network from individual subscriber units located within zones serviced by local area cell repeaters connected to a central switching center through a satellite relay.

The '101 patent, entitled "Interactive Nationwide Data Service Communication System for Stationary and Mobile Battery Operated Subscriber Units," was filed on October 26, 1992, and issued on February 7, 1995.  A0163. The '101 patent names Gilbert M. Dinkins of Herndon, VA, as the sole inventor. *Id.*  The '546 patent is a continuation of the application which issued as the '101 patent and has the same title.  A0183.

The purpose of the system described in the '101 and '546 patents is to enable communications between individual subscriber units and local or regional service participants.  Service participants provide application services, such as interactive communications related to broadcast television.  Service participants

connect to the system either at a local area repeater station (also referred to as a

"base station"),[1] or at the central data and switching control center (also referred to

as a "central switch").  Figure 1 from the '101 and '546 patents shows this system:



A0164; A0184.

The system in the '101 and '546 patents uses a cellular architecture to

support communications with a large number of subscriber units distributed nation-

wide.  Each cell has a base station assigned to it, which is responsible for

transmitting data to, and receiving data from, individual subscriber units within its

---

[1] The asserted patents use various terms for the base station depicted as element 3, both in the figures and the text, *e.g.*: Local Area Repeater Station, A0164; Cell/Cell Base Station, A0167, Fig. 6A; A0168, Fig 7A; repeater cell, A0173 at 5:5–6; local area base station repeater cell, A0173 at 5:6–7; local base station repeater cell, A0173 at 5:40–41, etc.

coverage area.  The system in the '101 and '546 patents is intended to be usable with stationary units such as television set-top box units or battery-operated portable or mobile subscriber units.  Low power consumption (to maximize battery life) is therefore an important factor for at least the battery-operated portable or mobile subscriber devices.  *See, e.g.*, A0172 at 3:17–22.  Thus, while the base station can transmit with a power level that can be received by all subscriber units, many low power subscriber units may be out of range for communication back to the base station.  To overcome this technical limitation, the '101 and '546 patents incorporate the concepts of local area cell subdivision combined with remote, receive-only relays[2] that receive low-power transmissions from individual subscriber units and retransmit them back to the base station.  *See, e.g.*, A0173 at 5:54–6:4.  The base station broadcast signal coverage area is subdivided into smaller zones, with a receive-only relay located in each such zone.  The zones are sized and spaced so that the low-power, individual subscriber unit message transmissions can be properly received by a receive-only relay, even if they cannot be received directly by the base station.  The receive-only relays pass on the

---

[2] The asserted patents use a variety of different terms to refer to these remote receive-only relays: "receive-only, fixed-location relay stations," A0173 at 5:54–55, "local remote receivers," A0173 at 5:61–62, "remote receiver stations," A0173 at 6:40, "remote receive only receivers," A0173 at 6:52, "remote stationary receivers," A0174 at 8:11–12, "remote fixed station subdivision receiver," A0174 at 8:18–19, "remote receiver," A0174 at 8:27, etc.

8

messages from the individual subscriber units back to the base station via a link, such as a telephone line.  A0173 at 5:2–8.  In this manner, the patents describe that two-way communications between the base station and individual subscriber units can be achieved, even when those subscriber units are operating at low power levels, too far away to transmit directly to the base station, and must therefore use a receive-only relay.

To coordinate the large number of potential subscriber units within a geographic zone of a receive-only relay and the limited communications capacity of the single frequency channel, the patents describe using a time division framework whereby each subscriber unit is assigned a particular time slot, only within which it is allowed to transmit a message.  *See, e.g.*, A0171 at 2:36–43.  The '101 and '546 patents disclose the use of a master television broadcast signal transmitted to all units and used for precisely determining when each time slot begins for each respective subscriber unit.  A0172 at 3:48–52; A0175 at 10:31–34.

## B.    EON's '491 patent.

U.S. Patent No. 5,592,491 ("'491 patent") relates to an interactive two-way data service network, and more particularly, to communication within an interactive two-way broadcast data service network.  *See, e.g.*, A0211 at 1:10–14.

The '491 patent entitled "Wireless Modem," was filed on December 2, 1994, and issued on January 7, 1997.  A0207.  The '491 patent is a continuation-in-part

of the application which issued as the '101 patent, discussed above. *Id.* The application that issued as the '101 patent is incorporated by reference in the '491 patent. *Id.*

The '491 patent is very similar to the '101 and '546 patents described above. The '491 patent discloses the additional feature of making available an alternate communication path (Path B) between the subscriber unit and the base station when the subscriber unit is unable to receive a signal from the local base station repeater cell directly (Path A). This architecture is shown in Figure 2:



FIG. 2

A0209.

The communication path at issue in the asserted claims of the '491 patent is the same one disclosed in the '101 patent, where the local base station repeater cell

10 (which appears to correspond to base station (3) of the '101 patent) transmits directly to a subscriber unit 12 (which appears to correspond to response unit terminal IDA (4) of the '101 patent), and the subscriber unit (12) communicates back to the local base station repeater cell 10 through remote receiver 16 (which appears to correspond to remote receiver 20 of the '101 patent). *See, e.g.*, A0212 at 3:7–20; A0209, Fig. 2. Thus, the local base station both sends and receives data messages to be transmitted between the subscriber unit and the central system.

## II.   THE ACCUSED SILVER SPRING PRODUCTS AND SERVICES

Silver Spring does not make portable or mobile video communications equipment. Instead, it provides a networking platform and solutions that enable utility companies to transform the power grid infrastructure into the smart grid, predicting the demand for electric power and controlling the flow of power in real time. The networking platform provides two-way communications between the utility back office and devices on the power grid. In addition to the networking platform, Silver Spring offers a suite of solutions that run on top of their network and services, all of which are referred to as the Smart Energy Platform.

Silver Spring's network is composed of hardware such as Access Points, Relays, Bridges, and Intelligent Endpoints, and software such as the UtiliOS network operating system and the UtilityIQ grid management program. These

components together provide utility companies the ability to communicate with and control devices connected to their power grid.

The "subscriber units" accused in this lawsuit are electric watt-hour meters containing Silver Spring's wireless network card. The meters are securely and enduringly attached to the exterior wall of houses or buildings of individual utility customers by bolts and/or tamper-proof locks, and are energized by 240 volts of electricity to operate. A0559 at 138:2–5. The process of installing or removing the meters is difficult and inconvenient. A0559 at 137:17–140:15; A0521 at 147:19–148:18. To be moved, the meters must be electrically disconnected, which is requires a certified electrician because the high voltage is dangerous. A0559 at 137:21–138:13; A0521 at 147:16–148:13. They must also be unsecured from the wall. A0559 at 138:2–5. The meters are not owned by the home or building owner but rather are owned by the utility company, which does not permit the meters to be relocated when a customer moves. A0471 at 139:12–140:5. A watt-hour meter is not operable until it is physically connected to the electricity supply entering a house or building to which it is securely attached. *See* A0521 at 148:2–6. Meters are not intended to be moved from building to building, A0559 at 139:4–8, and never are moved in practice, A0559 at 137:21–138:13; A0521 at 147:16–148:13, but instead are attached to one building for their expected lifespan of fifteen years or more. A0559 at 139:12–140:3 (when a meter is removed for

12

failure to operate it is not repaired and reused); A0592 at 81:20–22 ("[A meter is] [b]olted to the house. That's where it's used. It doesn't change."). There was no evidence at trial that a meter would even work (including communication) if it was detached from one building and reattached to another. *See* A0559 at 137:17–140:15; A0521 at 147:6–148:18; A0545 at 81:19–83:20.

Silver Spring's smart meters send data in the upstream direction through Silver Spring's wireless network to an Access Point, which then relays the data to the utility's back office server running UtilityIQ. The evidence presented by EON at trial is that Silver Spring's meters do not receive data messages downstream (*i.e.*, from the back office server, through the Access Point, and to the smart meter), though they do receive certain control and synchronization signals in that direction. As EON's expert Dr. Bims testified,

> [M]essages like beacon messages and other messages that are sent from the base station down to the smart meter [are] actually control messages, to control the operation of the meters, to make sure they're synchronized, to schedule various meter readings that take place, and that kind of thing, ***which is different from the digital data messages in which meter readings are embedded to be transmitted back*** to the UtilityIQ.

A0434 at 122:2–10 (emphasis added).

13

## III.   CLAIM CONSTRUCTION

### A.   The district court declined to construe the meaning of "portable" and "mobile" during claim construction.

The '101, '546, and '491 patents employ the claim terms "portable" and "mobile" to describe the subscriber units and parts thereof.[3] At the *Markman* hearing, Silver Spring proposed an identical construction of both terms:  "capable of being easily and conveniently moved from one location where the subscriber unit is operable to a second location where the subscriber unit is operable, and designed to operate without a fixed location."  A0306.  The district court declined to construe "portable" and "mobile" "because their meanings are clear in the context of the claims and will be readily understandable to the jury."  A0308; A0322.  The district court did, however, discuss the scope of the claim terms to clarify that "Defendants are asking for nothing that the plain and ordinary meaning of the terms cannot do on their face — distinguish from 'stationary' or 'fixed.'"

---

[3] Claims 19 and 20 of the '101 patent require both "subscribers with **portable** subscriber units" and a means for "**communicating from the subscriber units when moved through different geographic zones**."  A0177 (emphasis added). Claims 1 and 2 of the '491 patent require a "set of local subscriber units including low power **mobile** units."  A0213 (emphasis added).  Claim 1 of the '546 patent, for example, requires "a set of local subscriber transceiver units including low power **mobile** units."  A0196 (emphasis added).  In *Markman* proceedings in an earlier case involving these patents, the district court found that EON failed to provide any explanation how the terms "mobile" and "portable" were different. A0705 at 16.  At trial here, EON's expert told the jury, and EON reiterated and emphasized in closing argument regarding subscriber units, that "portable and mobile mean the exact same thing."  A0617 at 181:9–10; A0679 at 74:13–14.

A0307.  After deciding that portable and mobile devices cannot be stationary or fixed, the district court left the terms unexplained to the jury, while cautioning that "the parties may not interpret them in a manner inconsistent with this opinion." A0308; A0322.

**B.    The district court did not construe the meaning of "transmitting . . . and receiving . . . multiplexed synchronously related digital data messages of variable lengths" in the '491 and '546 patents during claim construction.**

During claim construction, the parties did not dispute the meaning of the term "transmit" in the claims of the '491 and '546 patents.  The plain meaning of claims 1 and 2 of the '491 patent and claim 3 of the '546 patent requires data messages to be "transmitted" from the base station to the subscriber unit downstream and "received" by the base station from the subscriber unit upstream.

The district court did, however, construe the term "multiplexed synchronously related digital data messages."  The district court construed "multiplexed" to mean "combined messages transmitted over a single channel" and "synchronously related" to mean "related in time and/or frequency."  A0297; A0299; A0319; A0321.

The district court also construed "receive only"[4] as limiting the role of the remote receivers to "communicat[ing] of messages to and from the base stations cells and the subscriber units."   A0294 (quoting A0257).   The district court explained:

> The reception unit's role with respect to those messages is simply to receive them from the low powered subscriber units and to pass them along to the base station cell. This does not however, forbid routine handshaking, error checking, and other control signals from being communicated between the receiver units and the subscriber units.

A0294–95 (quoting A0257).

## IV.   TRIAL

By the time the case went to trial, only 12 claims were presented to the jury: claims 1, 9, 19, and 20 of the '101 patent; claims 1, 2, 3, and 5 of the '546 patent; and claims 1, 2, 5, and 7 of the '491 patent.   A0045–46.

EON's case in chief set forth its infringement theories for all twelve claims of the three asserted patents.   EON and one of its experts described the patents as containing multiple claims, each of which constituted a separate invention.   A0368 at 17:5–12; A0617 at 182:14–18.   Yet EON's expert on damages did not value

---

[4] With the exception of claim 19 of the '101 patent, each of the claims at issue of the '101 and '491 patents on appeal require a "receive only" element but are labeled differently: "receive only stations" ('101 patent, claim 20) and "local remote receiver" ('491 patent, claims 1 and 2).

each patent separately; instead, EON asked the jury to award a single damages amount. A0506 at 85:4–11; A0679–80 at 76:25–77:11.

EON's technical experts offered testimony on claim construction at trial. For example, regarding the terms "mobile" and "portable," Dr. Kesan opined that nearly everything is movable and therefore a "mobile device," including even his own house. A0641 at 74:18–75:21. Indeed, he told the jury that houses are movable and thus "mobile" because they can be lifted and transported. *Id.* He begrudgingly testified that mountains might not be movable. *Id.* And Dr. Bims concluded that "the mobile element is found in the Silver Spring products, especially in light of reading the patent specification in terms of how the patent talks about mobility." A0616–17 at 180:20–181:10. Dr. Bims and EON's counsel suggested that "mobile" had a particular meaning to a person skilled in the art that was different to how it was generally known:

> **Q.** So, for example, the -- there may be some words that show up in a patent that someone that's not an electrical engineer may read and have what they believe is a common understanding of the term, but an electrical engineer looking at the patent may have a different understanding?
>
> **A.** That -- that does occur in certain cases where there's certain industry terms that are uses that someone not in the industry would not understand.
>
> **Q.** And so -- and one that we're going to discuss is potentially mobile in this context?
>
> **A.** Yes, that's one of the terms that's in the claims.

17

A0423 at 79:2–13.   Dr. Bims went further and told the jury that the claim limitations "subscribers with portable subscriber units" and "facilities for communicating from the subscriber units when moved through different geographic zones" did not require that subscriber units are capable of physical movement.   Instead, he opined that fixed location, stationary devices, such as electric meters securely mounted on houses, are "portable" or "mobile" subscriber units so long as they can transmit data to other devices by changing signaling paths of communications.   He told the jury that a meter can move through geographic zones for purposes of these patents not by physically moving, but by changing its communication path by connecting to another receiver and thereby joining another geographic zone.   A0426 at 91:18–92:10.

During closing argument, EON's attorney told the jury to "define [] for yourself" the meaning of "portable" and "mobile."   A0679 at 74:2–6.   He told the jury to "use your common sense," "[u]se the Court's definition," and "[u]se exactly what the patent says, what Mr. Dinkins said, that a meter is portable."   A0679 at 74:18–25.

In fact, however, the asserted patents said nothing of the sort.   What the asserted patents actually said was that "portable battery-operated milliwatt transmitter subscriber units may be moved throughout the base station geographical area for reliably performing such functions as meter reading and data transfer."   *E.g.*, A0172 at 4:8–12; A0192 at 4:2–5.   The meter is not the portable

element in the asserted patents; instead, a handheld device can be ***brought to*** the meter to read it. *Id.*

The jury found five of the twelve remaining asserted patent claims infringed and valid and awarded a lump sum judgment to EON for $18,800,000. A0067–70. The jury verdict form asked the jury to decide as to infringement and validity by patent, claim-by-claim. A0068–69. The damages amount, however, was a general verdict single lump sum amount. A0070. The jury did not indicate how damages were allocated amongst the three patents found infringed.

## V.    POST-TRIAL

The district court granted Silver Spring's motion for judgment as a matter of law of noninfringement of the '546 patent because it found that EON had not submitted sufficient evidence to permit a jury to conclude that Silver Spring's meters both transmitted and received data messages, as claim 3 of the '546 patent (the only claim of the '546 patent that the jury found to be infringed) required. A0012–13. The district court denied Silver Spring's motion for judgment as a matter of law as to noninfringement of claims 19 and 20 of the '101 patent and claims 1 and 2 of the '491 patent. A0008. The district court also adjudicated the bench issue regarding implied license in favor of Silver Spring and remitted the damages award to $12,990,990. A0032. Despite the district court's decision throwing out one of the three patents the jury had found infringed, the district court denied Silver Spring's request for a new trial on damages. A0026.

19

## SUMMARY OF THE ARGUMENT

The district court improperly delegated the task of claim construction to the jury. It erred by finding that the terms "portable" and "mobile" required no construction. It permitted expert witnesses to testify and lawyers to argue to the jury about the meaning of those terms. As a result, the jury concluded that Silver Spring's electric power meters, which only operate when they are enduringly secured and electrically connected to buildings, and can be removed only with difficulty, were "portable" and "mobile" devices rather than "fixed" and "stationary" ones. The district court erred by not resolving the claim construction dispute pre-trial. No jury that properly understood the terms "portable" and "mobile" could have found that Silver Spring's electric meters satisfied those terms.

A similar problem infects the district court's finding that Silver Spring's base stations "transmitted . . . digital data messages" to its subscriber units. The district court did not construe the language of the patent. Instead, it permitted EON to present evidence at trial that Silver Spring's base stations did not have to "transmit . . . digital data messages" to subscriber units despite the clear language of the asserted patent claims. Moreover, the district court's ruling on Silver Spring's Motion for Judgment as a Matter of Law erroneously held that claims 1 and 2 of the '491 patent did not have this requirement. The district court erred in

refusing to resolve the issue as a matter of claim construction and a question of law.  No jury that properly understood the asserted patents could have found from the evidence presented by EON that Silver Spring transmitted digital data messages from its base stations to its subscriber units.

Finally, the district court erred in refusing to follow this Court's "general rule" and grant a new trial on damages once it threw out EON's infringement case on one of the three patents the jury had found infringed.  EON's theory that the patent that was thrown out was worthless and the damages number should not change is inconsistent with both patent law and the evidence.

# ARGUMENT

## I.    STANDARD OF REVIEW

This appeal involves multiple standards of review.

First, Silver Spring challenges certain of the district court's claim constructions.  Claim construction is a question of law.  This Court reviews claim construction de novo when, as here, the construction of the claim was based on the intrinsic evidence rather than on evidentiary findings.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840–42 (2015); *In re Papst Licensing Digital Camera Patent Litig.*, No. 2014-1110, __ F.3d __, 2015 WL 408127, at *3 (Fed. Cir. Feb. 2, 2015).  And it reviews the ultimate claim construction de novo regardless. *Fenner Investments, Ltd. v. Cellco P'ship*, No. 2013-1640, __ F.3d __, 2015 WL 570730, at *2 (Fed. Cir. Feb. 12, 2015).

Second, this appeal challenges the district court's denial of Silver Spring's motion for judgment as a matter of law on noninfringement.  The district court's ruling is reviewed de novo by the Court, but the "jury's verdict can only be overturned if there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013).

Third, this appeal challenges the district court's denial of Silver Spring's motion for a new trial on damages after the district court found one of the three asserted patents not infringed.  The district court's ruling is reviewed for abuse of

discretion by the Court.  *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991).    But an error of law is necessarily an abuse of that discretion. *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

## II.    SILVER SPRING'S METERS ARE NOT "MOBILE" AND "PORTABLE"

Each of the asserted claims is directed to the subset of communications units that are "portable" or "mobile."[5]  Claims 19 and 20 of the '101 patent require both "portable subscriber units" and a means for "communicating from the subscriber units when moved through different geographic zones."  Similarly, claims 1 and 2 of the '491 patent require a "set of local subscriber units including low power mobile units."  The '101 and '491 patents distinguish between communications units that are "fixed" or "stationary" and those that are "mobile" or "portable." A0171 at 1:16–18 ("wherein the subscriber units comprise low energy, ***stationary and mobile***, digital transceivers"); A0172 at 4:62–63 ("subscriber units for digital only ***fixed*** *or* ***mobile*** communication services") (emphasis added).  The mobile and portable units described in the '101 and '491 patents are designed to be "moved throughout the cell territory," A0173 at 6:4, and to be operated while in motion.

---

[5]  Both the parties and the district court treated the terms "portable" and "mobile" as synonyms, A0306–07, and no party or court has proposed that they be construed differently.    A0616–17 at 180:20–181:10 (Dr. Bims testifying that "the term portable and mobile are one and the same").  Accordingly, Silver Spring treats the two terms together here.

*Id*. at 6:15–21.[6]  Indeed, claims 19 and 20 of the '101 patent require a means for "communicating from the subscriber units when moved through different geographic zones." A0177.

Silver Spring's meters, by contrast, are physically secured to buildings, locked with tamper-proof devices, and electrically connected to the buildings they service.  A0559 at 138:2–5.  They cannot be moved without hiring a certified electrician to disconnect them.   A0559 at 137:21–138:13; A0521 at 147:16–148:13.  And because they are monitoring and controlling the electric service to a building, they cannot detect electricity use while they are in transit.  A0559 at 140:4–7.  The meters' measurement and communication circuitry are powered by the 240 volt service the utility provides to the house.  A0592 at 83:25–84:4; A0559 at 137:17–138:23. The meters do not have battery power as one would expect in a mobile or portable device, and thus there is no evidence in the record that the electric meters have a battery or could operate disconnected from the house. Utilities own the meters and their customers are not intended or even permitted to move their meters.  A0471 at 139:12–140:5; A0559 at 139:4–8.  And the evidence at trial indicated that they never did so.   A0559 at 137:21–138:13; A0521 at

---

6  "Two-way paging services are also thus made available, or telemeter in location or condition of delivery trucks, etc.  Furthermore, with full service video display TV installation at a subscriber station 4, the feasibility of moving such remote units to different locations in a house, office, or car is established."  A0173 at 6:15–21.

147:16–148:13.  Indeed, no evidence was presented at trial that if a Silver Spring meter was unsecured and detached from a building and then driven to a new building, it could be reattached to a new building in a way that would allow it to function or communicate.  *See* A0559 at 137:17–140:15; A0521 at 147:6–148:18; A0545 at 81:19–83:20.  The meters are designed to be installed on one building and then left there for their entire operating life.  *See* A0559 at 139:12–140:3 (when a meter is removed for failure to operate it is not repaired and reused); A0592 at 81:20–22 ("[A meter is] [b]olted to the house.  That's where it's used.  It doesn't change.").

The district court in ruling on claim construction recognized that the terms "portable" and "mobile" must "distinguish [the products] from 'stationary' or 'fixed.'"  A0307.  But because the district court thought the meaning of those terms was so obvious, it deemed it unnecessary to instruct the jury as to that plain and ordinary meaning.  It did, however, warn the parties that they "may not interpret [the terms] in a manner inconsistent with this opinion."  A0308.

Unfortunately, that is just what happened at trial.  The district court did not communicate to the jury its understanding of the plain meaning of the terms mobile and portable or the fact that they must be distinguished from fixed and stationary.  EON exploited that loophole at trial to turn fixed, stationary items into mobile and portable ones.  EON's expert offered the conclusory statement that "the mobile

element is found in the Silver Spring products, especially in light of reading the patent specification in terms of how the patent talks about mobility." A0616–17 at 180:20–181:10. EON's expert testified that pretty much ***everything*** is mobile with the possible exception of a mountain. A0641 at 74:14–75:21. And EON concluded that anything that could be carried was therefore "portable," portraying Silver Spring's expert Dr. Almeroth's agreement that the meters could be moved, albeit with difficulty, as sufficient to satisfy the "portable" element of the claim. A0593 at 87:14–88:6. The district court denied Silver Spring's motion for judgment as a matter of law because it concluded that these two pieces of testimony "provided a sufficient evidentiary basis to support the jury's finding." A0007.

This was error, for two reasons. First, the district court improperly delegated to the jury the decision of what the claim language meant. The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). While district courts have the power to conclude that a term does not need construction, this Court emphasized in *O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, that "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the

court, not the jury, must resolve that dispute."   521 F.3d 1351, 1360 (Fed. Cir.

2008).

In *O2 Micro*, as here, the patent claim terms at issue were ordinary English

words: "only if."   As here, "the parties disputed not the ***meaning*** of the words

themselves, but the ***scope*** that should be encompassed by this claim language."   *Id*.

at 1360–61 (emphasis in original).   As here, the district court concluded that those

words were perfectly understandable and did not need construction.   *Id*.   So it

simply gave the terms to the jury to apply.

This Court reversed.   It held that:

> A determination that a claim term "needs no construction" or has the
> "plain and ordinary meaning" may be inadequate when a term has
> more than one "ordinary" meaning or when reliance on a term's
> "ordinary" meaning does not resolve the parties' dispute. In this case,
> for example, the parties agreed that "only if" has a common meaning,
> but then proceeded to dispute the scope of that claim term, each party
> providing an argument identifying the alleged circumstances when the
> requirement specified by the claim term must be satisfied . . .

*Id*. at 1361.   As this Court explained, "the 'ordinary' meaning of a term does not

resolve the parties' dispute, and claim construction requires ***the court*** to determine

what claim scope is appropriate in the context of the patents-in-suit.   This court has

construed other 'ordinary' words for these and other related reasons."   *Id*.

(emphasis added).

The debate in this case over the meaning of the words "mobile" and

"portable" was just such a debate over scope.   There is no fact dispute in this case

about how large Silver Spring's meters are, how heavy they are, whether they are secured to the side of a house or building, whether they only operate when secured and connected to a building's electrical source, or whether customers in fact ever move them.  Notably, the only "evidence" presented to the jury about Silver Spring's meters — the evidence on which the district court relied in denying judgment as a matter of law — involved testimony by the experts as to how they interpreted the terms mobile and portable.  A0616–17 at 180:20–181:10; A0593 at 87:14–88:6.  And because the district court did not share with the jury even its partial conclusion about the scope of those terms — that they must be distinguished from things that are "fixed" and "stationary" — the jury was left to interpret the '101 and '491 patent claims in its verdict by assigning them a scope. Indeed, EON's counsel in his closing argument asked the jury to do exactly that:

> Silver Spring wants to say that that meter is not portable or mobile. ***We know from what the Judge has said, is you can define that for yourself***.

A0679 at 74:2–5.  Ceding that function to the jury was error that requires reversal.

Because the patent specification distinguishes "mobile" and "portable" from "stationary" and "fixed," at a minimum, limitations that require units be mobile and portable cannot include devices that are fixed and stationary.  *See*, *e.g.*, A0163, Title ("Interactive Nationwide Data Service Communication System for ***Stationary and Mobile*** Battery Operated Subscriber Units"); A0171 at 1:16–18 ("wherein the

subscriber units comprise low energy, ***stationary and mobile***, digital transceivers"); A0172 at 4:62–63 ("subscriber units for digital only ***fixed or mobile*** communication services") (emphasis added); A0174–75 at 8:63–9:2 ("This set up procedure is important for 'hand-off' of a ***portable unit*** from one ***stationary*** local remote receiver site to another . . . .  Similarly, the ***portable units can move*** from cell to cell . . . requiring similar hand-off procedure." (emphasis added)).  The district court failed to limit these terms to a reasonable scope permitted by the specification.

Second, no reasonable jury could have reached the conclusion the jury did.  To be clear, Silver Spring does not believe the jury should have been given the question of claim construction at all.  Silver Spring asked the district court to do its duty and construe the terms at issue.  But even were this Court to conclude that the meanings of mobile and portable are so clear that there is no room for any debate over their scope, that "plain and ordinary meaning" cannot possibly encompass Silver Spring's products.  As the '101 and '491 patents use the term, "portable" and "mobile" are to be distinguished from their antonyms "fixed" and "stationary."  The mobility described in the '101 patent is "active mobility" while the invention is in use in the field.  A0163, Abstract.  The devices must include means for "communicating from the subscriber units ***when moved*** through different geographic zones."  A0177, claim 19 (emphasis added).

Thus, the question is not, as EON would have it, whether the meters can ever be moved. That test readily leads to nonsensical results. Under EON's test, a stationary bicycle is "mobile," not stationary, because it is possible to move it. As EON's own expert admitted, that standard would apply to everything except perhaps a mountain. A0641 at 74:14–75:21 (testifying that essentially everything manmade, including houses, and everything else capable of being moved are "mobile" and "portable" devices, though he grudgingly conceded mountains are not movable). EON's other expert, Dr. Bims, who was EON's sole expert on the issue of infringement, offered an even more far-fetched explanation that a meter can "move" through geographic zones not by physically moving, but by changing its communication path by connecting to another receiver and thereby sending data to another geographic zone. On this basis, he concluded that meters in Silver Spring's network are "mobile" and "portable" subscriber units. A0426 at 91:16–92:10.

Rather than "can the meter ever be moved," the right question is whether the meters are more properly characterized as "fixed" than as "portable," as "stationary" than as "mobile." And here, every characteristic of the Silver Spring meters points to them being fixed, stationary devices. Silver Spring's meters can only detect electricity use when in a fixed position, secured to a building, and connected to an electrical source, A0521 at 148:2–6, whereas the '101 and '491

patents describe devices that can be "communicating from the subscriber units when moved through different geographic zones." *E.g.*, A0177, claim 19. Silver Spring's meters are secured to a house or building, and connected electrically to that building, so that removing them requires not only specialized tools and safety equipment but also a qualified electrician. A0559 at 137:17–138:13. Installation and removal is difficult and time-consuming. A0559 at 138:14–139:11. Utility customers do not own the meters, A0471 at 139:12–140:5, are not intended or even permitted to move the meters, A0559 at 139:4–8, and they never do so over the fifteen-year lifespan of the meters. A0559 at 139:12–140:7. Doing so would be dangerous because of the high voltage involved. A0559 at 138:17–23. Indeed, one lawyer even joked (and EON's expert Dr. Goodstadt agreed) about the absurdity of customers taking their kids, dog, and their electric meter when they move. A0471 at 139:21–140:5. No evidence was presented at trial that if a Silver Spring meter was unsecured and detached from a building and then driven to a new building, it could be reattached to a new building in a way that would allow it to function or communicate. Indeed, when meters are removed they are not reused in a different location. A0559 at 139:12–25. They are designed to be installed on a building and then left there for their entire operating life. A0559 at 139:6–140:3. They are certainly not actively mobile, A0559 at 140:4–15, since they have no battery and therefore cannot even operate while being moved.

None of this evidence was questioned or contradicted at trial. Instead, EON's counsel succeeded in persuading the jury to conflate the patent specification's description of portable mobile units used by an employee of the electric utility when they come to check meters with the actual meters themselves. He argued in closing:

> It means, if you go look at patents -- Mr. Dinkins, you know, two decades ago told you exactly what he understood portable to mean. ***Portable subscriber units suitable for such functions as meter reading. He specifically said that meters are portable***, specific -- and we know portable and mobile mean the exact same thing. So when the Court says look within the context of the patent, look within the context of the claim, we know exactly what the patents and the claims say. . . . Use exactly what the patent says, what Mr. Dinkins said, that a meter is portable.

A0679 at 74:7–25 (emphasis added). The cited portion of the specification of the '101 patent, col. 1, lines 40–44, describes a portable battery-operated subscriber unit that is moved to the location of a meter and assists in performing the function of ***reading*** the meter. *See also* A0172 at 4:8–12 ("portable battery-operated milliwatt transmitter subscriber units may be ***moved throughout the base station geographical area*** for reliably performing such functions as meter reading and data transfer." (emphasis added)). The specification by no means describes a meter that is itself portable wherein the meter is moved through geographic zones.

The scope of the asserted claims is properly limited to devices whose use and functioning involves transportation. It does not extend to devices whose use

and functioning is fixed and stationary merely because those devices, like virtually all man-made objects, must be delivered and installed before they can be operated. No properly instructed jury could conclude otherwise.

For EON to prove direct infringement, "*every* limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co*., 54 F.3d 1570, 1575 (Fed. Cir. 1995) (emphasis added). Because each of the claims remaining in the case require that the accused meters be either "mobile" or "portable," the fact that the Silver Spring meters are neither mobile nor portable entitles Silver Spring to judgment of noninfringement as a matter of law on the only two patents remaining in the case.

## III.    SILVER SPRING DOES NOT INFRINGE THE '491 PATENT

Claims 1 and 2 of the '491 and claim 3 of the '546 patents all require two-way transmission of data messages. The relevant claim elements from the patents are side by side, below:

| '491 patent (claims 1 & 2) | '546 patent (claim 3) |
|---|---|
| *A two-way communication network comprising*: <br><br> . . . | *A two-way communication interactive video network system* having network hub switching center means for routing communications to and from a plurality of subscriber units *comprising*: |
| *local base station repeater cell communicating with identified individual subscriber units* . . . said local base station repeater cell further | *base station repeater cell means for communicating with a plurality of subscriber units*, . . . said base station repeater cell means further comprising: |

| | |
|---|---|
| comprising: | |
| *base station data processing and communication unit for <u>transmitting to a</u> set of said subscriber units* contained within said local base station geographic area associated with said local base station repeater cell *and receiving from a subset of said set of local subscriber units <u>multiplexed synchronously related digital data messages of variable lengths</u> for point-to-point communication* between said local base station repeater cell and said subset of said local subscriber units, | *data processing and transmission means for <u>transmitting to</u> and <u>receiving</u> from at least one of said plurality of subscriber units <u>multiplexed synchronously related data messages of variable lengths</u>, such that point-to-point communication* between said base station repeater cell means and said at least one of said plurality of subscriber units is possible, . . . . |

Both claims (and both patents) require either a base station repeater cell (means) containing a base station data processing and communication unit (data processing and transmitting means) "for transmitting to" "and receiving from a subset of (at least one) said [set of] local subscriber units multiplexed synchronously related digital data messages of variable lengths . . . ." A0213, claim 1; A0196, claim 3. Both patents require that the base station repeater cell (means) (1) **transmit** data messages to local subscriber units (downstream) and (2) **receive** data messages from local subscriber units (upstream). *Id.* The district court found, in its order granting in part Silver Spring's motion for judgment as a matter of law, that "EON has failed to present sufficient evidence establishing that the SSN network transmits data messages in a downstream direction as required by claim 3 of the '546 patent." A0012. Because the '491 patent requires this exact

same downstream transmission of data messages, EON has similarly failed to present sufficient evidence of infringement of the '491 patent. This Court should reverse the jury verdict and the district court's denial of judgment as a matter of law of noninfringement of the '491 patent.

The term "transmit" was not disputed during claim construction. No distinction was drawn between the words of the two patents because there was none. The '491 and '546 patent claims require both upstream and downstream transmission of data messages. Indeed, the specification of the '491 patent confirms this plain and ordinary meaning in discussing the disclosure to which both the '546 and '491 patents claim priority: "the local base station repeater cell transmits data directly to the individual subscriber units." A0211 at 1:33–35.

At trial and in the post-trial briefing, EON did *not* argue or present any evidence that Silver Spring's Access Points (what EON accused as the claimed "base station repeater cells") "transmitted . . . multiplexed synchronously related digital data messages." A0213, claim 1. Indeed, EON's own expert, Dr. Bims, testified clearly at trial that "[d]igital data messages, such as meter readings, do not flow towards the subscriber unit." A0452 at 61:8–24. "[I]n the Silver Spring system, the smart meters transmit their *information* regarding meter readings, for example, into the network on what we call the upstream path, and then *control signals* down from the headquarters to the meters." A0443 at 27:12–16 (emphasis added). As the district court concluded in ruling on Silver Spring's Motion for

Judgment as a Matter of Law, the testimony from EON's own expert forecloses a finding of infringement of a patent claim that requires the Silver Spring Access Points to be "transmitting . . . multiplexed synchronously related digital data messages." A0213, claim 1.

Instead, EON claimed for the first time at trial that the '491 patent did not require a downstream data transmission at all. *See* A0013 ("EON responds, arguing that claims 1 and 2 of the '491 patent do not require the base station to transmit data messages in a downstream direction to subscriber units."); A0014 ("On cross-examination Dr. Bims testified that claims 1 and 2 of the '491 patent do not require the transmission of data messages from the base station to the subscriber units."). Dr. Bims testified that claim 1 of the '491 patent is satisfied because "the base station is sending ***control messages and signals*** to the subscriber unit." A0452 at 61:8–24. (emphasis added). The district court found that "the claim language does not foreclose Dr. Bims' interpretation . . . it is not clear that the claims require the transmission of data messages from the base station to the subscriber units. While SSN's interpretation of the claim language may be reasonable, it has failed to show that Dr. Bims' interpretation is so unreasonable that this issue is one of law rather than fact." A0014.

The district court's conclusion was error, for two reasons. First, just as with the terms "mobile" and "portable," the district court gave the jury a question that is fundamentally a question of claim construction. The testimony and facts

introduced at trial were not directed to a disagreement over how the Silver Spring Access Points operate. Rather, the testimony on which EON and the district court relied was directed to interpreting the claims. Specifically, the testimony was directed to resolving the question of whether the claim language required the transmission of digital data messages from the base station, or whether the communication of control signals was sufficient. That is a question of claim construction that the judge, not the jury, was bound to resolve. This Court in *O2 Micro Int'l, Ltd.*, held that "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." 521 F.3d at 1360. And the judge was bound to resolve it as a question of law, not a question of fact. *Teva Pharm. USA, Inc.*, 135 S. Ct. at 841 ("[W]hen the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law."); *Fenner Investments Ltd.*, 2015 WL 570730, at *2 (same).[7] So the district court's actual determination — that while Silver Spring's reading of the claims was reasonable, EON's

---

[7] The fact that an expert testified at trial to his reading of the claim language does not change that result. EON's expert Dr. Bims did not introduce any extrinsic evidence of how one of skill in the art would understand the term "digital data messages." He merely testified as to the ultimate legal conclusion. A0434 at 121:19–122:10.

interpretation was not "so unreasonable that this issue is one of law" — is simply wrong as a legal matter.

Second, the jury erred in its implicit construction of the patent claims. There is simply no way to read the language of claim 1 other than to require that the base stations transmit digital data messages. The relevant claim language reads:

> said local base station repeater cell further comprising:
>
> *base station data processing and communication unit for <u>transmitting to a set of said subscriber units</u>* contained within said local base station geographic area associated with said local base station repeater cell <u>*and receiving* from a subset of said set of local subscriber units *multiplexed synchronously related digital data messages of variable lengths* for point-to-point communication</u> between said local base station repeater cell and said subset of said local subscriber units, . . .

A0213, claim 1 (emphasis added). The language "transmitting to a set of said subscriber units" is followed by the parallel construction "receiving from a subset of said set of local subscriber units." Immediately after that parallel construction, the claim language describes **what** must be transmitted and received: "multiplexed synchronously related digital data messages of variable lengths for point to point communication" between the base station and the local subscriber units. The words "transmitting" and "receiving" are parallel voices, strongly suggesting that they are used as part of a parallel structure, are part of the same clause, and both relate to the object being transmitted and received — the digital data messages. *See* A0738–39. And if the claim language were read as EON apparently now does,

not to require transmission of "multiplexed synchronously related digital data messages of variable lengths," the claim would say nothing whatsoever about what was being transmitted by the base station repeater cell.

There are other problems with EON's newfound construction of this claim term not to include transmission of "digital data messages." It is inconsistent with EON's agreement that the parallel language in claim 3 of the '546 patent required downstream transmission of digital data messages. *See* A0011 (noting that "EON does not take issue with" Silver Spring's construction of claim 3 as "requir[ing] full two-way communication of data messages synchronized in an upstream and downstream direction."). It is also inconsistent with the district court's interpretation of the separate "receive only" claims in the '491 patent. The district court construed the term "receive only" as limiting the role of the remote receivers to "communicat[ing] of messages to and from the base stations cells and the subscriber units" and further explained:

> The reception unit's role with respect to those messages is simply to receive them from the low powered subscriber units and to pass them along to the base station cell. This does not however, forbid routine handshaking, error checking, and other control signals from being communicated between the receiver units and the subscriber units.

A0294–95 (quoting A0257). If control signals are not data messages for purposes of the "receive only" claims, they cannot be data messages for purposes of the two-way communication claims.[8]

EON's interpretation is also inconsistent with the preamble of the claims, which requires "a two-way communication network."[9] And it is inconsistent with the specification of the patent, which is entitled "Two-Way Communication Network" and includes repeated references to the fact that allowing two-way communication is an advantage of the invention. *See, e.g.*, A0211 at 1:11–13,

---

[8] The district court found that Silver Spring's accused system had met the "receive only" limitation because EON's expert testified that he could not find any downstream data messages. A0012–13.

[9] Because EON failed to raise any of its claim construction arguments during the *Markman* process, the district court was not asked to address whether the "two-way communication network" language, or the similar language in the '546 patent requiring "[a] two-way communication interactive video network system" and in the '101 patent requiring "an interactive video data system," was limiting. Silver Spring contends that that language is a part of the patent claim and, as such, should be read to have meaning in all cases. We acknowledge that this Court has sometimes held to the contrary, *cf. Pacing Techs., LLC v. Garmin Int'l, Inc.*, No. 2014-1396, _ F.3d __, 2015 WL 668828, at *2 (Fed. Cir. Feb. 18, 2015) (preambles are limiting only where they are necessary to understand terms in the body of the claims), and that the panel cannot overrule those cases. But if necessary, this Court should hold *en banc* that every word in a patent claim has meaning and cannot be ignored merely because of its location in the preamble. Silver Spring does not infringe the '491 or '101 patents for the additional reason that EON failed to submit evidence at trial showing a "two way communication network" or "an interactive video data system." Dr. Bims' conclusory statement that Silver Spring's system is "two-way" has no evidentiary support. *See* A0443 at 27:3–18.

1:18–19, 2:10–11, 2:22–23.  To interpret that patent as requiring only one-way communication would not only ignore the plain language and grammar of claim 1 but also would be inconsistent with the entire point of the invention.

EON's expert Dr. Bims himself made clear that the control signals the base station transmits were not the "digital data messages" the patent requires:

> [M]essages like beacon messages and other messages that are sent from the base station down to the smart meter [are] actually control messages, to control the operation of the meters, to make sure they're synchronized, to schedule various meter readings that take place, and that kind of thing, ***which is different from the digital data messages in which meter readings are embedded to be transmitted back*** to the UtilityIQ.

A0434 at 122:2–10 (emphasis added).  Because EON failed to present evidence establishing that the base stations transmit as well as receive digital data messages, as claim 1 requires, there can be no infringement of claim 1 (or claim 2, which depends from it) as a matter of law.[10]

## IV.   SILVER SPRING IS ENTITLED TO A NEW TRIAL ON DAMAGES

The district court granted judgment as a matter of law of non-infringement for Silver Spring as to one of the three asserted patents but denied Silver Spring's

---

[10]   Regardless of how this Court resolves Silver Spring's motion for a new trial on damages below, this Court should remand for a recalculation of damages should it find the '491 patent was not infringed but that the '101 patent was infringed. Because the '491 patent expired after the '101 patent, the damages calculation would have to be adjusted to account for the fact that Silver Spring was not infringing any patent in force between October 2012 (when the '101 patent expired) and December 2013 (when the '491 patent expired).

request for a new trial on damages. A0026. The jury's damages award of $18,800,000, later remitted to $12,990,990, was a lump sum reasonable royalty payment for infringement of all three asserted patents. A0070; A0038. The district court described the jury's verdict as a "general verdict" on damages. A0011; A0025–26.[11]

After trial, the district court concluded that one of the three patents the jury found infringed — the '546 patent — was not infringed as a matter of law. A0013. This Court has explained that under this exact this set of facts — "where the jury rendered a single verdict on damages, without breaking down the damages attributable to each patent, the normal rule would require a new trial as to damages." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007). In *Verizon*, this Court partially reversed a finding of patent infringement based on the district court's erroneous claim construction of terms in one of three patents. *Id.* at 1311. The jury verdict was a lump sum reasonable compensatory damages amount plus a 5.5% reasonable royalty payment for infringement of the three patents. *Id.* at 1298. After reversing infringement as to one patent, this Court vacated the jury's entire damages award. *Id.* at 1310. This Court explained that "the jury's verdict gives no indication what portion of such

---

[11]   The jury did, however, break down its infringement findings by patent and by claim. A0068.

damages were allocated to the infringement of the [non-infringed] patent" and "where the jury rendered a single verdict on damages." *Id.*

That is consistent with Supreme Court practice in other areas of law. *See, e.g.*, *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 312 (1986) ("When damages instructions are faulty and the verdict does not reveal the means by which the jury calculated damages, 'the error in the charge is difficult, if not impossible, to correct without retrial, in light of the jury's general verdict.'" (quoting *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256 n.12 (1981)). This Court has followed this so-called "normal rule" in a series of cases to vacate damages awards in similar circumstances. *See, e.g.*, *Accentra, Inc. v. Staples, Inc.*, 500 Fed. App'x 922, 931 (Fed. Cir. 2013); *NTP, Inc. v. Research In Motion, LTD.*, 418 F.3d 1282, 1326 (Fed. Cir. 2005).[12]

---

[12] A few of this Court's recent cases declined to grant new trials on damages in similar circumstances, but these denials all rested on different procedural grounds: the alleged infringer failed to either ask the district court or this Court for a new trial on damages. For example, in *DDR Holdings, LLC v. Hotels.com, L.P.*, this Court vacated the damages award after finding an asserted patent invalid, but remanded the issue of whether or not a new trial was warranted to the district court because the alleged infringer did not move for a new trial under Federal Rule of Civil Procedure 59. 773 F.3d 1245, 1262 (Fed. Cir. 2014). Similarly, in *Retractable Technologies, Inc. v. Becton Dickinson & Co.*, 757 F.3d 1366, 1369 (Fed. Cir. 2014), and in *Fresenius USA Inc. v. Baxter Int'l, Inc.*, 733 F.3d 1369, 1379 (Fed. Cir. 2013), this Court denied a new trial on damages because the appellant failed to ask for it on appeal.

EON persuaded the district court to ignore the general rule on the grounds that the reasonable royalty would be the same no matter how many patents and how many claims were infringed. Its expert took that position at trial. *See* A0508 at 96:20–22 (asserting that damages would be the same even if only one claim were valid and infringed).

In fact, however, EON's damages case at various points acknowledged that it mattered which patents were infringed. The three asserted patents share a similar specification but contained different claims of different scopes and had different expiration dates. *See* '101 patent (expired October 2012); '546 patent (same); '491 patent (expired December 2013). EON's expert testified at trial that his reasonable royalty calculation not only was computed for the three patents as a whole, and not per patent, but also depended on the last-to-expire patent as the end date for computing the royalty figure:

> Q.    Did you say interrelated?
>
> A.    Interrelated.    These are interrelated.    And from EON's perspective, they view -- they view these patents as a portfolio, as a -- as a family, if you will. When entering into a license agreement, they would view it as such, and ***they would enter into an agreement through the expiration of the last to expire of those patents***.

A0508 at 96:4–11 (emphasis added).   And EON's damages expert noted this dependency on expiration dates in one of the tables in his expert report.  A0342 n.1 ("2012 damages through October 26th (expiration of the '101 and '546 patents)

estimated based on 2012 data").  This contradicts EON's theory that infringement of only a single claim of any of the three patents would be entitled to the same damages award as that of another claim or patent, regardless of the expiration date.

Further, when it benefitted EON to do so, it was more than happy to emphasize the independence of each of the patent claims.  EON told the jury at trial that each claim constituted a separate invention.  A0368 at 17:5–12 ("Each numbered claim is a separate invention").  And EON's expert, Dr. Bims, agreed:

> Q.    I'm going to pick up on something that you just mentioned. You said the invention of Claim 7.  Is it your understanding that each of these claims defines a separate invention?
>
> A.    Yes.  As I've described, there are differences between each of these claims that we've talked about, and those differences mean that *each claim is its own separate invention*.

A0445 at 35:6–13 (emphasis added).

It is axiomatic that each patent, and indeed each claim, stands on its own as a separate invention.  *Kearns v. General Motors Corp.*, 94 F.3d 1553, 1555 (Fed. Cir. 1996) ("By statutory and common law, each patent establishes an independent and distinct property right. . . .  Each patent asserted raises an independent and distinct cause of action.").  And section 284 provides that the remedy for infringement of any one of those separate inventions must be "in no event less than a reasonable royalty."  35 U.S.C. § 284.  But EON would now have this Court believe that the '546 patent was valueless, entirely redundant of the '101 and '491

patents, so that the royalty awarded for infringement of all three patents would be precisely the same as the royalty awarded for infringement of one or two patents. That is not the law. As this Court held in *Apple Inc. v. Motorola, Inc.*:

> [A] fact finder may award no damages only when the record supports a zero royalty award. For example, . . . a record could demonstrate that, at the time of infringement, the defendant considered the patent valueless and the patentee would have accepted no payment for the defendant's infringement. Of course, it seems unlikely that a willing licensor and willing licensee would agree to a zero royalty payment in a hypothetical negotiation, where both infringement and validity are assumed.
> . . .
> In any event, simply because a patentee fails to show that its royalty estimate is correct does not, by itself, justify awarding a royalty of zero . . . .

757 F.3d 1286, 1327–28 (Fed. Cir. 2014). In *Apple*, this Court overturned the district court's conclusion that a patentee could not show infringement because its expert evidence was excluded. This Court started from the presumption that "a holder of a valid and infringed patent has inherently suffered legal damage at least to the extent of a lost license royalty opportunity." *Id*. at 1330 (quoting 7 Donald S. Chisum, *Chisum on Patents* § 20.07[3][a] (2011)). It went on to require affirmative evidence in the record that a patent was valueless before treating the value as zero:

> [T]here is nothing in the record suggesting that Apple would have been willing to accept no payment for Motorola's infringement. Nor is there any evidence that, at the time of infringement, Motorola concluded that the '647 patent had no value.

*Id*. at 1329.

In this case, the '546 patent was not held invalid. It is a presumptively valid legal right, and the jury found (incorrectly, it turns out) that Silver Spring infringed that legal right. To assume that the damages number should not change, as the district court did, is to assume that the '546 patent has no value whatsoever. That assumption goes against the basic nature of patent law, and is unsupported by any record evidence that the '546 patent is worthless. Indeed, it would be inconsistent with EON's expressed views of the patent in the no fewer than **ten** federal court cases in which it has sought to enforce the '546 patent.[13]

The fact that both parties testified to a single damages number at trial, A0026, does not change that result. It is not surprising or problematic that a party will present a single damages number to a jury in a multi-patent case. When the jury evaluates the patents, it can presumably factor its own determinations of validity and infringement into its damages calculation, as it did here in finding

---

[13] *EON Corp. IP Holdings, LLC v. Apple Inc.*, 3:14-cv-05511 (N.D. Cal. 2014); *EON Corp. IP Holdings, LLC v. Landis+Gyr Inc. et al.,* 6:11-cv-00317 (E.D. Tex. 2011); *EON Corp. IP Holdings, LLC v. Apple Inc.,* 6:12-cv-00943 (E.D. Tex. 2012); *EON Corp. IP Holdings, LLC v. AT&T Mobility LLC*, 3:11-cv-01555 (D.P.R. 2011); *EON Corp. IP Holdings, LLC v. AT&T Mobility LLC*, 1:13-cv-00910 (D. Del. 2013); *EON Corp. IP Holdings, LLC v. Skyguard, LLC et al.,* 6:11-cv-00015 (E.D. Tex. 2011); *Verizon Clinton Center Drive Corp. v. EON Corp.*, 1:10-cv-00179 (D. Del. 2010); *EON Corp. IP Holdings, LLC v. Sensus USA Inc.*, 6:09-cv-00116 (E.D. Tex. 2009); *EON Corp. IP Holdings, LLC v. Verizon Clinton Center Drive Corp. et al.*, 6:08-cv-00385 (E.D. Tex. 2008); *Verizon Clinton Center Drive Corp. v. EON Corporation*, 1:09-cv-00823 (D. Del. 2009).

infringement of only five of the twelve asserted claims. But when the jury errs in determining validity or infringement a recalculation of damages based on the correct legal ruling is required.

The '546 patent, if it alone had been infringed, would surely have generated some royalty. The jury's finding that it was infringed means that under the law the jury was required to attribute some royalty payment to it. But the jury's damages award was a general verdict, which means that we cannot know how much of its damages award the jury attributed to the '546 patent. Now that the jury's infringement finding on one of the three patents has been reversed, a new trial is warranted on the issue of damages and the jury's damages award should not stand. *See Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, No. 2013-1577, 2013-1576, __ F.3d __, 2015 WL 859503, at *10 (Fed. Cir. Mar. 2, 2015) (remanding a jury verdict based in part on an overturned ground: "Although the jury verdict did state a reasonable royalty rate, it is not entirely clear the period for which that reasonable royalty was determined or whether the jury impermissibly relied on evidence not probative of the value of the patented technology. We therefore remand for a new trial to determine a reasonable royalty on the patented technologies").

## CONCLUSION

The district court's denial of Silver Spring's motion for judgment as a matter of law should be reversed as to infringement, and judgment rendered in favor of Silver Spring.  In the alternative, a new trial on damages should be ordered.


Dated:  March 9, 2015                    Respectfully submitted,

                                         DURIE TANGRI LLP


                              By:   /s/ Mark A. Lemley
                                         MARK A. LEMLEY

                                    *Attorneys for Defendant-Appellant Silver Spring Networks, Inc.*

# ADDENDUM

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | | |
|---|---|---|
| **EON CORP. IP HOLDINGS, LLC** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 6:11-CV-317-JDL** |
| v. | § | |
| | § | |
| | § | **JURY TRIAL DEMANDED** |
| **LANDIS+GYR INC., ET AL.,** | § | |
| | § | |
| *Defendants* | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is: 1) Plaintiff EON Corporation IP Holdings, LLC's ("EON") Motion for Judgment as Matter of Law (Doc. No. 621); and 2) Defendant Silver Spring Network, Inc.'s ("SSN") Motion for Judgment as a Matter of Law, New Trial, and Judgment on Equitable Defense of Joint and Several Liability (Doc. No. 636).[1] For the reasons stated below, EON's Motion for Judgment as a Matter of Law (Doc. No. 621) is **DENIED AS MOOT**. SSN's Motion for Judgment as a Matter of Law, New Trial and Judgment on Equitable Defense of Joint and Several Liability (Doc. No. 636) is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

EON filed suit on June 17, 2011, alleging that SSN infringed U.S. Patent Nos. 5,388,101 (the "'101 Patent"); 5,481,546 (the "'546 Patent"); and 5,592,491 (the "'491 Patent") (collectively, the "patents-in-suit"). Generally, the patents "relate[] to an interactive two-way data service network for conveying synchronously timed digital messages point to point through the network." '101 Patent at 1:8–10. SSN answered, denying infringement and alleging invalidity

---

[1] Also before the Court is Plaintiff EON's Motion for Prejudgment Interest (Doc. No. 622) and Motion for Attorney Fees (Doc. No. 640). These motions will be addressed by the Court in a separate order.

pursuant to 35 U.S.C. §§ 101, 102, and 103 (Doc. No. 50 at 10).  EON proceeded to trial on June

2, 2014, asserting claims 1, 9, 19, and 20 of the '101 patent; claims 1, 2, 3, and 5 of the '546

patent; and claims 1, 2, 5, and 7 of the '491 patent against SSN (Doc. No. 618).

At trial, SSN denied infringement and alleged that the asserted claims were invalid as

anticipated.  *See* Tr. 6/5/14 P.M. 3:1-156:1.  At the close of SSN's case, EON moved for

judgment as a matter of law ("JMOL") on the issue of validity, which the Court granted in part

as to claims 9, 19, and 20 of the '101 patent, and claims 1 and 2 of the '491 patent.  Tr. 6/6/14

A.M. 111:13-115:14.  On June 6, 2014, the jury found the remaining asserted claims valid, and

that SSN directly infringed claims 19 and 20 of the '101 patent, claim 3 of the '546 patent, and

claims 1 and 2 of the '491 patent (Doc. No. 618 at 2, 3).  To compensate EON for SSN's

infringement, the jury awarded EON $18,800,000 in damages.  *Id.* at 4.

## LEGAL STANDARDS

### I.     Judgment as a Matter of Law

A renewed motion for judgment as a matter of law ("JMOL") is a challenge to the legal

sufficiency of the evidence supporting the jury's verdict.  *Power-One, Inc. v. Artesyn Tech., Inc.*,

556 F. Supp. 2d 591, 593 (E.D. Tex. 2008) (citing *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d

229, 235 (5th Cir. 2001)).  Rule 50 provides that judgment as a matter of law is appropriate if the

court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for

the party on that issue.  Fed. R. Civ. P. 50(a)(1).  In ruling on a renewed motion for JMOL, the

court may allow judgment on the verdict, if the jury returned a verdict; order a new trial; or

direct the entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b).[2]  A post-trial motion for

JMOL should be granted only when the facts and inferences so conclusively favor one party

---

[2] In order to advance a renewed motion for judgment as a matter of law under Rule 50(b), the movant must raise the same arguments during trial, in a Rule 50(a) motion for judgment as a matter of law.  Fed. R. Civ. P. 50 (a)-(b).

"that reasonable jurors could not arrive at a contrary verdict." *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007) (citing *Tol–O–Matic, Inc. v. Proma Produkt–Und Mktg. Gesellschaft m.b.H.*, 945 F.2d 1546, 1549 (Fed. Cir. 1991)). "If reasonable persons in the exercise of impartial judgment could differ in their interpretations of the evidence, then the motion should be denied." *Id.* Thus, a jury's verdict may be overturned if, viewing the evidence and inferences therefrom in the light most favorable to the party opposing the motion, there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.[3] *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005) (citing *Delano-Pyle v. Victoria County*, 302 F.3d 567, 572 (5th Cir. 2002)). The court may not make credibility determinations, nor weigh the evidence. *Power-One*, 556 F. Supp. 2d at 594 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

## II. New Trial

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). The Court is required to view the evidence "in a light most favorable to the jury's verdict, and [] the verdict must be affirmed unless the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable persons could not arrive at a contrary conclusion." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

---

[3] Because a motion for judgment as a matter of law is a procedural matter not unique to patent law, the law of the regional circuit governs under Rule 50(b). *See SynQor, Inc. v. Artesyn Techs.*, 709 F.3d 1365, 1373 (Fed. Cir. 2013) ("This court reviews the grant or denial of a motion for JMOL under the law of the regional circuit . . . .").

## EON'S MOTION FOR JUDGMENT AS A MATTER OF LAW OF NO INVALIDITY

At the close of the SSN's case, EON moved for JMOL on the issue of validity, which the Court granted in part as to claims 9, 19, and 20 of the '101 patent, and claims 1 and 2 of the '491 patent.  Tr. 6/6/14 A.M. 111:13-115:14.  The jury found the remaining asserted claims valid (Doc. No. 618).  Thus, EON prevailed on the issue of validity as to all asserted claims.  Despite prevailing on the issue of validity at trial EON filed the instant renewed motion for JMOL on June 10, 2014 (Doc. No. 621).  EON's arguments focus on the sufficiency of the evidence offered by SSN's expert, Dr. Almeroth.  Specifically, EON argues that Dr. Almeroth: (1) applied inconsistent claim interpretations of the patents-in-suit (Doc. No. 621 at 3); (2) failed to sufficiently identify a specific structure for the asserted means-plus function claims, *id.* at 5; (3) failed to provide an element-by-element invalidity analysis, *id.* at 7; and (4) relied on uncorroborated witness testimony, rendering his opinion legally insufficient.  *Id.* at 8.

 EON's renewed motion for JMOL merely seeks to confirm its favorable outcome on the issue of validity at trial.  Accordingly, because EON prevailed on the issue of validity as to all asserted claims, EON's renewed motion for JMOL is **DENIED AS MOOT**.

## SILVER SPRING'S MOTION FOR JUDGMENT AS A MATTER OF LAW, MOTION FOR NEW TRIAL, AND JUDGMENT ON EQUITABLE DEFENSE OF JOINT AND SEVERAL LIABILITY

SSN moves for JMOL, or in the alternative a new trial, on the following grounds:

- No Reasonable Juror Could Find That SSN Smart Meters are "Portable" and "Mobile"

- The Verdict Contains Irreconcilable Conflicts As to Claims 2 and 3 of the '546 Patent and Claims 1 and 2 of the '491 Patent

- No Reasonable Juror Could Find That There are Multiplexed Synchronously Related Data Messages As Required by Claim 3 of the '546 Patent and Claims 1 And 2 of the '491 Patent

4

- No Reasonable Juror Could Find that Silver Spring's Relays are "Receive Only Stations" as Required by Claim 20 of the '101 Patent

- EON Cannot Recover Damages for Alleged Infringement of Claim 3 of the '546 Patent Before the Certificate of Reexamination Issued on October 4, 2011

- No Legally Sufficient Evidence Supports EON's Claimed Reasonable Royalty or the Jury's Damages Award

- The Court Should Grant Judgment in Favor of Silver Spring on its Equitable Defense of Joint and Severable Liability

- EON's Counsel Made Impermissible Comments During Closing Arguments

## I. Infringement of the '101 and '491 Patents

### a. Applicable Law

To prove infringement, the plaintiff must show the presence of every element or its equivalent in the accused device. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). Determining infringement is a two-step process. First, the claim must be properly construed to determine its scope and meaning. Second, the construed claim must be compared to the accused device or process. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

### b. Analysis

SSN argues that EON failed to produce any evidence to support the jury's finding of infringement as to the '101 and '491 patents because "the accused electric and gas meters that are permanently attached and locked to buildings are not 'mobile' or 'portable' devices that

5

communicate with the network 'when moved through different geographic zones' as required by the claims."[4] (Doc. No. 636 at 1). SSN also asserts that EON failed to show that the accused meters include facilities for communicating from the subscriber units when moved through different geographic zones,[5] and that EON's closing argument "misled the jurors[,] causing them to arrive at an irrational verdict . . . ." (Doc. No. 636 at 6). SSN asks the court to "grant judgment as a matter of law in favor of Silver Spring, or alternatively, grant a new trial because the jury's infringement verdict was against the great weight of the evidence under either Silver Spring's proposed construction or the Court's determination that no construction was required." (Doc. No. 636 at 10).

EON argues that it presented sufficient evidence to support the jury's finding, focusing primarily on Dr. Kevin Almeroth's[6] testimony on cross examination. While declining to characterize the accused meters as mobile, Dr. Almeroth acknowledged that the meters were portable:

> Q. Is it portable?
>
> A. I think you can carry it around, but—
>
> Q. Well, how about answer yes or no before you give an explanation on this one?
>
> A. Well, the—in the very broadest sense, yes, you can carry it around. **It's portable**.

Tr. 6/5/14 P.M. at 87:14-88:6. He also testified that it would take "maybe a few minutes" to remove one of the meters, *see id.* at 89:14-16, and that the meters do not have to be operational

---

[4] The "mobile" element is found in claims 1 and 9 of the '101 patent, and claims 1 and 2 of the '491 patent. The "portable" element is found in claims 19 and 20 of the '101 patent. The Court declined to construe these terms, deciding that they require nothing more than their plain and ordinary meaning (Doc. No. 249 at 21).

[5] SSN failed to raise this issue in its Rule 50(a) motion at trial, and the Court will not consider it here. *See* Fed. R. Civ. P. 50 (a)-(b).

[6] Dr. Almeroth served as SSN's testifying expert on infringement and validity at trial.

6

when they are physically moved. *See id.* at 77:8-15. EON also offered the following testimony from Dr. Harry Bims:[7]

> Q. Okay. So do you understand that—or what's your opinion with regard to the mobile and the portable elements being met by the meters that have the communication modules in them in Silver Spring's network?
>
> A. So my opinion is that the mobile element is found in the Silver Spring products, especially in light of reading the patent specification in terms of how the—the patent talks about mobility.
>
> Q. And what's—what's your understanding with regard to any difference between the term "mobile" and "portable" as it's used in the patents and—and as it's been interpreted through the Court's claim construction?
>
> A. Well, in the Court's definition, the term "portable" and "mobile" are one and the same.

Tr. 6/5/14 P.M. 180:20-181:10. Viewing the foregoing testimony as a whole, there is sufficient evidence to support the jury's verdict of infringement as to the '101 and '491 patents. Dr. Almeroth's testimony as to the portability of the accused meters, coupled with the testimony of Dr. Bims, wherein he equates the terms "portable" and "mobile," provided a sufficient evidentiary basis to support the jury's finding.

EON next argues that it did not mislead the jury, and that even if it did, SSN waived its opportunity to challenge any improper argument because it failed to object during trial. *See* Doc. No. 647 at 11. In *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988) the Fifth Circuit found that the plaintiff's failure to object to the impropriety of the defendant's closing argument barred it "'from urging the improper arguments as grounds for a new trial after the jury had returned its verdict.'" (citing *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir. 1984)). Neither SSN's briefing, nor the trial record reveal any attempt by SSN to object to EON's closing argument. Thus, SSN waived its opportunity to

---

[7] Dr. Bims served as EON's testifying expert on infringement at trial.

object to the alleged impropriety of EON's closing arguments when it remained silent and let the case go to the jury.

Accordingly, SSN's motion for judgment as a matter of law, or in the alternative, a new trial, as to infringement of the '101 and '491 patents is **DENIED**.

## II.    Irreconcilable Conflicts in the Jury's Verdict

SSN argues that the jury's verdict contains irreconcilable legal conflicts as to the infringement findings relating to claims 2 and 3 of the '546 patent and claims 1 and 2 of the '491 patent.  First, SSN asserts that since the jury found independent claim 2 of the '546 Patent not infringed, but dependent claim 3 infringed,[8] the verdict cannot exist "as a matter of basic patent law." (Doc. No. 636 at 1).  Next, SSN argues that the verdict is irreconcilable as to the jury's finding of infringement as to claims 1 and 2 of the '491 patent because the jury found claim 1 of the '546 Patent not infringed, since EON allegedly presented claim 1 of the '491 patent as being "functionally dependent" on claim 1 of the '546 patent.  *Id.* at 13.  In light of the alleged irreconcilable conflicts, SSN moves for JMOL, or in the alternative, a new trial.  *Id.* at 14.  SSN further argues that "the jury's inconsistent findings on infringement impact the damages verdict and require a new trial as to damages."  *Id.*

EON's principal response is that the jury returned a general verdict, and that SSN waived any objections to the verdict when it failed to object to the alleged inconsistencies before the jury was dismissed (Doc. No. 647 at 12).

### a.  Applicable Law

The Federal Circuit reviews the question of allegedly inconsistent jury verdicts under the law of the regional circuit.  *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009); *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1302 (Fed. Cir. 2002).  In the

---

[8] Claim 3 is dependent on claim 2.

8

Fifth Circuit, a party need not object to the jury's inconsistent verdict prior to the dismissal of the jury if the verdict is *special* and falls under Federal Rule of Civil Procedure Rule 49(a). *See Mercer v. Long Mfg. N.C., Inc.*, 671 F.2d 946, 947–48 (5th Cir.1982) ("We know of no case in this Circuit holding that inconsistencies in special verdicts pursuant to Rule 49(a) are waived if not raised prior to release of the jury."); *see also id.* at 948 n.1 (explaining that waiver does not apply to verdicts under Rule 49(a) but does apply to verdicts under Rule 49(b)). However, the Federal Circuit has found that under Fifth Circuit law, "[i]f the verdict falls under Rule 49(b), which covers general verdicts and general verdicts 'with written questions on one or more issues of fact,' waiver applies if no objection is raised before the jury is dismissed." *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1328 (Fed. Cir. 2013) (citing *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 533–35 (5th Cir.1974) ("By failing to object to the form of the verdict and answers at the time they were announced by the jury, both parties waived any objection to inconsistencies under Rule 49(b).")). Importantly, *Function Media* was a patent case involving a claim that the verdicts of non-infringement and invalidity were irreconcilable. *See id.* at 1327; *accord L&W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1318-19 (Fed. Cir. 2006) (applying Sixth Circuit waiver rule in the context of patent case involving alleged irreconcilable verdict) ("Under Sixth Circuit law, a party waives its objection to inconsistency in a jury's verdict if the party had adequate opportunity to object but failed to do so. . . . Thus, we hold that the parties waived their objections to inconsistency in the jury's findings on claims 7 and 10 by failing to object at trial.").

While Rule 49 does not define the term "general verdict," it is commonly known as "[a] verdict by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions." BLACK'S LAW DICTIONARY (9th ed. 2009). "The theoretical distinction between

9

general and special verdicts is that general verdicts require the jury to apply the law to facts, and therefore require legal instruction, whereas special verdicts compel the jury to focus exclusively on its fact finding role." Charles Alan Wright & Arthur R. Miller, 9B Federal Practice and Procedure § 2503 n. 1 (3d ed. 2008).

### b. Analysis

Immediately following the presentation of the jury's verdict, the Court asked the parties whether they wished to address anything further.

> THE COURT: All right. Anything further at this time from the Plaintiff?
>
> MR. DACUS: No, nothing from the Plaintiff.
>
> THE COURT: From the Defendant?
>
> MR. MOORE: No, Your Honor. Thank you.
>
> THE COURT: Thank you. We are adjourned.

Tr. 6/6/14 P.M. 115:4-10. SSN remained silent and did not object to the jury's alleged inconsistent verdict at trial. Tr. 6/6/14 P.M. 115:5-10. SSN argues that the jury returned a special verdict under Rule 49(a), and that it was not required to object prior to the jury's dismissal (Doc. No. 651 at 8).

The Court finds that the verdict in this case was general under Rule 49(b). Unlike a special verdict, the jury form here did not require the jury to resolve specific factual questions. Rather the jury was asked to decide "Yes" or "No" as to infringement and invalidity for each of the asserted claims; "they did not decide factual issues and leave for the Court a determination of liability as in a special verdict." *Giddy Up, LLC v. PRISM Graphics, Inc.*, No. 3:060-CV-0948-B, 2008 WL 656504 at *3 (N.D. Tex. Mar. 12, 2008) (holding that jury rendered general verdict and that defendant waived objection to inconsistency in verdict by failing to object prior to jury's

dismissal); *see also Function Media*, 708 F.3d at 1329 (finding jury verdict general under Rule 49(b) where jury answered yes or no questions on each asserted claim).

Since the Court finds that the jury rendered a general verdict, and that SSN failed to object to the inconsistency prior to dismissal of the jury, SSN has waived its objections. It is impermissible for SSN to claim in its post-verdict JMOL that the jury's verdict contains "irreconcilable legal conflicts" that are "a matter of basic patent law," yet have failed to object to such an obvious defect at trial. *See Function Media,* 708 F.3d at 1330 ("It would be improper to allow FM to now argue inconsistencies require an entirely new trial when it failed to object at the only time when an inconsistency could have been cured.")*; see also L & W, Inc.*, 471 F.3d at 1319 ) ("[T]he verdict was a simple one and the issue of inconsistency between the verdicts as to [the independent claim and its dependent claim] should have been obvious.").

Accordingly, SSN's motion for JMOL, or in the alternative, a new trial, regarding the alleged inconsistencies in the jury's verdict is **DENIED**.

## III. Evidence of the "Transmission of Multiplexed Synchronously Related Data Messages" in SSN's Accused Network

### a. Claim 3 of the '546 Patent

SSN argues that claim 3 of the '546 patent "requires full two-way communication of data messages synchronized in an upstream and downstream direction," and that EON failed to present any evidence establishing that SSN's network transmits data messages in a downstream direction (Doc. No. 636 at 17-18). EON does not take issue with SSN's reading of claim 3, but argues that "SSN itself presented evidence that access points in the SSN [n]etwork send data messages to the meters in the system and vice versa."[9] (Doc. No. 647 at 29).

---

[9] For purposes of its infringement argument, EON asserted at trial that SSN's access point device is a base station and that the meters in the SSN network are subscriber units.

*CONFIDENTIAL MATERIAL REDACTED*

The Court finds that EON has failed to present sufficient evidence establishing that the SSN network transmits data messages in a downstream direction as required by claim 3 of the '546 patent. Notably, during his discussion of claims 2 and 3 of the '546 patent, EON's infringement expert, Dr. Bims, testified that "in the Silver Spring system, the smart meters transmit their information regarding meter readings, for example, into the network on what we call the upstream path, and then *control signals* down from the headquarters to the meters." Tr. 6/3/14 P.M. 27:12-16 (emphasis added). Moreover, in discussing how the SSN network functions, Dr. Bims explicitly negates the possibility that the SSN network transmits data messages in a downstream direction to the meters.

> Q. Does the Silver Spring system ever transmit a meter reading from the base station down to the subscriber unit through the receiver?
>
> A. Not to my knowledge.
>
> ****
>
> A. So, yes, in my review of the Silver Spring technical documents, messages like ▮▮▮▮

Tr. 6/3/14 A.M. 122:2-10.

On cross-examination, Dr. Bims was similarly careful to note that control signals—not data messages—are sent in a downstream direction from the access point to the meters.

> Q. Right. And then we talked about downstream routing. Now we're talking about when messages are sent from an access point to a Silver Spring meter. That's downstream routing, right?
>
> A. Yes.

Q. Okay. And we agree that the—the access point does send messages to meters in Silver Spring's system, right?

A. Control signals, yes.

*Id.* at 83. EON fails to point to any other testimony and offers no explanation as to why its own expert's testimony is inconsistent with its position that the SSN network transmits data messages in a downstream direction.

Accordingly, SSN's motion for JMOL as to non-infringement of claim 3 of the '546 patent is **GRANTED**.

### b. Claims 1 and 2 of the '491 Patent

SSN's argument is premised on its subjective reading of claims 1 and 2 of the '491 patent. It asserts that those claims require the "transmission of 'multiplexed synchronously related data messages' from [] a base station to subscriber units and also [the] receipt of such data messages [] by a base station from the subscriber units." (Doc. No. 636 at 20). SSN argues that EON failed to present evidence that there are data messages in the SSN network transmitted in a downstream direction that are synchronously related to data messages sent in an upstream direction (Doc. No. 636 at 18). EON responds, arguing that claims 1 and 2 of the '491 patent do not require the base station to transmit data messages in a downstream direction to subscriber units (Doc. No. 647 at 25).

The parties' dispute centers on the "base station processing and communication unit" element in claim 1 of the '491 patent.

> base station data processing and communication unit
>     for transmitting to a set of said subscriber units
>     contained within said local base station geographic
>     area associated with said local base station
>     repeater cell and receiving from a subset of said
>     set of local subscriber units multiplexed
>     synchronously related digital data messages of

13

> variable lengths for point-to-point communication
> between said local base station repeater cell and
> said subset of said local subscriber units

'491 Patent 6:28-37.  At trial, EON's expert, Dr. Bims, outlined the interaction of the base

station, subscriber units, and the receive-only receiver elements contained in the asserted claims:

"[t]he base station . . . communicates with what the claims call a subscriber unit . . . .  The

subscriber units communicate to receivers . . . [a]nd that receiver, in turn, relays information

back to the base station over . . . a wireless route."  Tr. 6/3/14 A.M. 82:5-19.  On cross-

examination, Dr. Bims testified that claims 1 and 2 of the '491 patent do not require the

transmission of data messages from the base station to the subscriber units.

> Q. So what we have here is basically a flow.  Base station sends a message
> to subscriber unit.  Subscriber unit responds by sending a message to remote
> receiver.  And then that gets forwarded on back to the base station.  That's the
> EON patent Path A, right?
>
> A. **So I think we need to qualify here that the base station is sending
> control messages and signals to the subscriber unit**.  The—the subscriber unit
> is responding by sending digital data messages back in to the network.
>
> \*\*\*\*
>
> A. Correct. **Digital data messages, such as meter readings, do not flow
> towards the subscriber unit**.

Tr. 6/3/14 P.M. 61:8-24.  He then explained how the foregoing claim elements are present in

SSN's accused network.  Tr. 6/3/14 A.M. 96:12-125:15.

The Court finds that the claim language does not foreclose Dr. Bims' interpretation, i.e.,

it is not clear that the claims require the transmission of data messages from the base station to

the subscriber units.  While SSN's interpretation of the claim language may be reasonable, it has

failed to show that Dr. Bims' interpretation is so unreasonable that this issue is one of law rather

than fact.  Accordingly, the jury was entitled to accept Dr. Bims' reading of the claims, including

*CONFIDENTIAL MATERIAL REDACTED*

his assertion that there is no requirement that data messages flow in a downstream direction from the base station to the subscriber units.

In addition, Dr. Bims testified that the SSN communication modules ███████

████████████████████████████████████

█████████████████████████████. [10]

Q. Okay. And what's the—what's the next term that we're going to consider?

A. So the next term is synchronously related. This term was defined by the—the Court to mean related in time and/or frequency.

Q. And what's the evidence of that occurring in the Silver Spring network?

A. So in the Silver Spring network, their technical documents describe how these NIC, which are network cards or communication modules, are

████████████████████████████████████████

████████████████████████████████████████

Q. Okay. And what's the next term we're going to discuss?

A. So the next term is the base station broadcast signal, and the Court has defined that term to mean a wireless signal transmitted to all subscriber units and/or receivers.

Q. Okay. And what's the evidence in Silver Spring for -- for that?

A. So turning to a deposition from George Flammer, who is the Silver Spring chief scientist, when asked the—the question about ██████████

████████████████████████████████████████

████████████████████████████████████████

Q. Do you have additional evidence also that supports that?

---

[10] In the Claim Construction Order (Doc. No. 249), the Court construed the term "synchronously related" as "related in time and/or frequency."

15

*CONFIDENTIAL MATERIAL REDACTED*

A. So, again, for the base station broadcast signal term, there are additional documents produced by Silver Spring, which as you can see here talk about

Q. Okay. And you have another slide for this?

A. Yes. So in this slide it shows that the—the meter or smart meter has to

Tr. 6/3/14 A.M. 110:16-112:19.

In viewing Dr. Bims' testimony as a whole, the jury had a sufficient evidentiary basis to conclude that the SSN network involved the transmission of multiplexed synchronously related data messages as required by claims 1 and 2 of the '491 patent.

Accordingly, SSN's motion for JMOL as to infringement of claims 1 and 2 of the '491 patent is **DENIED**.

## IV. Evidence of "Receive Only Stations" in SSN's Accused Network

Claim 20 of the '101 patent requires "receive only stations located in said zones for reception of transmissions from subscriber units located in the respective zones." '101 Patent 14:44-47. SSN moves for JMOL on the basis that EON failed to present sufficient evidence that there are receive only stations in SSN's accused network (Doc. No. 636 at 22). EON argues that "SSN tries to limit the claims by requiring the base station to send data messages to the subscriber unit *via the remote receiver*." (Doc. No. 647 at 30) (emphasis in original).

####   a.  Analysis

At trial, EON presented testimony from Dr. Bims in support of the proposition that the relay device in the SSN network meets the "receive only station" requirement.  Tr. 6/3/14 A.M. 120:14-122:10.  As discussed above, Dr. Bims specifically noted that the SSN system does not transmit data messages from the access point in a downstream direction to the meters *through* the relay.  Tr. 6/3/14 A.M. 121:19-22.  He asserted that only "control signals" are sent downstream to the meter; not data messages.  *Id.* at 122:2-10.  This interpretation is consistent with the Court's Claim Construction Order.  *See* Doc. No. 249 at 7-8.

Therefore, the Court finds that EON presented sufficient evidence that the relay device in the SSN network meets the "receive only station" requirement in claim 20 of the '101 patent.

Accordingly, SSN's motion for JMOL as to non-infringement of claim 20 of the '101 patent is **DENIED**.

## V.  Damages for Claim 3 of the '546 Patent in Light of Reexamination

At trial, the jury found that SSN infringed claim 3 of the '546 patent (Doc. No. 618). Claim 3 is dependent on claim 2.  SSN argues that Claim 2 of the '546 Patent was substantially amended in a reexamination proceeding and that as a result, "EON's maximum recovery for any infringement of claim 3 of the '546 Patent must be limited to the period commencing October 4, 2011, the date the Reexamination Certificate issued, through October 26, 2012, the date the '546 Patent expired." (Doc. 636 at 23).  However, as discussed above, the Court finds that, as a matter of law, EON failed to produce sufficient evidence to support the jury's finding of infringement as to claim 3 of the '546 patent.

Accordingly, SSN's motion for a new trial on damages in light of the reexamination of claim 2 of the '546 patent is **DENIED AS MOOT**.

17

## VI.    Damages

SSN moves for JMOL, a vacatur of the damages verdict, or in the alternative, a new trial, on grounds that EON failed to present sufficient evidence supporting a reasonable royalty rate or the jury's damages award.  Specifically, SSN claims: 1) Mr. Lindsay's expert opinion on the reasonable royalty rate lacks a sufficient evidentiary basis because it is based on dissimilar agreements rather rights comparable to the patents-in-suit, and also because he failed to use the most reliable evidence of a reasonable royalty; 2) Mr. Lindsay improperly applied the Entire Market Value Rule; 3) Mr. Lindsay failed to offer a damages opinion for infringement of less than all three patents-in-suit; and 4) EON's closing arguments with respect to its claimed damages was misleading and prejudicial to the jury (Doc. No. 636 at 24-32).

### a.   Applicable Law

The damages statute, 35 U.S.C. § 284, sets the floor for "damages adequate to compensate for [patent] infringement" at "a reasonable royalty for the use made of the invention by the infringer."  The burden of proving damages falls on the patentee.  *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003).   Calculation of a reasonable royalty requires determination of two separate and distinct amounts: 1) the royalty base, or the revenue pool implicated by the infringement; and 2) the royalty rate, or the percentage of that pool "adequate to compensate" the plaintiff for the infringement.  *See Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009).   A reasonable royalty is based on a hypothetical negotiation that takes place between the patentee and the infringer on the date infringement began.  *Unisplay, S.A. v. American Electronic Sign Co.*, Inc., 69 F.3d 512, 517 (Fed. Cir. 1995).  "Although this analysis necessarily involves an element of approximation and uncertainty, a trier of fact must have some factual basis for a determination of a reasonable royalty."  *Id.*  The trial

18

court has discretion to discern the reliability of methods used to arrive at a reasonable royalty.

*See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991)

("[D]ecisions underlying a damage theory are discretionary with the court, such as, the choice of

an accounting method for determining profit margin, or the methodology for arriving at a

reasonable royalty.") (internal citations omitted)).

**b. Analysis**

**1. Reasonable Royalty Rate**

SSN first argues that "Mr. Lindsay's damages opinion is unsupported by the evidence

because his sole basis for a starting point royalty ▮▮▮▮ the communication module price is a

non-comparable 2005 manufacturing agreement between Silver Spring and ▮▮▮▮▮▮▮

(Doc. No. 636 at 24). At trial, Mr. Lindsay testified that he used SSN's communication modules

as a royalty base. Tr. 6/3/14 P.M. 163:24-15.

> Q. Can you explain to the jury why?
>
> A. Right. As we've heard about the last few days, there's a variety of components in Silver Spring's smart energy platform. They have the relays, the access points, these communication modules that go into these meters.
>
> And rather than focusing on those other components or even the revenue that those components generate, I limited it to just the communication modules that go into it. And there's a couple of reasons.
>
> One is, as we'll see in some of these documents, Silver Spring refers to that communication module, one, as the key that turns those smart meters on. It takes them from your standard traditional meters to your intelligent meters, and it kind of establishes that two-way communication in a network.
>
> So to me, that's a good indicator of their extent of use, how many of these modules have they sold. It's also something they track. If you were to look at their SEC filings or quarterly releases, they talk about how many intelligent endpoints they have out in the marketplace, and that's the number of these communication modules.

A0019

*CONFIDENTIAL MATERIAL REDACTED*

> So I limited my analysis to just that component and the number of those components that have been sold.

Tr. 6/4/14 A.M. 8:3-9:2.  Thus, Mr. Lindsay used the communication module as a royalty base because he found that it was an integral component of SSN's accused network, and therefore served as a reasonable indicator of the extent of SSN's infringing activity.

In forming his opinion on a reasonable royalty rate, Mr. Lindsay testified that he considered the following: 1) a 2005 agreement with ████████████ 2) a 2008 agreement with ██████████ 3) a 2010 agreement with ██████████████ 4) eight settlement agreements involving the patents-in-suit entered into by EON; and 5) various settlement agreements entered into by SSN.  *See id.* at 21:25-37:24.  He ultimately determined that the hypothetical negotiation between EON and SSN would have occurred in 2007, *id.* at 13:3-9, and that based on the 2005 ████████████ agreement, the appropriate royalty rate ██████ *See id.* at 31:16-34:24.

SSN takes issue with the fact that Mr. Lindsay's reasonable royalty calculations are primarily based on the ██████████████████████████ agreements, arguing that those "were meant to compensate Silver Spring for various rights, such as technological 'know-how' and intellectual property rights that were not patent-specific." (Doc. No. 636 at 25-26).  At trial, Mr. Lindsay fully acknowledged that the hypothetical negotiation would involve only bare patent licenses, rather than additional rights such as "know-how" and other intellectual property rights.  Tr. 6/4/14 A.M. 25:13-25.  However, he testified that he gave more weight to the ██████ agreement because it would have been contemplated by the parties at the time of the 2007 hypothetical negotiation, as opposed to the later 2008 and 2010 agreements.  *Id.* at 39:2-7.  Mr. Lindsay further testified that he discounted the reliability of EON's settlement agreements involving the patents-in-suit because such payments are "not intended to reflect

*CONFIDENTIAL MATERIAL REDACTED*

either the rate of a reasonable royalty, an established royalty, or an established base upon which

royalties should be paid." *Id.* at 23:3.

> Q. And why—why is it important in your mind that these were settlements of litigation?

> A. Well, if you remember at the beginning, we're talking about a hypothetical negotiation where patents are valid and they're enforceable and they're infringed, right? We're making that assumption. Well, that's not the assumption when these settlement agreements are negotiated.

<div align="center">****</div>

> A. So settlement agreements, just by their nature, are influenced by litigation. There are costs. There are risks. There are uncertainties on what's going to happen. And all of those factors can influence the—the willingness to enter into settlement negotiations. Like I said, there's no assumption of infringement. So it's not comparable to a hypothetical negotiation where you have a willing licensor and a willing licensee for valid and infringed patents.

Realizing that the royalty rate in the ▮▮▮▮ agreement was based on more than bare

patent rights, Mr. Lindsay testified that he adjusted his reasonable royalty calculation downward.

> Q. We—I think we've walked through those numbers from ▮▮▮▮ agreement. In your analysis, did you feel it was necessary to adjust those numbers that result from ▮▮▮▮ agreement? And if so, can you talk to the jury about why and how?

> A. Yes, I did. Remember what I mentioned early on about this—about the EON Silver Spring being a bare patent license. It wouldn't be one where they would get the technology and know-how and support of what parts you need and how to get those parts. That's not part of it.

<div align="center">****</div>

*Id.* at 39:2-18. He then explained how he adjusted the calculation downward to reach a per-unit

royalty of ▮▮▮ the SSN communication modules. Tr. 6/4/14 A.M. 39:8-43:24.

SSN claims that Mr. Lindsay's damages opinion is flawed because he "disregarded

EON's own comparable licensing agreements for the '101, '546 and '491 patents . . . ." (Doc.

No. 636 at 27). SSN cites *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010),

<div align="center">21</div>

*CONFIDENTIAL MATERIAL REDACTED*

arguing that EON disregarded the most reliable evidence in the record. However, SSN reads *ResQNet* more broadly than is warranted. In that case, the Federal Circuit decided that "the most reliable license *in this record* arose out of litigation." 594 F.3d 860, 872 (Fed. Cir. 2010) (emphasis added). *ResQNet* was decided in the context of its own record; it does not establish a rule that every damages expert must only weigh past settlement licenses involving the specific patents in suit to arrive at a reasonable royalty. Moreover, post-*ResQNet*, the reliability of settlement agreements derived from litigation can be questioned. Notably, in *ResQNet* itself, the Federal Circuit observed that in certain instances, settlement agreements may have questionable relevance because "the hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation." *Id.* at 872; *see also Small v. Nobel Biocare USA, LLC*, 808 F. Supp. 2d 584, 591 (S.D.N.Y. 2011) (observing that *ResQNet* "cautions that such settlements may be of minimal relevance in light of the possibility that litigation can skew the results of a hypothetical negotiation."); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) (acknowledging the Federal Circuit's "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages."). Given the inherent uncertainty surrounding the reliability of settlement licenses, Mr. Lindsay was not required to assign special or controlling weight to EON's settlement agreements in calculating a reasonable royalty rate. Mr. Lindsay's testimony reflects a conservative and practical approach, wherein he methodically explained why he gave more weight to the ▆▆▆ agreement, and why he discounted the EON settlement agreements involving the patents-in-suit. Tr. 6/4/14 A.M. 38:19-43:24.

It is important to note that the licenses SSN points to were not "disregarded," but rather weighed by Mr. Lindsay, and presented to the jury for consideration. SSN is simply unsatisfied

*CONFIDENTIAL MATERIAL REDACTED*

with *how* he weighed them in comparison to the ▮▮▮ agreement.  The Federal Circuit does "not discount all agreements regarding the technology at issue other than licenses addressing the price terms and circumstances at issue in the case at bar."  *SSL Servs., LLC v. Citrix Sys., Inc.*, No. 2013-1419, 2014 WL 5137552 (Fed. Cir. Oct. 14, 2014).  In *SSL*, the plaintiff's damages expert relied on agreements that supplied distribution rights to a specific software product, but did not provide a bare patent license.  *See id.* at *16.  The agreements merely referenced the patent at issue as "intellectual property that was relevant to the technology underlying the agreements."  *Id.*  Nevertheless, the Federal Circuit agreed with the district court's finding that "'the agreements [were] sufficiently 'comparable' to be probative of the hypothetical negotiation' as they involve[d] the actual parties, relevant technology, and were close in time to the date of the hypothetical negotiation.'"  *Id.* (citing *SSL Servs., LLC v. Citrix Sys., Inc.*, 940 F. Supp. 2d 480, 489-90 (E.D. Tex. 2013)).  The Court further observed that "SSL's expert expressly addressed the differences between the license negotiations and any hypothetical negotiations, thereby clarifying for the jury where such differences might exist and the limited value of such evidence."  *Id.* at 17.  Like the expert in *SSL*, Mr. Lindsay specifically addressed the differences between the ▮▮▮ license agreement negotiations and a hypothetical negotiation involving only bare patent licenses, allowing the jury to make a reasoned assessment.  Nothing prevented SSN from challenging Mr. Lindsay's reliance on the ▮▮▮ agreement by way of cross-examination at trial.  Clearly, the jury did not wholly credit Mr. Lindsay's analysis, as it rejected his conclusion that a reasonable royalty would amount to $56.4 million.

In addition, this case does not involve the obvious inflation tactics that were an underlying concern in *ResQNet* and *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009).  Here, SSN's *entire network* is the infringing product.  Rather than

23

attempting to calculate damages based on the entire SSN network, EON's damages theory was based a single component: the communications module. Presumably, Mr. Lindsay's damages calculation would have been higher had he chosen to base the royalty rate on SSN's infringing network as a whole.

> Q. And you know from testimony and from the work you've done that in fact Silver Spring sells access points, relays, the—the UtilityIQ—
>
> A. Right.
>
> Q. —SaaS system—
>
> A. Right.
>
> Q. —all of which is accused, correct?
>
> A. That's what I understand.
>
> Q. And all of which they derive money or revenues from?
>
> A. Yes.
>
> Q. What I'm understanding you to say is you've limited your damages analysis to just the communication modules that they sell.
>
> A. That's exactly right. That's the communication modules.

Tr. 6/4/14 A.M. 9:12-10:2. In contrast to the circumstances in *ResQNet* and *Lucent*, Mr. Lindsay's royalty rate calculation was not a superficial attempt at inflating the verdict. Rather, it was a practical approach aimed at ascertaining a royalty rate for an entire system or network with several revenue generating components.

## 2. Entire Market Value Rule

In addition, the Court rejects SSN's arguments based on the Entire Market Value Rule ("EMVR"). "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product [if] the patented feature creates the 'basis for

customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (citing *Lucent*, 580 F.3d at 1336; *Rite-Hite*, 56 F.3d at 1549-50). Thus, the EMVR is inapplicable here because, as outlined above, Mr. Lindsay did not calculate the royalty rate on the value of the accused product, which is the entire SSN network as a whole. Rather, he calculated the royalty based on a component of the SSN network: the communication module.

### 3. Infringement of Less Than All Three Patents-in-Suit

At trial, the jury found that SSN directly infringed claims 19 and 20 of the '101 patent, claim 3 of the '546 patent, and claims 1 and 2 of the '491 patent (Doc. No. 618 at 2). As outlined above, the Court vacates the jury's infringement finding as to claim 3 of the '546 patent. Anticipating a finding of non-infringement as to one of the three patents-in-suit, SSN asks the Court to vacate the damages award or to grant a new trial on the issue of damages because Mr. Lindsay failed to offer a damages opinion for infringement of less than all three patents-in-suit. (Doc. No. 636 at 14-17, 32). In support of its argument for a new trial, SSN relies primarily on *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1309-10 (Fed. Cir. 2007), wherein the Federal Circuit held that a new trial on damages was appropriate in light of the fact that a new trial was required on the issue of infringement. The Court held that the general rule requires a new trial as to damages where the jury renders a "single verdict on damages, without breaking down the damages attributable to each patent." *Id.* (citing *Memphis Cmty. Sch. Dist. v. Stachura,* 477 U.S. 299 (1986)). However in *Verizon*, the Federal Circuit observed that there was no reason to depart from the general rule because the parties did not address it in their post-verdict briefing. *Id.*

25

In contrast to the parties in *Verizon*, EON has provided sufficient justification for the Court to depart from the general rule. First, EON points to the fact that SSN made no objection to the apportionment of damages on the jury verdict form. Even in its responsive briefing SSN admits that it "does not object to the form of the verdict or apportionment of damages . . . ." (Doc. No. 651 at 12). In addition, Mr. Lindsay testified that his damages model was structured such that it would remain the same regardless of the number of claims or patents that were found infringed. Tr. 6/4/14 A.M. 95:17-96:22. He testified that he structured the damages model this way because EON viewed the three patents-in-suit as interrelated. *Id.* at 96:16-19. Moreover, as EON points out, SSN fails to explain why its damages expert, Mr. Blakewell, offered single lump sum damages amount that remained the same regardless of the number of claims or patents found to be infringed. *See* Doc. No. 655 at 8.

Accordingly, despite the Court's vacatur of the jury's finding of infringement as to the '546 patent, SSN is not entitled to a new trial on the issue of damages.

### 4. EON's Closing Arguments

SSN waived any argument as to the impropriety of EON's closing arguments by failing to object during the argument or to move for a mistrial before the case was submitted to the jury. *See Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (holding that plaintiff was barred "'from urging the improper arguments as grounds for a new trial after the jury had returned its verdict.'"). Even if SSN had timely objected to EON's closing argument, it would have to show that EON's argument irreparably prejudiced the verdict or that the jury failed to follow the Court's instructions. *See id.* SSN has failed to make that showing.

Accordingly, SSN's motion for JMOL, or alternatively a new trial as to damages is **DENIED**.

## VI.    SSN's "Equitable Defense of Joint and Several Liability"

On August 8, 2013, EON executed a settlement agreement (the "Agreement") with Landis+Gyr ("L+G"), dismissing L+G from the instant lawsuit (Doc. No. 636-4 at 15).   The agreement required, *inter alia*, L+G to pay EON ███████████████ covering certain L+G products which EON alleged to be infringing.  *See id.* at 8.   SSN claims that those products include L+G electric meters, which incorporate SSN's communication modules (Doc. No. 636 at 33).  Thus, SSN asserts that it is entitled to JMOL on its self-titled "equitable defense of joint and several liability" to prevent EON "from seeking an impermissible 'double recovery' from Silver Spring for the same communication modules incorporated into L+G meters." *Id.*   EON responds, arguing that: 1) SSN failed to produce any evidence of its sales of the communication modules to L+G; 2) there is no such thing as an equitable defense of joint and several liability; 3) SSN is not a licensee nor an implied licensee under EON's agreement with L+G; and 4) EON is not obtaining a double recovery.  *See* Doc. No. 647 at 38-48.

### a.  Analysis

On May 20, 2014, the Court held a hearing to consider several motions submitted by the parties (Doc. No. 593).  The Court denied SSN's motion for leave to file an amended answer as to its defense of patent exhaustion, but allowed SSN leave to assert an argument based on (what SSN characterized as) joint and several liability.  *Id.* at 62.  In addition, the Court noted that it would open to addressing the issue of whether EON granted SSN an implied license.  *Id.* at 65. To the extent that SSN raises the defense of patent exhaustion in the instant motion, the Court finds that it is inapplicable for the same reasons considered at the May 20, 2014 hearing. Moreover, the Court finds that SSN's argument premised on joint and several liability is similarly inapposite.   It is black letter law that joint and several liability is a mechanism for a

27

*CONFIDENTIAL MATERIAL REDACTED*

plaintiff to obtain full recovery from joint tortfeasors, whereby "each liable party is individually responsible for the entire obligation." BLACK'S LAW DICTIONARY (9th ed. 2009). SSN's attempt to assert joint and several liability as a *defense* is inappropriate, especially in light of the fact that SSN is the only liable party in this action.[11]

The only remaining argument SSN has raised is best characterized as an implied license defense.[12] SSN asserts that under Section 9 of the Agreement, "EON was fully compensated for the alleged joint infringement by L+G and Silver Spring arising from the sale of L+G electric meters containing Silver Spring's communication modules that were provided to utilities for use in automated meter reading networks." (Doc. No. 636 at 35). The crux of SSN's argument is that it qualifies as a Licensee Supplier under the Agreement, and that EON granted a full release to L+G and its Licensee Suppliers for all past sales of L+G meters containing SSN communication modules in exchange for *See id.* at 37.

Under Section 1.8 of the agreement, a Licensee Supplier is defined as



(Doc. No. 636-4 at 7) (emphasis added). The Licensed Product at issue is L+G electric meters. The record is undisputed that SSN

---

[11] SSN argues that "[t]he issue here is whether L+G are jointly and severally liable for infringing EON's patents, namely by selling L+G meters containing Silver Spring communication modules." (Doc. 636 at 36). That issue was not before the jury, and thus, there was no finding of liability as to L+G. Accordingly, the Court will not address that issue here.

[12] In order to determine whether EON granted SSN an implied license, the Court must interpret relevant terms of the EON-L+G Agreement. In the Fifth Circuit, "'[a] settlement agreement is a contract,'" and "the interpretation of an unambiguous contract is a question of law . . . ." *Alford v. Kuhlman Elec. Corp.*, 716 F.3d 909, 912 (5th Cir. 2013). (internal citations omitted). Since the Court finds that the relevant portions of the Agreement are unambiguous, it will construe those portions as a matter of law.

*CONFIDENTIAL MATERIAL REDACTED*

██████████████ communication modules that were incorporated into the L+G meters.[13] (Dresslhuys Decl. at ¶ 13). Thus, the Court finds that SSN falls within the definition of a Licensee Supplier under the settlement agreement.

Under Section 9.2 of the Agreement, EON granted a release and dismissal of all claims against Licensee Suppliers ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at 16.

Finally, in consideration of the entire Agreement, L+G agreed to pay ████████████ to EON. *Id.* at 9. Therefore, L+G's payment necessarily compensated EON for SSN's activities in connection with the Licensed Product, viz., supplying communication modules that were incorporated into L+G electric meters.

EON asserts that the "L+G Agreement was unambiguously, expressly and painstakingly written to exclude SSN and other defendants in this case from any license to EON's patents." (Doc. 647 at 45). EON first points to Section 11.1 of the Agreement which provides:



---

[13] EON asserts that this is a disputed fact, yet has failed to offer any evidence to the contrary. At the May 20, 2014 hearing, the Court made it clear that the parties could request additional discovery on the damages issue, specifically in regard to the settlement agreement at issue here. Tr. 5/20/14 63:12-19. EON's failure to challenge SSN's evidence does not create a factual dispute.

*CONFIDENTIAL MATERIAL REDACTED*

(Doc. No. 636-4 at 17-18) (emphasis added).  EON claims that "the language could not be more

clear that the rights, release, covenant and license in the L+G Agreement excludes SSN and its

products, even if SSN sells those products to L+G." (Doc. No. 647 at 46).  EON overlooks the

importance of the phrase ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in Section 11.1.  The issue here

is not whether the Agreement conferred rights to SSN with respect to *Third Party Products*;

rather the issue is whether the Agreement conferred rights to SSN with respect to *Licensed*

*Products* (L+G meters).  The payment L+G provided to EON under the settlement was (at least

in part) in consideration of rights conferred to Licensee Suppliers such as SSN with respect to the

Licensed Products.  Thus, EON's reliance on Section 11.1 of the Agreement is misplaced.

Next, EON asserts that the Agreement excludes SSN from being a Licensee Supplier

EON citing Section 10:



(Doc. No. 636-4 at 17) (emphasis added).  Under Section 1.8 of the Agreement ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 7.  Third Party

products are defined as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

and the agreement states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 8 (emphasis added).   EON argues that these

provisions show that the Agreement was "specifically drafted to carve out any license to SSN or

any other manufacturer that has not taken a license from EON, even if that manufacturer's

*CONFIDENTIAL MATERIAL REDACTED*

products somehow subsequently become combined with L+G's products." (Doc. No. 647 at 46-47). Again, EON's reliance on these provisions is misplaced. First, SSN is not asserting that it is a Licensee Supplier for *Third Party Products*; rather, it is claiming to be a Licensee Supplier with respect to the *Licensed Products* (L+G meters). Section 10 focuses on Third Party sales of Third Party Products; the issue here is the sale of Licensed Products.

The Court finds that SSN falls within the definition of a Licensee Supplier under the Agreement. By the terms of the Agreement, EON was compensated and SSN was released with respect to SSN's ███████████ communication modules that were incorporated into the L+G meters. It is undisputed that SSN sold ████████████ communication modules during the relevant time period. The jury awarded EON $18,800,000 based on SSN's sale of those ████████ communication modules. Thus, EON's damages calculations including the ████████ communication modules SSN sold to L+G resulted in a double recovery.

"'There is a strong presumption in favor of affirming a jury award of damages. The damage award may be overturned only upon a clear showing of excessiveness . . . . However, when [the] court is left with the perception that the verdict is clearly excessive, deference must be abandoned.'" *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001) (quoting *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir.1995)). Where the Court finds that the jury's verdict is excessive it may grant a "remittitur, or if the plaintiff chooses not to accept the remitted award, a new trial on the issue of damages alone." *Id.* In determining the amount of the remittitur, the Fifth Circuit follows the "maximum recovery rule," whereby damages are reduced to the maximum amount a reasonable jury could have awarded. *Id.* at 489 (citing *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 590 (5th Cir.1985)). "Of course, [the Court's] reassessment of

31

damages cannot be supported entirely by rational analysis, but involves an inherently subjective component." *Eiland*, 58 F.3d at 183.

Here, the jury awarded EON $18,800,000 for SSN's infringing sales of ███████ communication modules.  However, because the Court finds that EON was compensated for ██ ███████ communication modules SSN sold to L+G—████████████████████████ ████████████—the jury's damages award must be remitted to prevent EON from obtaining an excessive recovery.  Therefore, the Court adjusts EON's damages award downward ███████ to $12,990,800.  Accordingly, EON may either accept the remitted award or request a new trial on the issue of damages.

## VII.    EON's Comments Regarding Willful Infringement

SSN moves for a new trial on the basis that EON made misleading and prejudicial references to SSN's alleged willful infringement.  Specifically, SSN claims that "EON's closing argument impugning Silver Spring's post-filing conduct was . . . inaccurate, irrelevant, prejudicial to the jury, and in violation of the Court's decision to grant judgment as a matter of law [in favor of SSN] on EON's willful infringement claim." (Doc. 636 at 40).  The Court will not address the merits of this argument, because it finds that SSN waived any objection it may have had to EON's closing argument.  As discussed above, failure to object to the impropriety of the closing argument bars a party "'from urging the improper arguments as grounds for a new trial after the jury ha[s] returned its verdict.'" *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988) (citing *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F.2d 59, 69 (1st Cir. 1984)).  In addition, even where a party timely objects, a new trial is only warranted if the improper arguments "irreparably prejudice a jury verdict or if the jury fails to follow instructions." *Id.*  Neither SSN's briefing, nor the trial record reveal any attempt by SSN

to object to EON's closing arguments. Moreover, SSN has not even attempted to show that the statements made during EON's closing irreparably prejudiced the jury verdict or caused the jury to ignore the Court's instructions.

Accordingly, SSN's motion for a new trial on the basis that EON's counsel made impermissible comments during closing arguments is **DENIED**.

### CONCLUSION

EON's Motion for Judgment as a Matter of Law (Doc. No. 621) is **DENIED AS MOOT**. SSN's Motion for Judgment as a Matter of Law, New Trial and Judgment on Equitable Defense of Joint and Several Liability (Doc. No. 636) is **GRANTED IN PART** and **DENIED IN PART**.

EON may either accept the remitted damages award or request a new trial on the issue of damages within **ten days** from the issuance of this memorandum opinion and order.

So ORDERED and SIGNED this 21st day of October, 2014.

_John D. Love_

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **EON CORP. IP HOLDINGS, LLC** | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 6:11-CV-317-JDL** |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| **LANDIS+GYR INC., ET AL.,** | § | |
| *Defendants* | § | |

## ORDER

Before the Court is Defendant Silver Springs Networks, Inc.'s ("SSN") Motion for Reconsideration of the Sealed Memorandum Opinion and Order (Doc. No. 658) Regarding Claims 1 and 2 of the '491 Patent (Doc. No. 662). SSN moves for reconsideration "with respect to whether claims 1 and 2 of the '491 patent require transmission of data messages in a downstream direction from a base station to subscriber units." *Id.* at 1. SSN further argues that if the Court concludes that there are two reasonable, but conflicting claim constructions, the claim would be indefinite and invalid under *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).

SSN mischaracterizes the Court's ruling by arguing that the Court "address[ed] this claim construction issue as being an issue of fact that the jury was to decide, rather than an issue of claim construction to be decided by the Court." (Doc. No. 662 at 1). The Court did not address this issue as one of claim construction.[1] Rather, it was tasked with determining whether the

---

[1] SSN attempts to couch as a claim construction issue the denial of its motion for judgment as a matter of law by comparing this case to *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008). However, in *O2 Micro* the claim construction "issues were fully litigated and decided at the *Markman* stage of the litigation." *Id.* at 1359. Here, SSN did not request construction of the relevant terms in claims 1 and 2 of the '491 patent at the *Markman* stage, and failed to raise the issue at trial. Rather, SSN presented its claim construction argument for the first time in its post-trial motion for judgment as a matter of law (Doc. No. 636 at 20). Thus, even if the parties' disagreement concerned the scope of the claim limitations, SSN waived any claim construction arguments it may have had. *Lazare Kaplan Int'l, Inc. v. Photoscribe Technologies, Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) ("Unlike *O2 Micro* where the appellant presented its claim construction argument to the district court during a *Markman* hearing, [the plaintiff] first asserted the claim construction argument it presses on appeal in a post-trial motion."); *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008) ("Unlike in *O2 Micro*, where the parties disputed the proper construction of a term at a pre-trial *Markman* hearing, [defendant] here has failed to offer its proposed construction of 'networks' at or prior to trial, and we reject such arguments raised for the first time after the jury verdict (internal citation omitted)).

**A0034**

jury's finding of infringement as to claims 1 and 2 of the '491 patent was supported by sufficient evidence. The Court evaluated the position of EON's infringement expert, Dr. Bims, and ultimately held that his testimony provided a legally sufficient evidentiary basis to support the jury's finding.[2]

Moreover, SSN's argument that the claims are indefinite under *Nautilus* is misguided. First, SSN did not raise its indefiniteness argument at trial, or in a Rule 50(a) motion for judgment as a matter of law, and as a result, the Court did not address it in ruling on SSN's renewed motion for judgment as a matter of law. Thus, the Court has nothing reconsider regarding SSN's indefiniteness arguments. Next, contrary to SSN's assertion, the Court did not hold that claims 1 and 2 of the '491 patent are susceptible to two reasonable interpretations as a matter of the legal parameters of claim scope. Rather, the Court merely noted that Dr. Bims presented his own interpretation of the claim language—which differed from SSN's subjective interpretation—and that the jury was entitled accept his testimony. As EON points out, a difference of opinion between two experts does not automatically render a claim indefinite under the standard set out in *Nautilus*.

Accordingly, SSN's Motion for Reconsideration of the Sealed Memorandum Opinion and Order (Doc. No. 658) Regarding Claims 1 and 2 of the '491 Patent (Doc. No. 662) is **DENIED**.

**So ORDERED and SIGNED this 3rd day of December, 2014.**

*John D. Love*
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

---

[2] SSN argues that the Court's citation to Dr. Bims' testimony in relation to claim 5 of the '491 patent is misplaced and that this testimony is insufficient to support the jury's infringement finding as to claims 1 and 2. However, at the outset of his direct examination, Dr. Bims specifically testified that he structured his infringement analysis by organizing the text of all of the asserted claims into five distinct components, and that each component was applicable across all claims. *See* Tr. 6/3/14 A.M. 80:25-83:4. He further explained to the jury that "no matter which claim you're looking at, you're going to have up to five components that we're going to address, and that's all you really have to focus on." Tr. 6/3/14 A.M. 82:24-83:4. Thus, given the structure of his analysis, Dr. Bims' testimony regarding claim 5 of the '491 patent necessarily provided the jury with a sufficient evidentiary basis to support the infringement finding as to claims 1 and 2.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | | |
|---|---|---|
| **EON CORP. IP HOLDINGS, LLC** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 6:11-CV-317-JDL** |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| **LANDIS+GYR INC., ET AL.,** | § | |
| | § | |
| *Defendants* | § | |

## FINAL JUDGMENT

Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the jury verdict delivered on June 6, 2014, the Court's Memorandum Opinion and Order of October 21, 2014 (Doc. No. 658), the Court's Memorandum Opinion and Order of November 7, 2014 (Doc. No. 663), the Court's Memorandum Opinion and Order of November 13, 2014 (Doc. No. 665), and the entirety of the record available to this Court, the Court **ORDERS AND ENTERS FINAL JUDGMENT** as follows:

- Defendant Silver Spring Networks, Inc. ("SSN") is found to have unlawfully infringed U.S. Patent Nos. 5,388,101 (the "'101 patent") and 5,592,491 (the "'491 patent").

- As decided in the Court's Memorandum Opinion and Order of October 21, 2014 (Doc. No. 658), EON failed to present sufficient evidence of infringement as to U.S. Patent No. 5,481,546 (the "'546 patent").

- The '101 patent, the '491 patent, and the '546 patent are found to be valid.

- As decided in the Court's Memorandum Opinion and Order of October 21, 2014 (Doc. No. 658), the jury's damages award is remitted to $12,990,800.

**A0036**

- Plaintiff EON is entitled to prejudgment interest at the prime rate, compounded quarterly, on the damages award (Doc. No. 663 at 2-3).[1] Prejudgment interest on the $12,990,800 damages award is $1,481,694,[2] plus $1,272 per-day through the date of final judgment.

- As decided in the Court's Memorandum Opinion and Order of November 13, 2014 (Doc. No. 665), EON is not entitled to an award of attorney fees under 35 U.S.C. § 285 or 28 U.S.C. § 1927.

All relief not specifically granted herein is **DENIED**. This is a Final Judgment and is appealable.

**So ORDERED and SIGNED this 4th day of December, 2014.**

_John D. Love_
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

---

[1] While the Court determined that EON is entitled to prejudgment interest (Doc. No. 663), it denied EON's Motion for Prejudgment Interest (Doc. No. 622) because EON requested interest based on the original damages award of $18.8 million, and directed EON to file notice setting forth a prejudgment interest amount based on the remitted damages award. Eon subsequently filed its Notice of Revised Calculation of Prejudgment Interest (Doc. No. 670) based on the remitted damages award.

[2] EON's expert calculated prejudgment interest in the amount of $1,481,694 through November 20, 2014. Therefore, interest shall accrue in the amount of $1,272 per-day from November 20, 2014 through the date of final judgment.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

| | | |
|---|---|---|
| **EON CORP. IP HOLDINGS, LLC** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 6:11-CV-317-JDL** |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| **LANDIS+GYR INC., ET AL.,** | § | |
| | § | |
| *Defendants* | § | |

## AMENDED FINAL JUDGMENT

Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the jury verdict delivered on June 6, 2014, the Court's Memorandum Opinion and Order of October 21, 2014 (Doc. No. 658), the Court's Memorandum Opinion and Order of November 7, 2014 (Doc. No. 663), the Court's Memorandum Opinion and Order of November 13, 2014 (Doc. No. 665), and the entirety of the record available to this Court, the Court **ORDERS AND ENTERS FINAL JUDGMENT** as follows:

- Defendant Silver Spring Networks, Inc. ("SSN") is found to have unlawfully infringed U.S. Patent Nos. 5,388,101 (the "'101 patent") and 5,592,491 (the "'491 patent").

- As decided in the Court's Memorandum Opinion and Order of October 21, 2014 (Doc. No. 658), EON failed to present sufficient evidence of infringement as to U.S. Patent No. 5,481,546 (the "'546 patent").

- The '101 patent, the '491 patent, and the '546 patent are found to be valid.

- As decided in the Court's Memorandum Opinion and Order of October 21, 2014 (Doc. No. 658), the jury's damages award is remitted to $12,990,800.

- Plaintiff EON is entitled to prejudgment interest at the prime rate, compounded quarterly, on the damages award (Doc. No. 663 at 2-3).[1] Prejudgment interest on the $12,990,800 damages award is $1,481,694,[2] plus $1,272 per-day through the date of final judgment.

- As decided in the Court's Memorandum Opinion and Order of November 13, 2014 (Doc. No. 665), EON is not entitled to an award of attorney fees under 35 U.S.C. § 285 or 28 U.S.C. § 1927.

- It is further **ORDERED** that the Clerk of this Court tax costs in the amount of $196,302.33 in favor of EON against SSN pursuant to Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920.

All relief not specifically granted herein is **DENIED**. This is a Final Judgment and is appealable.

**So ORDERED and SIGNED this 19th day of December, 2014.**

_John P. Love_

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

---

[1] While the Court determined that EON is entitled to prejudgment interest (Doc. No. 663), it denied EON's Motion for Prejudgment Interest (Doc. No. 622) because EON requested interest based on the original damages award of $18.8 million, and directed EON to file notice setting forth a prejudgment interest amount based on the remitted damages award. Eon subsequently filed its Notice of Revised Calculation of Prejudgment Interest (Doc. No. 670) based on the remitted damages award.
[2] EON's expert calculated prejudgment interest in the amount of $1,481,694 through November 20, 2014. Therefore, interest shall accrue in the amount of $1,272 per-day from November 20, 2014 through the date of final judgment.

US005388101A

# United States Patent [19]

## Dinkins

[11] **Patent Number:** **5,388,101**

[45] **Date of Patent:** **Feb. 7, 1995**

[54] **INTERACTIVE NATIONWIDE DATA SERVICE COMMUNICATION SYSTEM FOR STATIONARY AND MOBILE BATTERY OPERATED SUBSCRIBER UNITS**

[75] Inventor: **Gilbert M. Dinkins**, Herdon, Va.

[73] Assignee: **Eon Corporation**, Reston, Va.

[21] Appl. No.: **966,414**

[22] Filed: **Oct. 26, 1992**

[51] Int. Cl.⁶ ........................ H04B 7/185; H04N 7/14

[52] U.S. Cl. .................................... 370/95.1; 370/97; 348/8; 348/12; 348/13; 455/33.1; 455/53.1

[58] Field of Search .................... 358/86; 465/5.1, 6.1, 465/6.3, 3.2, 33.1, 53.1; 320/71, 73, 75, 85.1, 95.1, 95.3, 104.1; 379/90, 93, 58, 59, 63; 348/6, 8, 12, 7, 10, 13; 370/97; 455/54.1, 56.1

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,481,670 | 11/1984 | Freeburg | 455/33.3 |
| 4,525,861 | 6/1985 | Freeburg | 455/33.3 |
| 4,550,443 | 10/1985 | Freeburg | 455/33.3 |
| 4,591,906 | 5/1986 | Morales-Garza et al. | 358/84 |
| 4,755,871 | 7/1988 | Morales-Garza et al. | 358/84 |
| 4,870,410 | 9/1989 | Andros et al. | 340/825.02 |
| 4,875,039 | 10/1989 | Andros et al. | 340/825.44 |
| 5,036,389 | 6/1991 | Morales | 455/5.1 |
| 5,101,267 | 3/1992 | Morales-Garza | 455/5.1 |
| 5,177,604 | 1/1993 | Martinez | 358/86 |

*Primary Examiner*—Wellington Chin
*Attorney, Agent, or Firm*—Patrick T. King

[57] **ABSTRACT**

In a two-way interactive communication video network having a network switching center for point-to-point communications between subscribers at different geographic locations, a local base station configuration is provided for facilitating low power battery operated portable subscriber units. The local subscriber units surrounding a base station are adapted for multiplex transmission of digital messages synchronously related to a broadcast television signal for system coordination. Digital messages are transmitted from the local subscriber units to the base station data processing facility through a set of receive only cell site subdivision zones distributed over the base station transmitter geographical range, which communicate with the base station data processing facility over a communication link such as wired cable. Messages are compiled and relayed by satellite to a network switching center transmitter site for nationwide point-to-point communications. Small-size, inexpensive, low-power, portable, digital-transmitting subscriber units are introduced compatible with interactive video data system standards with the ability to cross subdivision and cell zones. Thus, monitoring of inventory, temperature, and other parameters for passive automatic alarm systems and the like, as well as active mobility of subscriber units for meter reading and the like is made possible with direct low-cost nationwide real time reporting capability.

**20 Claims, 7 Drawing Sheets**





SATELLITE
1
1A
LOCAL SERVICE PARTICIPANT
7'
REGIONAL SERVICE PARTICIPANT
7
MEMORY, PROGRAM AND INTERACTOR
17
RESPONSE UNIT TERMINAL IDA
4
REMOTE RECEIVER
20
20A
5
LOCAL AREA REPEATER STATION AND REMOTE RECEIVER
3
3A
MEMORY PROGRAM
2
2F
SWITCH CONTROL CENTER
AUDIENCE CONTROL AND DATA CENTER
DATA ANALYSIS MENU CORRELATION SOURCE VERIFICATION TERMINAL DIRECTORY
DATA PROGRAM LIBRARY AND DOWN LOAD FACILITY
TRANSACTION BILLING AND PROCESSING STATISTICAL SAMPLER
14
13
15
16

FIG. 1

A0164



**FIG. 2**

**FIG. 3**



**FIG. 4**

**FIG. 5**

A0166



3
CELL BASE STATION
486
Rxa
Txa
MODEM
4
Rxa
Txa
HOME UNIT OR IDA
Rxa1
Rxsu
MODEM
22
21
REMOTE RECEIVER
22'
REMOTE RECEIVER

FIG. 6A

BROADCAST
3
SYNC ON Txa TRANSMIT SUBSCRIBER ID AND CELL ID
4
RECEIVES SUBSCRIBERS TRANSMISSION ON Rxsu PASSES BIT ON TO CELL 3
22
CELL 3 SELECTS BEST RR ID (IDA) AND RELAYS FREQ. OF BEST RR
3
RECEIVES INFO OVER Rxa TUNES Tx TO BEST RR FREQ START PASSING BITS
4
RECEIVES ON Rxa1 PASSES BIT ON TO 486
22
486 PROCESS BITS, SENDS UP TO THE VSAT LINK
3

FIG. 6B



PROPOGATION TIME:  5.3 μ SEC PER MILE

# FIG. 7A



$T_1 = T_0$ + IDA PROCESSING TIME
X = LINK DELAY BETWEEN
REMOTE RECEIVER AND CELL

# FIG. 7B



| | GUARD BAND | SYSTEM A | GUARD BAND | GUARD BAND | SYSTEM B | GUARD BAND |
|---|---|---|---|---|---|---|
| | 15.625 KHz | 15 CHANNELS 468.75 KHz | 15.625 KHz | 15.625 KHz | 15 CHANNELS 468.75 KHz | 15.625 KHz |

1          15          16          30

218 MHz          218.5 MHz          219 MHz

## FIG. 8A

| | SYSTEM A | | SYSTEM B |
|---|---|---|---|
| 1 | 218.03125 MHz | 16 | 218.53125 MHz |
| 2 | 218.0625 | 17 | 218.5625 |
| 3 | 218.09375 | 18 | 218.59375 |
| 4 | 218.125 | 19 | 218.625 |
| 5 | 218.15625 | 20 | 218.65625 |
| 6 | 218.1875 | 21 | 218.6875 |
| 7 | 218.21875 | 22 | 218.75875 |
| 8 | 218.25 | 23 | 218.75 |
| 9 | 218.28125 | 24 | 218.78125 |
| 10 | 218.3125 | 25 | 218.8125 |
| 11 | 218.34375 | 26 | 218.84375 |
| 12 | 218.375 | 27 | 218.875 |
| 13 | 218.40625 | 28 | 218.90625 |
| 14 | 218.4375 | 29 | 218.9375 |
| 15 | 218.46875 | 30 | 218.96875 |

## FIG. 8B



FIG. 9A



FIG. 9B

5,388,101

1

# INTERACTIVE NATIONWIDE DATA SERVICE COMMUNICATION SYSTEM FOR STATIONARY AND MOBILE BATTERY OPERATED SUBSCRIBER UNITS

## TECHNICAL FIELD:

This invention relates to an interactive two-way data service network for conveying synchronously timed digital messages point to point throughout the network, and more particularly it relates to local area base station cell sites subdivided into zones for processing communications within the zones from subsets of subscriber units of a configuration for integrating communications into a nationwide network of interconnected base station cell sites for point to point communications with identified remote subscriber units, wherein the subscriber units comprise low energy, stationary and mobile, digital transceivers, which may be battery operated.

## BACKGROUND ART

A wireless interactive video system disclosed in U.S. Pat. No. 4,591,906, May 27, 1986, Fernando Morales-Garza, et al. provides for real time interactive digital communication from a large audience of subscribers in urban areas in the vicinity of a central television transmitting station.

The Federal Communications Commission (FCC) has now established in the U.S.A. communication standards for such interactive video data service allocating wireless transmissions in the 218–219 MHz band for FCC licensing for public use in assigned local base station areas authorizing low power subscriber interaction units of maximum effective radiated power under twenty watts.

There has been no known interactive video data service system available heretofore that has the capability of servicing an assigned base station area with subscriber units transmitting in a milliwatt power range. With such an improved system, battery powered, portable subscriber units, suitable for such functions as meter reading, would become feasible with low battery drain, permitting interactive digital communication in local areas or nationwide.

Wireless interactive video data service is provided without telephone lines or cable systems over a nationwide network of base stations in the manner disclosed in U.S. Pat. No. 5,101,267, Mar. 31, 1992, Fernando Morales, by way of satellite transmissions between local area base stations and a data center.

This nationwide communication capability permits live video programs viewed nationwide, such as world series baseball games, to become interactive for individual subscriber participation. Thus, mass communications over a substantially real time communication system with such large urban area audience participation that would jam any existing public telephone switching network capability are made feasible.

Each local base station in such a nationwide communication system must be capable of interacting within designated license restrictions in the presence of peak local audience participation without significant switching delays to establish substantially real time interactive two-way connections over a network processing an audience of very large numbers of participants wishing to communicate substantially simultaneously.

Prior art two-way radio transmission network technology, as represented for example by portable tele-

2

phone communication systems, is generally incompatible with efficient substantially real time communication in the presence of heavy subscriber activity. This occurs because in telephone systems switching and connection operations must be made compatible with switching instructions from subscriber instruments with coded audio tones at audio frequencies accompanying analog audio messages. Thus with long numeric identification numbers for nationwide long distance connections, typically of ten decimal digits, which must be manually entered while busying lines to complete point-to-point connections as a part of the interconnecting signal data, switching circuits are engaged for very long periods of time inconsistent with substantially real time connections or heavy traffic conditions. Accordingly busy signals are encountered often to restrict the size of a participating audience for immediate connection and the follow-up contention for a line requiring re-dialing is frustrating to the potential using audience. Thus, interactive response that requires telephone exchange communications tends to be delayed and discouraging to participants, and introduces the critical problem of identifying and communicating interactively between subscribers in real time without jammed exchanges and the frustration of encountering busy signals and starting over with a new attempt to communicate.

Similarly, even with the restricted amount of digital data that might be transferred in digital paging system messages, where typically some messages only indicate a short fixed length message such as a calling telephone number, there is little possibility of approaching real time communications in the presence of heavy traffic because of the complexities of the necessary telephone switching networks employed for conveying messages.

In order to process digital information accurately, efficiently and privately it is necessary to precisely time and organize the digital data and accompanying commands. For real time two-way digital communications with large audiences wanting prompt access to the message conveyance system or network, synchronous signal timing becomes critical and absolutely necessary for real time interactive communication. In general audio telephone communications are of an analog nature not critical to timing and are conveyed asynchronously. Thus, prior telephone art signal communication systems are unsuited for adoption in interactive video data systems that convey private point to point digital messages on a real time basis for large audiences.

Typical patents relating to nationwide communications employing such prior art telephone switching techniques are now briefly referenced as representative of the present state of the art utilizing analog (voice) telephone communication networks and cellular technology to accommodate low-cost mobile battery-operated subscriber units operable within local cellular subdivisions.

In the telephone arts: Freeburg, U.S. Pat. No. 4,481,670, Nov. 6, 1984 and U.S. Pat. No. 4,525,861, Jun. 25, 1985 and 4,550,443, Oct. 29, 1985 provide for handing off best signals from portable radio sets in two-way audio analog communications between overlapping zones served by different fixed location cellular transceivers, which in some cases use different frequency bands for isolating adjacent zones.

In the paging arts, modems are used for connection with a telephone system for communication and switching over a national network as typically set forth in

5,388,101

**3**

Andros, et al. patents U.S. Pat. No. 4,870,410, Sep. 26, 1989 and U.S. Pat. No. 4,875,039, Oct. 17, 1989, and therefore are subject to the same switching system bottlenecks previously described even when short digital only communication is desired.

It is accordingly an objective of this invention to improve the state of the art by effectively using licensed interactive communication channels to provide substantially real time, synchronously timed digital communications of variable length between geographically separated base station subscribers of an interactive video data service system. Capacity for heavy audience participation without substantial delays during peak loading conditions is essential in a manner compatible with the FCC licensing conditions for interactive video data service.

It is a further objective of this invention to introduce into interactive video data service a system providing effective two-way interactive communications with simplified low-cost subscriber units transmitting in milliwatt peak power ranges under parameters compatible with FCC licensing restrictions.

Another object of the invention is to introduce portable digital communication subscriber units into an interactive video data service system adapted for local and national communications.

Other objects, features and advantages of the invention will be found throughout the following description, the drawings and the claims.

BRIEF DISCLOSURE OF THE INVENTION

A base station configuration for interactive data service provides several interrelated features for improving effectiveness of digital communication. Such features include (1) a system employing portable subscriber units of milliwatt transmitting power capacity, and (2) increasing substantially the number of subscriber units operable at the base station. Thus, typically 4000 subscriber units at a base station may be processed for point to point nationwide communication at 5.16 Kbaud data rate per unit.

A significant advantage of the invention is the capacity to rapidly connect a very large number of individually identified subscribers at each base station for parallel communications and connecting new subscribers into awaiting communication slots without significant delay.

In one embodiment the features of the present invention are embodied in a subscriber multiplexing system at the base station that relates synchronously with a base station carrier signal or the television frames of a master TV channel. Thus, the communications and switching connections are synchronized throughout a nationwide network for more efficiently and promptly processing point-to-point real time communications. Even more significant is the corresponding freedom to multiplex digital messages of variable length from a large number of transmitting subscriber units at the base station, with the assurance that little access waiting time will be encountered by subscribers to complete switching connections, even for nationwide communications.

The base station comprises a central transmitter and data processing site for processing transmitted digital data to subscriber units within the base station designated area. A plurality of receive only stations distributed throughout the region and connected by wire, cable, microwave link or radio to the central data processing site then process and relay transmitted digital

**4**

data from subscriber units within subdivided zones in the base station designated area. Thus, the base station serves a gridwork of receiver sub-cell sites distributed at locations permitting reliable response by subscribers transmitting with milliwatt digit signal levels in the FCC authorized 218–219 MHz band. Provision is made to process fringe signals between the different subdivided zones so that low-cost portable battery-operated milliwatt transmitter subscriber units may be moved throughout the base station geographical area for reliably performing such functions as meter reading and data transfer.

The base station system is adapted for communication in a nationwide network of base stations over a satellite communication network such as that of U.S. Pat. No. 5,101,267. Thus, the base station data processor locally segregates, accumulates and formats the messages from individual subscribers for re-transmission over the satellite network to a switching hub and data processing center with the capacity to locate individual subscribers in remote base stations over a nationwide network.

BRIEF DESCRIPTION OF THE DRAWINGS

In the accompanying drawings:

FIG. 1 is a block system diagram of a nationwide interactive video data satellite system embodiment of the invention that provides point-to-point communications between subscriber response units in local service areas and with various vendors of goods and services;

FIG. 2 is a diagrammatic view of a local area base cell site system embodiment of the invention for communications with very low powered local subscriber units, including mobile or portable units;

FIG. 3 is a fragmental sketch of r-f signal protocol at the base cell site for permitting communications from a significant number of subscriber units simultaneously in real time;

FIG. 4 is a diagrammatic sketch of message frames for illustrating the maximization of data processed at local cell sites;

FIG. 5 is a block diagram of a base cell site to satellite communication link afforded by the invention to process fixed length frames and formulate variable length messages from subscribers during an active connection interval;

FIGS. 6A and 6B respectively are a block system diagram of communication channels at the base cell site, and a corresponding diagrammatic system flow diagram for transmitted messages between local subscribers the cell data center and the satellite connected network of cell sites;

FIGS. 7A and 7B respectively are a block diagram illustrating transit time characteristics of messages at a base cell site, and a diagrammatic view of typical communication frames showing relative times at different cell site communication stations;

FIGS. 8A and 8B are respectively frequency band charts for FCC allocated frequency bands and subchannel bands for interactive video data services as employed by this invention; and

FIGS. 9A and 9B are respective block circuit diagrams of subscriber units for digital only fixed or mobile communication services and integrated video and digital data service embodiments of the invention.

THE PREFERRED EMBODIMENTS:

In FIG. 1 the nationwide interactive network embodying this invention and setting out in perspective

5,388,101

5

support services and equipment is illustrated in block diagram format. Thus a set of subscribers at response units 4 communicate over the wireless 218–219 MHz r-f links 5 to either a set of local remote receivers 20, each connected by a link 21 such as a telephone line to re- peater cell 3, or to a local area base station repeater cell 3, one of a set of such repeater stations in different geo- graphic locations for communicating via satellite 1 under control of a data and switching control center 2. Regional and local service or product participants 7 also communicate with the local area cells 3 and the control center 2. The basic operation of this system is set forth in said U.S. Pat. Nos. 4,591,906 and 5,101,267. Details of point-to-point switching and communication throughout the system identified at switch control cen- ter 14 and accompanying terminal directory 13, down- loading of data and software from the control center 15, and the processing of billings and transactions 16, and the corresponding interaction of the memory and soft- ware at the subscriber unit 17 are set forth in co-pending applications Ser. No. 07/889,626, May 28, 1992 for Software Controlled Interactive Video Network and Ser. No. 07/932,241, Aug. 19, 1992 for Interactive Sat- ellite Broadcast Network, which are incorporated here- into by reference as background material to the extent necessary for providing a full disclosure of operating details.

In this system therefore, simplified low cost sub- scriber response units 4 are universally applicable to a wide range of interactive functions by means of soft- ware control facilities. The system furthermore in its r-f processing system efficiently handles mass data for ac- commodating ·very large system peak load capacity substantially in real time through the switch control center 14 with typically stores for each subscriber cur- rently updated information that need not be transmitted with every transaction such as the directory identifica- tion code, name, address, telephone number and credit card, etc.

An explicit cell site 3 embodiment utilizing a local base station repeater cell 3 afforded by this invention, which expands the interactive capabilities and functions of the subscriber response units 4 while improving per- formance and reducing cost, is diagrammatically shown in FIG. 2. The outer dotted ring 19 outlines the limits of a local area cell site, such as may be licensed by the FCC for interactive video data service. The cell site embodiment utilizing local base station repeater cell 3 communicates with the satellite system via directed dish antenna 3A, and transmits digital communications and TV video overlay trigger signals to a set of subscribers X throughout the assigned territory by way of antenna 8.

A set of typically ten remote, receive-only, fixed- location relay stations 20A–20N are positioned at strate- gic locations within the cell area. Each local remote receiver station 20 is connected by cable, microwave or leased telephone line 21 to the cell site utilizing a local base station repeater cell 3 Thus, transceiving sub- scriber units X 4, 4', etc located within the subdivided response zones 22 communicate with the local remote receivers 20 over a significantly reduced transmission path distance within the subdivided response areas 22, as compared with direct transmission from a local base station repeater cell transceiving subscriber units X 4, 4'. This subdivision feature, accordingly for the first time in interactive video data system provides for reli- able transmission at radiated power levels in the milli-

6

watt region. Distinct advantages result including less chance for external interference and long life battery operated portable subscriber units 4 which can be moved throughout the cell territory (19).

Accordingly, this invention encourages such addi- tional interactive services in the network as typified by meter reading, and inventory control in soft drink dis- pensing machines, etc. in a manner saving so much manpower and expense as to be viable economically in this type of interactive video data service system. In the latter two examples, very simple digital communication subscriber units 4 may be provided without the neces- sity for video displays, in the manner later described. Other examples are site alarms for remote monitoring of open doors, fires, failure, temperature, etc. Two-way paging services are also thus made available, or teleme- ter in location or condition of delivery trucks, etc. Fur- thermore, with full service video display TV installa- tion at a subscriber station 4, the feasibility of moving such remote units to different locations in a house, of- fice, or car is established. Accordingly this invention is in part directed to the provision of portable or mobile interactive subscriber stations and communication units for interactive video data service systems compatible with FCC standards. With the lower power transmit- ters provided, adjustments of power in the subscriber units may be avoided by simple AGC at the remote receiver terminals. Smaller and portable home units are also possible. There is considerable advantage of longer battery life for portable units.

A further substantial advantage to the invention is the ability to handle point-to-point connections nationwide under peak traffic conditions with very little subscriber waiting time for access to the system. The system proto- col for reception of messages and response at the sub- scriber units in the chart form of FIG. 3 illustrates the large number, typically 640, of subscribers X that can be simultaneously using the system at any cell site 5. With reference again to FIG. 2, thus assume that each of ten fixed remote receiver stations 20A–20N within the cell area (19) is capable of processing 64 on-air subscriber units X. This results because the milliwatt powered subscriber units X are adapted for transmission in a single one of the ten subdivided areas or zones 22, with provisions preventing interference with adjacent zones 22A, 22B, etc.

Other system advantages are: (1) that low power subscribers use the system at outer cell boundaries, thereby reducing chances for inter-cell interference, (2) that the expansion of the system may occur by adding subdivided zones as the subscriber base grows, (3) that the passive local remote receive-only receivers have no problems in meeting FCC interactive video data service conditions, (4) and that capital, power and operating costs substantially decrease.

With reference now FIG. 3, to transmit with ten subscriber units X in the respective zones 22 of FIG. 2, the protocol assigns in a timed broadcast period 30 a home unit (HU) response time interval 31, at an accu- mulated 5.1 kbaud response rate. Each of these switched-in user home units then transmits a digital message superimposed by modulation on the 218–219 MHz band subcarrier. The broadcast time interval 32 permits the cell site transmitter 8 of FIG. 2 to broadcast a message including a (ringing) signal that may include an address code number for activating a single home unit within the cell area 19 of FIG. 2. Each home unit has a built in address code that must be used to activate

5,388,101

7

that unit 14 of FIG. 2, and the central data switch control unit maintains a directory of all such numbers in the nationwide network. The broadcast time interval 33 provides a time gap for checking errors and for providing desirable control signals. Guard gaps 36 are supplied between successive broadcast periods 30, also identifiable as r-f frames.

With reference again to FIG. 3, the r-f frames permit transmission at 5.1 kbaud for each of say ten subdivisions 22 of FIG. 2. Thus the cell stores in a buffer the ten multiplexed home unit data rates to load the buffer at a 51 kbaud rate. A total data rate for the main cell area 19 of FIG. 2 is 51 kbaud from the ten simultaneous responses from the separate subdivisions 22 of FIG. 2. Assuming no errors and 1000 bit messages from each home unit, with 3,000 home units trying to get their message through ten channels, the waiting time for a "line" would be less than one minute without contention, thereby minimizing the necessity of "redialing".

The legends in the right hand column show that each remote receiver station 20A–20N is assigned a corresponding communication frequency bandwidth $f_1$—$f_n$, thereby isolating the communications from subscriber units X in each subdivision 22 within the cell area 19 as shown in FIG. 2. The length of the r-f frames 30 is 12.4 milliseconds including a guard band 36 of about 120 microseconds.

Typical message protocol is illustrated in FIG. 4 for fixed frame message lengths of 30 bytes of eight bits. This fixed length is important in minimizing access time to the system under peak load conditions, since there will be substantially no dead air time incurred while a subscriber is awaiting to be connected or disconnected. Various functional categories are typically included in the broadcast interval 32 as shown in the blocks. Of note is the home unit ID section which addresses the unit to be activated (similar to a telephone number), and the Packet ID byte for accumulating a sequence of home unit response frames into a packet. All messages and protocols are consistent with the transmission of data implicitly as part of a video message during the vertical blanking interval or transmission over a digital r-f link parallel to a video channel. However, as will be more particularly set forth later, it is pertinent to synchronize timed data within the nationwide system, even taking into account differences in travel time of radio waves (see U.S. Pat. No. 4,591,906), and for this reason the technique described in Pat. No. 4,755,871, Jul. 5, 1988 for Control of RF Answer Pulses in a TV Answer Back System may be used to synchronize transmissions with the TV carrier signal from the cell site transmitter and to organize all the multiplexed timing slots for avoiding idle on-air time. Thus, this system departs from any former telephone switching system art which is asynchronously switched.

As seen from FIGS. 1, 2, 4 and 5, the nationwide transmission of messages from the individual subscriber home units 4, (X) longer than 240 bits require several frames, with accumulation into packets, identifiable in the broadcast frame 32. The cell site transmission system 40 thus processes a set of packets in the manner shown in FIG. 5 to accumulate subscriber messages of variable length in a set of serial transmissions for transmitting to the satellite at higher transmission frequency. Accordingly packet builders 41, 41A, etc. are individually assigned to a responding one of simultaneously active subscribers until the subscriber's variable length message of n 240 bit frames is completed, and after

8

pricing 42 the messages are accumulated 43, synchronously timed 45 and transmitted to the satellite 44. These accumulated messages are received at the central data station 2 for switching, adding pertinent subscriber data and a receiving address and retransmitting over the satellite at a receiving point, such as a further subscriber or a service provider.

Now FIGS. 6A and 6B relate to the communication sequences within the local base station repeater cell area (19, FIG. 2) between home units 4, the cell site utilizing local base station repeater 3 and local remote stationary receivers 20A–20N Note that the home unit 4 is also designated as an interactive data appliance (IDA), a general term including subscriber video stations, digital alarms, or the like, and portable units.

The data flow chart of FIG. 6B relates to a "set-up" and response sequence of intercommunications between the respective subscriber units 4, (IDA) local remote fixed station subdivision receivers 20A–20N (RR) and the cell site utilizing local base station repeater cell 3. Synchronization is controlled by the carrier frequency $Tx_{cl}$ of the cell transmitter upon which the subscriber unit 4 locks. Then the subscriber unit 4 initiates a response which includes both the subscriber ID and the cell ID for the purpose of handoff between cells with portable units or fringe area cells.

The remote receiver 20 receives the subscriber's transmission on its frequency $Rx_{su}$, and passes an acknowledgement to the base station repeater cell 3 for sampling transmission and auditing the transmission routing. Thus base station repeater cell 3 selects the local receiver remote 20A–20N, etc. that receives the best subscriber signal Note that the local remote receiver 20 receives both the transmissions from the cell transmitter frequency at $Rx_{al}$ and the communications at its assigned frequency $Rx_{su}$, and similarly the subscriber unit transmits on two alternative frequencies, one tuned to a particular remote receiver 20 frequency.

The base station repeater cell 3 then relays the best frequency back to the subscriber unit 4 for tuning in and finishing communications with the best and only remote receiver 20. This is the end of the "set up" period and the start of the transmission period, during which the message bits are relayed to the base station repeater cell 3 by the local remote receiver 20 tuned in, and are at the base station repeater cell 3 processed and relayed into the network to the central data hub via the VSAT link. Note that the gap 33 between the base station repeater cell 3 broadcast interval 32 and the home unit response interval 31 is used for the set up function so that a single frame period covers the procedure of FIG. 6B through the sending of a single frame of the message from the subscriber unit. If transmission conditions change, a succeeding frame of the subscriber's message thus could be transmitted from a different remote receiver at a different frequency. Thus the packet ID byte portion of FIG. 4 is significant for reassembling the message frames into a single message packet (also identified). The arbitrary cell identification number 486 is similar to a telephone exchange area code designation in the identification of the cell or the subscriber's complete ID address.

This set up procedure is important for "hand-off" of a portable unit from one stationary local remote receiver site 22 to another as fringe areas are encountered, such as at borders 25 between two local remote receiver 22 activity sites 22 (FIG. 2). Similarly the portable units can move from cell to cell when adjacent cells are pres-

9

ent such as in urban areas, requiring similar hand-off procedure. The hand-off may be initiated in different ways.

As above described, the base station repeater cell 3 may initiate the hand-off of a subscriber 4 from a local remote receiver 20 in one zone to another in a different zone within the subdivided cell. Thus a signal strength (RSSI) measurement may serve as a criterion for hand-off, with the cell directing the subscriber into a set-up routine when signals below a threshold, −80dBm for example, are encountered. Since the subscriber unit 4 stores the message data, it is retained until the set-up procedure is completed in about 50 milliseconds.

Alternatively the subscriber unit software may cause the subscriber unit 4 to place itself in a set-up routine when the RSSI goes below a chosen threshold value, so that the home unit response is transmitted only after set-up with a satisfactory cell or cell sub-division zone (22) connection of proper signal strength.

When the subscribers 4 are transportable from cell to cell, the packets (FIG. 5) should be sorted at the data processing center 2 rather than at the base station repeater cell 3 level. Each packet carries an identification of the subscriber for this purpose and the packet ID is carried in the broadcast frame (FIG. 4) for such processing. Thus at the central hub (2) a packet of three frames could be derived from two different cells, generally adjacent in geographical relationship. Note the cell ID in the subscriber's transmissions (FIG. 6B), which is used for control purposes.

Also with reference to FIG. 2, the possibility of fringe hand off errors or interfering signals between cells is avoided by the allocation of different transmission frequencies for communicating with the geographically adjoining local remote receiver stations (20) in the adjacent base station repeater cell areas (19, 26). Thus, in the vicinity of overlapping base station repeater cell regions 19 and 26, the related frequencies $f_x$, $f_y$ assigned to adjacent local remote receivers 20X and 20Y may avoid interference problems between local remote receiver stations 20 in different adjacent base station repeater cell territories.

Critical timings in the messages processed within the base station repeater cell site (19, FIG. 2) are discussed in relationship to FIGS. 7A and 7B. For keeping the message bits accurately synchronized within the system, the delays in transit time of r-f transmissions must be accounted for. Those transit times are noted in FIG. 7A, and the transmitted message frame timings are set forth in FIG. 7B. The frames are sequentially separated by a 120 microsecond guard band. The approximate 2.7 microsecond delay within the cell area (19) of 2 miles diameter is encountered between the subscriber (IDA) 4 and the closest local remote receiver station 20 of approximately ten such stations distributed about the base station repeater cell. This is of no significance since by the use of fifty microsecond pulse widths in the communications that is less than 6% of the pulse width and thus no range adjustment is needed for that propagation induced delay. The base station repeater cell 3 thus adjusts its synchronization with system timing of the received IDA responses after accounting for the approximately two times 10.6 microsecond (average) delay time for the transmissions to IDA 4 and back to base station repeater cell 3.

FIGS. 8A and 8B set forth the FCC approved bands for licensed interactive communications, thus allocating

10

fifteen channels of bandwidth capable of carrying the messages under the conditions described herein.

FIGS. 9A and 9B respectively illustrate portable subscriber units afforded by this invention for interactive two-way wireless communications in a cell compatible with FCC standards for interactive video data services of the simplified digital appliance type (9A) and the more comprehensive video display type (9B).

In the simplified version of FIG. 9A, the transceiver 50 permits two-way wireless communications in the 218–219 MHz bands set forth in FIG. 8, and compatible with the functions hereinbefore set forth such as in connection with FIG. 6A. The double headed arrow notation for the radiowaves at antenna 49 signifies two way wireless communication. For digital communications, an input register 51 for received digital data is supplied and an output register 52 for retaining interactive subscriber entered messages from transducer 53, typically a manual keyboard or a digital sensing instrument. Digital display means may be provided for subscriber viewing of either or both register contents. Thus the data processor 54, by way of suitable software controls the system with different modes of operation such as the manual control 55 suitable to keyboard input of data from a subscriber, or an automatic monitoring control mode 56 for relaying an alarm or inventory reading at a subscriber's coin operated vending machine. The frequency control section 57 serves to monitor and set the transmission carrier frequency during set up procedures for transmission to a most favorable fixed local remote receiver (20) station. Also it serves as the system clock to synchronize the transmission frequency of digital data pulses with the system by means of locking to a TV station carrier signal, for example. The unique identification number 58 is built into each subscriber unit and serves similar to a telephone number as a screen for incoming messages directed to that subscriber unit and as an identification of the source of messages sent from an individual subscriber. General software control technology for operation of the subscriber units and systems of the disclosed system are known in the art as set forth in more detail in the before mentioned prior patents and patent applications.

This interactive data appliance embodiment of the invention provides a number of innovative features and significant advantages, all compatible with operations within the parameters of a nationwide network of FCC licensed local interactive video data service cells, either for interactive communication within the local cell or for interactive communications nationwide over the network. The software controlled data processor makes the utility of the appliance substantially universal in terms of introduction of modes of operation to match with and integrate into machinery or systems and to provide a variety of features for manual control of interactivity by a subscriber. The simplicity of the digital mode of communication makes the unit simple, low cost and small in size for ideal portability and long life from battery power. It is of major importance to have the ability in an interactive video data service installation for portable movement of a subscriber unit for providing communication capabilities formerly limited to nationwide mobile telephone systems and further providing a range of interactivities not hitherto feasible.

The embodiment of FIG. 9B provides for interactivity in conjunction with video displays, and in particular as related to broadcast television programs. Thus the conventional television receiver 60 with the wireless

5,388,101

11

communication link **63** communicates with the interactive data appliance **61** for the type of service described in U.S. Pat. No. 5,101,267, for example. Therefore the manual control unit **62** controls the TV receiver **60** and the interactive data appliance, which in this case may be termed a home unit or subscriber station. The portability feature made possible by this invention permits such a unit to be moved next door or put into a car or van for movement within or across cell boundaries with good digital synchronous communication contact within the nationwide network of cells, which utility has not heretofore been known or feasible in interactive video data systems.

It is therefore evident from this disclosure that the state of the art is advanced. Accordingly the features of novelty believed descriptive of the spirit and nature of the invention are set forth with particularity in the following claims.

I claim:

1. A base station configuration in a two-way communication interactive video network having a network hub switching center for routing communications from and to a plurality of subscriber units at various geographic locations served by a base station that processes digital data modulated on an r-f carrier and transmitted from a plurality of subscriber units dispersed over a predetermined base station geographic area by presenting multiplexed digital data synchronously related to the base station broadcast signal for communication from identified individual subscriber units within designated geographic service areas, comprising in combination,

base station data processing and transmission facilities for transmitting to a set of local subscriber units and receiving from a subset of those local subscriber units multiplexed synchronously related digital data messages of variable lengths for point-to-point communication between individual subscribers with remotely located reception stations,

base station reception means for receiving and processing data messages from the set of local subscriber units at that base station comprising a set of cell subdivision sites partitioned from said base station geographic area and dispersed over the base station geographic area, each cell subdivision site being adapted for receiving-only low power digital messages transmitted from local subscriber units within range of the partitioned cell site areas, and

a set of local subscriber transceiver units including low power mobile units located within the base station geographic area each adapted to communicate with said base station by way of digital data signals of variable lengths synchronously related to said base station broadcast signal and timed for said multiplexed message transmission.

2. The base station configuration defined in claim **1** wherein said hub switching center is located remotely from said base station, and said network comprises a plurality of base stations located in different geographic areas, further comprising,

data processing facilities in said base station and network for communicating designated digital data messages between local subscriber units in said predetermined base station geographic area and other subscriber units located in the vicinity of the base stations located in different geographic areas via said hub switching center.

3. The configuration of claim **2** further comprising,

12

message accumulation means in said base station data processing facilities operative to store and retransmit digital message packets from identified subscriber units comprising a sequence of subscriber transmission frames, and

processing means for retransmission of the digital message packets to the hub switching center by satellite.

4. The configuration of claim **2** further comprising, subscriber unit management and transmission means for conveying messages from the base station to the hub switching center which processes a subscriber message data bit output from the base station at 2.560 kbaud.

5. The configuration of claim **4** further comprising a set of n isolated said cell sites, and assembling means for accumulating the messages from said n cell sites and transmitting the accumulated messages over said transmission means at a message data bit capacity of n times 2.560 kbaud.

6. The configuration of claim **5** further comprising means for interlacing **64** subscriber units for transmitting simultaneously multiplexed messages at said base station.

7. The configuration of claim **5** further comprising means for transmitting bit data rate at 5.16 kbaud from the home units to the assembling means.

8. The configuration of claim **2** further comprising means for transmitting messages from the different subdivided cell areas on different carrier frequencies.

9. The base station configuration defined in claim **1** further comprising, means in said base unit for compensating for the time of propagation of messages between the different individual subscriber units and the base station data processing facilities.

10. The base station configuration defined in claim **1** further comprising a transmitter for conveying messages from said base station to said subscriber units on a carrier frequency of substantially 218 MHz.

11. The base station configuration defined in claim **1** wherein each of said local subscriber units is individually identified by reception and transmission of digital signal pulses in a predetermined timing relationship synchronized with a television frame of said television broadcast signal.

12. The base station configuration in claim **1** wherein said local subscriber units comprise digital message organization means that disassembles a variable length digital message for transmission on a sequence of fixed length transmission frames.

13. The base station configuration in claim **1** further comprising receive only stations in said cell subdivision sites, and means for operating the base station and subscriber units to hand-off a communication message for transmission over a path through a single one of said cell subdivision receive-only stations.

14. The base station configuration in claim **13** further comprising subscriber units operable to transmit on a plurality of frequency bands, and receive-only receivers at different subdivision sites operable in different ones of said frequency bands.

15. The base station configuration in claim **13** which comprises one of a plurality of base stations in said network, further comprising facilities for handing off communications from a subscriber unit within the base station geographic area for communication through a network path of a different base station.

5,388,101

13

16. A point-to-point interactive video network system having a central switching station, a plurality of base stations, a satellite station, and a set of subscriber units located in the vicinity of each base unit, comprising in combination, means for providing for two-way digital communications between two different subscriber units by a serial communication path extending through a base station, the satellite, the central station, the satellite and back to a base station, wherein at least some of said base stations serve a set of subscriber units dispersed over a predetermined geographic area and comprise communication means between the subscriber units with the base station including a set of stationary receive only terminals remote from the base station coupled by a communication link with the base station for conveying transmitted messages from subscriber units in a subdivided portion of said geographic area in the vicinity of the receive only terminals to the base station, subscriber transmitter units for transmitting digital amplitude modulated pulses at a peak power in the milliwatt range, and data processing means at the base station for assembling and re-transmitting digital subscriber messages from the subscriber units via the satellite to the central station, said subscriber units transmitting on a plurality of frequency bands.

17. A point-to-point interactive video network system having a central switching station, a plurality of base stations, a satellite station, and a set of subscriber units located in the vicinity of each base unit, comprising in combination, means for providing for two-way digital communications between two different subscriber units by a serial communication path extending through a base station, the satellite, the central station, the satellite and back to a base station, wherein at least some of said base stations serve a set of subscriber units dispersed over a predetermined geographic area and comprise communication means between the subscriber units with the base station including a set of stationary receive only terminals remote from the base station coupled by a communication link with the base station for conveying transmitted messages from subscriber units in a subdivided portion of said geographic area in the vicinity of the receive only terminals to the base station, subscriber transmitter units for transmitting digital amplitude modulated pulses at a peak power in the milliwatt range, and data processing means at the base station for assembling and re-transmitting digital subscriber messages from the subscriber units via the satellite to the central station, said subscriber units being portable, said base station including means to receive messages from said subscriber units through a single one of said receive only terminals.

14

18. A point-to-point interactive video network system having a central switching station, a plurality of base stations, a satellite station, and a set of subscriber units located in the vicinity of each base unit, comprising in combination, means for providing for two-way digital communications between two different subscriber units by a serial communication path extending through a base station, the satellite, the central station, the satellite and back to a base station, wherein at least some of said base stations serve a set of subscriber units dispersed over a predetermined geographic area and comprise communication means between the subscriber units with the base station including a set of stationary receive only terminals remote from the base station coupled by a communication link with the base station for conveying transmitted messages from subscriber units in a subdivided portion of said geographic area in the vicinity of the receive only terminals to the base station, subscriber transmitter units for transmitting digital amplitude modulated pulses at a peak power in the milliwatt range, and data processing means at the base station for assembling and re-transmitting digital subscriber messages from the subscriber units via the satellite to the central station, each of the receive only terminals receiving signals in a different frequency band, and the subscriber units having means for selecting a transmission carrier frequency in a plurality of the frequency bands.

19. An interactive video data system comprising:

subscribers with portable subscriber units and facilities for communicating from the subscriber units when moved through different geographic zones, and

a set of subscriber units limited to digital processing facilities comprising digital transducers and means for transmitting digital data derived by said transducers.

20. An interactive video data system comprising:

subscribers with portable subscriber units and facilities for communicating from the subscriber units when moved through different geographic zones,

a base station of defined geographic area for serving a set of said subscriber units, said area is subdivided into a plurality of zones, and receive only stations located in said zones for reception of transmissions from subscriber units located in the respective zones, and

facilities in said base station and subscriber units for handing off communications between zones when communicated signals deteriorate below a given threshold.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 5,388,101                                  Page 1 of  1
APPLICATION NO. : 07/966414
DATED                   : February 7, 1995
INVENTOR(S)        : Gilbert M. Dinkins

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 12, Line 45. In claim 11, delete "said television" and insert --said base station--.

Signed and Sealed this

Twenty-second Day of December, 2009

David J. Kappos
*Director of the United States Patent and Trademark Office*



US005388101C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (8797th)

# United States Patent

**Dinkins**

(10) **Number:** US 5,388,101 C1

(45) **Certificate Issued:** Jan. 17, 2012

---

(54) **INTERACTIVE NATIONWIDE DATA SERVICE COMMUNICATION SYSTEM FOR STATIONARY AND MOBILE BATTERY OPERATED SUBSCRIBER UNITS**

(75) Inventor: **Gilbert M. Dinkins**, Herdon, VA (US)

(73) Assignee: **Eon Corporation**, Reston, VA (US)

**Reexamination Request:**
No. 90/011,264, Oct. 6, 2010

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **5,388,101** |
| Issued: | **Feb. 7, 1995** |
| Appl. No.: | **07/966,414** |
| Filed: | **Oct. 26, 1992** |

Certificate of Correction issued Dec. 22, 2009.

(51) **Int. Cl.**
| | |
|---|---|
| *H04B 7/185* | (2006.01) |
| *H04H 9/00* | (2006.01) |
| *H04H 3/00* | (2006.01) |
| *H04N 7/173* | (2006.01) |
| *H04N 7/24* | (2006.01) |
| *H04Q 7/12* | (2006.01) |
| *H04Q 7/14* | (2006.01) |

(52) **U.S. Cl.** ...................... **725/62**; 348/E7.07; 370/316; 370/328; 375/E7.025; 455/420; 455/428; 455/436; 455/454; 455/507; 455/560; 725/119; 725/65

(58) **Field of Classification Search** .................. 370/95.1
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/011,264, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Ovidio Escalante

(57) **ABSTRACT**

In a two-way interactive communication video network having a network switching center for point-to-point communications between subscribers at different geographic locations, a local base station configuration is provided for facilitating low power battery operated portable subscriber units. The local subscriber units surrounding a base station are adapted for multiplex transmission of digital messages synchronously related to a broadcast television signal for system coordination. Digital messages are transmitted from the local subscriber units to the base station data processing facility through a set of receive only cell site subdivision zones distributed over the base station transmitter geographical range, which communicate with the base stations data processing facility over a communication link such as wired cable. Messages are compiled and relayed by satellite to a network switching center transmitter site for nationwide point-to-point communications. Small-size, inexpensive, low-power, portable, digital-transmitting subscriber units are introduced compatible with interactive video data system standards with the ability to cross subdivision and cell zones. Thus, monitoring of inventory, temperature, and other parameters for passive automatic alarm systems and the like, as well as active mobility of subscriber units for meter reading and the like is made possible with direct low-cost nationwide real time reporting capability.



US 5,388,101 C1

**1**

## EX PARTE
## REEXAMINATION CERTIFICATE
## ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1**, **2**, **4-6**, **8** and **12** is confirmed.

Claims **3**, **7**, **9-11** and **13-20** were not reexamined.

\* \* \* \* \*

US005388101C2

## (12) EX PARTE REEXAMINATION CERTIFICATE (9205th)

# United States Patent

### Dinkins

(10) **Number:** US 5,388,101 C2

(45) **Certificate Issued:** Aug. 14, 2012

(54) **INTERACTIVE NATIONWIDE DATA SERVICE COMMUNICATION SYSTEM FOR STATIONARY AND MOBILE BATTERY OPERATED SUBSCRIBER UNITS**

(75) Inventor: **Gilbert M. Dinkins**, Herdon, VA (US)

(73) Assignee: **Eon Corporation**, Reston, VA (US)

**Reexamination Request:**
No. 90/010,383, Jan. 9, 2009

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,388,101** |
| Issued: | **Feb. 7, 1995** |
| Appl. No.: | **07/966,414** |
| Filed: | **Oct. 26, 1992** |

Reexamination Certificate C1 5,388,101 issued Jan. 17, 2012

Certificate of Correction issued Dec. 22, 2009.

(51) **Int. Cl.**
| | |
|---|---|
| *H04B 7/185* | (2006.01) |
| *H04N 7/173* | (2006.01) |
| *H04N 7/24* | (2006.01) |

(52) **U.S. Cl.** ..................... **725/62**; 348/E7.07; 370/316; 370/328; 375/E7.025; 455/428; 455/436; 455/454; 455/507; 455/560; 725/65

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/010,383, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner*—Roland Foster

(57) **ABSTRACT**

In a two-way interactive communication video network having a network switching center for point-to-point communications between subscribers at different geographic locations, a local base station configuration is provided for facilitating low power battery operated portable subscriber units. The local subscriber units surrounding a base station are adapted for multiplex transmission of digital messages synchronously related to a broadcast television signal for system coordination. Digital messages are tansmitted from the local subscriber units to the base station data processing facility through a set of receive only cell site subdivision zones distributed over the base station transmitter geographical range, which communicate with the base stations data processing facility over a communication link such as wired cable. Messages are compiled and relayed by satellite to a network switching center transmitter site for nationwide point-to-point communications. Small-size, inexpensive, low-power, portable, digital-transmitting subscriber units are introduced compatible with interactive video data system standards with the ability to cross subdivision and cell zones. Thus, monitoring of inventory, temperature, and other parameters for passive automatic alarm systems and the like, as well as active mobility of subscriber units for meter reading and the like is made possible with direct low-cost nationwide real time reporting capability.



US 5,388,101 C2

**1**

## EX PARTE REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-20** is confirmed.

\* \* \* \* \*

# United States Patent [19]

**Dinkins**

[11]    **Patent Number:**    **5,481,546**

[45]    **Date of Patent:**    * **Jan. 2, 1996**

[54]    **INTERACTIVE NATIONWIDE DATA SERVICE COMMUNICATION SYSTEM FOR STATIONARY AND MOBILE BATTERY OPERATED SUBSCRIBER UNITS**

[75]    Inventor:    **Gilbert M. Dinkins**, Herdon, Va.

[73]    Assignee:    **Eon Corporation**, Reston, Va.

[ * ]    Notice:    The portion of the term of this patent subsequent to Feb. 7, 2012, has been disclaimed.

[21]    Appl. No.: **240,147**

[22]    Filed:    **May 10, 1994**

**Related U.S. Application Data**

[63]    Continuation of Ser. No. 966,414, Oct. 26, 1992, Pat. No. 5,388,101.

[51]    **Int. Cl.$^6$** ............................ **H04N 7/173**; H04B 7/24; H04L 12/18

[52]    **U.S. Cl.** ........................ **370/95.1**; 455/33.1; 455/53.1; 348/7; 348/13

[58]    **Field of Search** .............................. 348/6, 8, 12, 13, 348/7, 10; 379/58, 59, 63, 90, 93; 370/71, 73, 75, 85.1, 95.1, 95.3, 104.1; 455/33.1, 53.1

[56]    **References Cited**

U.S. PATENT DOCUMENTS

5,036,389    7/1991    Morales ...................................... 348/13

5,177,604    1/1993    Martinez .................................... 348/13

*Primary Examiner*—Wellington Chin
*Attorney, Agent, or Firm*—Patrick T. King; John P. Wagner, Jr.

[57]    **ABSTRACT**

In a two-way interactive communication video network having a network switching center for point-to-point communications between subscribers at different geographic locations, a local base station configuration is provided for facilitating low power battery operated portable subscriber units. The local subscriber units surrounding a base station are adapted for multiplex transmission of digital messages synchronously related to a broadcast television signal for system coordination. Digital messages are transmitted from the local subscriber units to the base station data processing facility through a set of receive only cell site subdivision zones distributed over the base station transmitter geographical range, which communicate with the base station data processing facility over a communication link such as wired cable. Messages are compiled and relayed by satellite to a network switching center transmitter site for nationwide point-to-point communications. Small-size, inexpensive, low-power, portable, digital-transmitting subscriber units are introduced compatible with interactive video data system standards with the ability to cross subdivision and cell zones. Thus, monitoring of inventory, temperature, and other parameters for passive automatic alarm systems and the like, as well as active mobility of subscriber units for meter reading and the like is made possible with direct low-cost nationwide real time reporting capability.

**14 Claims, 7 Drawing Sheets**





FIG.1



FIG. 2

FIG. 3

| 36 | 32 | 33 | 31 | ← 30 | |
|---|---|---|---|---|---|
| | BROADCAST INTERVAL | ERROR CORRECTING AND RESERVED | HU RESPONSE INTERVAL | | REMOTE RECEIVER f1 |

| HU RESPONSE INTERVAL | REMOTE RECEIVER f2 |
|---|---|

| HU RESPONSE INTERVAL | REMOTE RECEIVER fn |
|---|---|

A0185



FIG. 4

FIG. 5

A0186



3
CELL BASE STATION
486
Rxa
Txa
MODEM
4
Rxa
Txa
HOME UNIT OR IDA
Rxa1
Rxsu
MODEM
21
22
REMOTE RECEIVER
REMOTE RECEIVER
22'

FIG. 6A

BROADCAST
3
SYNC ON Txa TRANSMIT SUBSCRIBER ID AND CELL ID
4
RECEIVES SUBSCRIBERS TRANSMISSION ON Rxsu PASSES BIT ON TO CELL 3
22
CELL 3 SELECTS BEST RR ID (IDA) AND RELAYS FREQ. OF BEST RR
3
RECEIVES INFO OVER Rxa TUNES Tx TO BEST RR FREQ START PASSING BITS
4
RECEIVES ON Rxa1 PASSES BIT ON TO 486
22
486 PROCESS BITS, SENDS UP TO THE VSAT LINK
3

FIG. 6B



PROPOGATION TIME:  5.3 μSEC PER MILE

# FIG. 7A



$T_1 = T_0 + $ IDA PROCESSING TIME
X = LINK DELAY BETWEEN
REMOTE RECEIVER AND CELL

# FIG. 7B

| GUARD BAND | SYSTEM A | GUARD BAND | GUARD BAND | SYSTEM B | GUARD BAND |
|---|---|---|---|---|---|
| 15.625 kHz | 15 CHANNELS 468.75 kHz | 15.625 kHz | 15.625 kHz | 15 CHANNELS 468.75 kHz | 15.625 kHz |

218 MHz          1          15          218.5 MHz          16          30          219 MHz

## FIG. 8A

|   | SYSTEM A |    | SYSTEM B |
|---|---|---|---|
| 1 | 218.03125 MHz | 16 | 218.53125 MHz |
| 2 | 218.0625 | 17 | 218.5625 |
| 3 | 218.09375 | 18 | 218.59375 |
| 4 | 218.125 | 19 | 218.625 |
| 5 | 218.15625 | 20 | 218.65625 |
| 6 | 218.1875 | 21 | 218.6875 |
| 7 | 218.21875 | 22 | 218.75875 |
| 8 | 218.25 | 23 | 218.75 |
| 9 | 218.28125 | 24 | 218.78125 |
| 10 | 218.3125 | 25 | 218.8125 |
| 11 | 218.34375 | 26 | 218.84375 |
| 12 | 218.375 | 27 | 218.875 |
| 13 | 218.40625 | 28 | 218.90625 |
| 14 | 218.4375 | 29 | 218.9375 |
| 15 | 218.46875 | 30 | 218.96875 |

## FIG. 8B



**FIG. 9A**

**FIG. 9B**

5,481,546

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## INTERACTIVE NATIONWIDE DATA SERVICE COMMUNICATION SYSTEM FOR STATIONARY AND MOBILE BATTERY OPERATED SUBSCRIBER UNITS

This application is a Continuation of application Ser. No. 07/966,414, filed Oct. 26, 1992, now U.S. Pat. No. 5,388, 101.

### TECHNICAL FIELD

This invention relates to an interactive two-way data service network for conveying synchronously timed digital messages point to point throughout the network, and more particularly it relates to local area base station cell sites subdivided into zones for processing communications within the zones from subsets of subscriber units of a configuration for integrating communications into a nationwide network of interconnected base station cell sites for point to point communications with identified remote subscriber units, wherein the subscriber units comprise low energy, stationary and mobile, digital transceivers, which may be battery operated.

### BACKGROUND ART

A wireless interactive video system disclosed in U.S. Pat. No. 4,591,906, May 27, 1986, Fernando Morales-Garza, et al. provides for real time interactive digital communication from a large audience of subscribers in urban areas in the vicinity of a central television transmitting station.

The Federal Communications Commission (FCC) has now established in the U.S.A. communication standards for such interactive video data service allocating wireless transmissions in the 218–219 MHz band for FCC licensing for public use in assigned local base station areas authorizing low power subscriber interaction units of maximum effective radiated power under twenty watts.

There has been no known interactive video data service system available heretofore that has the capability of servicing an assigned base station area with subscriber units transmitting in a milliwatt power range. With such an improved system, battery powered, portable subscriber units, suitable for such functions as meter reading, would become feasible with low battery drain, permitting interactive digital communication in local areas or nationwide.

Wireless interactive video data service is provided without telephone lines or cable systems over a nationwide network of base stations in the manner disclosed in U.S. Pat. No. 5,101,267, Mar. 31, 1992, Fernando Morales, by way of satellite transmissions between local area base stations and a data center.

This nationwide communication capability permits live video programs viewed nationwide, such as world series baseball games, to become interactive for individual subscriber participation. Thus, mass communications over a substantially real time communication system with such large urban area audience participation that would jam any existing public telephone switching network capability are made feasible.

Each local base station in such a nationwide communication system must be capable of interacting within designated license restrictions in the presence of peak local audience participation without significant switching delays to establish substantially real time interactive two-way connections over a network processing an audience of very large

numbers of participants wishing to communicate substantially simultaneously.

Prior art two-ay radio transmission network technology, as represented for example by portable telephone communication systems, is generally incompatible with efficient substantially real time communication in the presence of heavy subscriber activity. This occurs because in telephone systems switching and connection operations must be made compatible with switching instructions from subscriber instruments with coded audio tones at audio frequencies accompanying analog audio messages. Thus with long numeric identification numbers for nationwide long distance connections, typically of ten decimal digits, which must be manually entered while busying lines to complete point-to-point connections as a part of the interconnecting signal data, switching circuits are engaged for very long periods of time inconsistent with substantially real time connections or heavy traffic conditions. Accordingly busy signals are encountered often to restrict the size of a participating audience for immediate connection and the follow-up contention for a line requiring re-dialing is frustrating to the potential using audience. Thus, interactive response that requires telephone exchange communications tends to be delayed and discouraging to participants, and introduces the critical problem of identifying and communicating interactively between subscribers in real time without jammed exchanges and the frustration of encountering busy signals and starting over with a new attempt to communicate.

Similarly, even with the restricted amount of digital data that might be transferred in digital paging system messages, where typically some messages only indicate a short fixed length message such as a calling telephone number, there is little possibility of approaching real time communications in the presence of heavy traffic because of the complexities of the necessary telephone switching networks employed for conveying messages.

In order to process digital information accurately, efficiently and privately it is necessary to precisely time and organize the digital data and accompanying commands. For real time two-way digital communications with large audiences wanting prompt access to the message conveyance system or network, synchronous signal timing becomes critical and absolutely necessary for real time interactive communication. In general, audio telephone communications are of an analog nature not critical to timing and are conveyed asynchronously. Thus, prior telephone art signal communication systems are unsuited for adoption in interactive video data systems that convey private point to point digital messages on a real time basis for large audiences.

Typical patents relating to nationwide communications employing such prior art telephone switching techniques are now briefly referenced as representative of the present state of the are utilizing analog (voice) telephone communication networks and cellular technology to accommodate low-cost mobile battery-operated subscriber units operable within local cellular subdivisions.

In the telephone arts: Freeburg, U.S. Pat. Nos. 4,481,670, Nov. 6, 1984 and 4,525,861, Jun. 25, 1985 and 4,550,443, Oct. 29, 1985 provide for handing off best signals from portable radio sets in two-way audio analog communications between overlapping zones served by different fixed location cellular transceivers, which in some cases use different frequency bands for isolating adjacent zones.

In the paging arts, modems are used for connection with a telephone system for communication and switching over a national network as typically set forth in Andros, et al. U.S. Pat. Nos. 4,870,410, Sep. 26, 1989 and 4,875,039, Oct. 17, 1989, and therefore are subject to the same switching system bottlenecks previously described even when short digital

5,481,546

3

only communication is desired.

It is accordingly an objective of this invention to improve the state of the art by effectively using licensed interactive communication channels to provide substantially real time, synchronously timed digital communications of variable length between geographically separated base station subscribers of an interactive video data service system. Capacity for heavy audience participation without substantial delays during peak loading conditions is essential in a manner compatible with the FCC licensing conditions for interactive video data service.

It is a further objective of this invention to introduce into interactive video data service a system providing effective two-way interactive communications with simplified low-cost subscriber units transmitting in milliwatt peak power ranges under parameters compatible with FCC licensing restrictions.

Another object of the invention is to introduce portable digital communication subscriber units into an interactive video data service system adapted for local and national communications.

Other objects, features and advantages of the invention will be found throughout the following description, the drawings and the claims.

BRIEF DESCRIPTION OF THE INVENTION

A base station configuration for interactive data service provides several interrelated features for improving effectiveness of digital communication. Such features include (1) a system employing portable subscriber units of milliwatt transmitting power capacity, and (2) increasing substantially the number of subscriber units operable at the base station. Thus, typically 4000 subscriber units at a base station may be processed for point to point nationwide communication at 5.16 Kbaud data rate per unit.

A significant advantage of the invention is the capacity to rapidly connect a very large number of individually identified subscribers at each base station for parallel communications and connecting new subscribers into awaiting communication slots without significant delay.

In one embodiment, the features of the present invention are embodied in a subscriber multiplexing system at the base station that relates synchronously with a base station carrier signal or the television frames of a master TV channel. Thus, the communications and switching connections are synchronized throughout a nationwide network for more efficiently and promptly processing point-to-point real time communications. Even more significantly is the corresponding freedom to multiplex digital messages of variable length from a large number of transmitting subscriber units at the base station, with the assurance that little access waiting time will be encountered by subscribers to complete switching connections, even for nationwide communications.

The base station comprises a central transmitter and data processing site for processing transmitted digital data to subscriber units within the base station designated area. A plurality of receive only stations distributed throughout the region and connected by wire, cable, microwave link or radio to the central data processing site then process and relay transmitted digital data from subscriber units within subdivided zones in the base station designated area. Thus, the base station serves a gridwork of receiver sub-cell sites distributed at locations permitting reliable response by subscribers transmitting with milliwatt digit signal levels in the FCC authorized 218–219 MHz band. Provision is made to

4

process fringe signals between the different subdivided zones so that low-cost portable battery-operated milliwatt transmitter subscriber units may be moved throughout the base station geographical area for reliably performing such functions as meter reading and data transfer.

The base station system is adapted for communication in a nationwide network of base stations over a satellite communication network such as that of U.S. Pat. No. 5,101,267. Thus, the base station data processor locally segregates, accumulates and formats the messages from individual subscribers for retransmission over the satellite network to a switching hub and data processing center with the capacity to locate individual subscribers in remote base stations over a nationwide network.

BRIEF DESCRIPTION OF THE DRAWINGS

In the accompanying drawings:

FIG. 1 is a block system diagram of a nationwide interactive video data satellite system embodiment of the invention that provides point-to-point communications between subscriber response units in local service areas and with various vendors of goods and services;

FIG. 2 is a diagrammatic view of a local area base cell site system embodiment of the invention for communications with very low powered local subscriber units, including mobile or portable units;

FIG. 3 is a fragmental sketch of r-f signal protocol at the base cell site for permitting communications from a significant number of subscriber units simultaneously in real time;

FIG. 4 is a diagrammatic sketch of message frames for illustrating the maximization of data processed at local cell sites;

FIG. 5 is a block diagram of a base cell site to satellite communication link afforded by the invention to process fixed length frames and formulate variable length messages from subscribers during an active connection interval;

FIGS. 6A and 6B respectively are a block system diagram of communication channels at the base cell site, and a corresponding diagrammatic system flow diagram for transmitted messages between local subscribers the cell data center and the satellite connected network of cell sites;

FIGS. 7A and 7B respectively are a block diagram illustrating transit time characteristics of messages at a base cell site, and a diagrammatic view of typical communication frames showing relative times at different cell site communication stations;

FIGS. 8A and 8B are respectively frequency band charts for FCC allocated frequency bands and subchannel bands for interactive video data services as employed by this invention; and

FIGS. 9A and 9B are respective block circuit diagrams of subscriber units for digital only fixed or mobile communication services and integrated video and digital data service embodiments of the invention.

THE PREFERRED EMBODIMENTS

In FIG. 1 the nationwide interactive network embodying this invention and setting out in perspective support services and equipment is illustrated in block diagram format. Thus a set of subscribers at response units 4 communicate over the wireless 218–219 MHz r-f links 5 to either a set of local remote receivers 20, each connected by a link 21 such as a telephone line to repeater cell 3, or to a local area base station repeater cell 3, one of a set of such repeater stations

5,481,546

| 5 | 6 |

in different geographic locations for communicating via satellite **1** under control of a data and switching control center **2**. Regional and local service or product participants **7** also communicate with the local area cells **3** and the control center **2**. The basic operation of this system is set forth in said U.S. Pat. Nos. 4,591,906 and 5,101,267. Details of point-to-point switching and communication throughout the system identified at switch control center **14** and accompanying terminal directory **13**, downloading of data and software from the control center **15**, and the processing of billings and transactions **16**, and the corresponding interaction of the memory and software at the subscriber unit **17** are set forth in co-pending application Ser. No. 07/889,626, May 28, 1992 for Software Controlled Interactive Video Network and Ser. No. 07/932,241, Aug. 19, 1992 for Interactive Satellite Broadcast Network, which are incorporated hereinto by reference as background material to the extent necessary for providing a full disclosure of operating details.

In this system therefore, simplified low cost subscriber response units **4** are universally applicable to a wide range of interactive functions by means of software control facilities. The system furthermore in its r-f processing system efficiently handles mass data for accommodating very large system peak load capacity substantially in real time through the switch control center **14** with typically stores for each subscriber currently updated information that need not be transmitted with every transaction such as the directory identification code, name, address, telephone number and credit card, etc.

An explicit cell site **3** embodiment utilizing a local base station repeater cell **3** afforded by this invention, which expands the interactive capabilities and functions of the subscriber response units **4** while improving performance and reducing cost, is diagrammatically shown in FIG. **2**. The outer dotted ring **19** outlines the limits of a local area cell site, such as may be licensed by the FCC, for interactive video data service. The cell site embodiment utilizing local base station repeater cell **3** communicates with the satellite system via directed dish antenna **3A**, and transmits digital communications and TV video overlay trigger signals to a set of subscribers X throughout the assigned territory by way of antenna **8**.

A set of typically ten remote, receive-only, fixed-location relay stations **20A–20N** are positioned at strategic locations within the cell area. Each local remote receiver station **20** is connected by cable, microwave or leased telephone line **21** to the cell site utilizing a local base station repeater cell **3**. Thus, transceiving subscriber units X **4**, **4'**, etc. located within the subdivided response zones **22** communicate with the local remote receivers **20** over a significantly reduced transmission path distance within the subdivided response areas **22**, as compared with direct transmission from a local base station repeater cell to transceiving subscriber units X **4**, **4'**, etc. This subdivision feature, accordingly for the first time in interactive video data system provides for reliable transmission at radiated power levels in the milliwatt region. Distinct advantages result including less chance for external interference and long life battery operated portable subscriber units **4** which can be moved throughout the cell territory (**19**).

Accordingly, this invention encourages such additional interactive services in the network as typified by meter reading, and inventory control in soft drink dispensing machines, etc. in a manner saving so much manpower and expense as to be viable economically in this type of interactive video data service system. In the latter two examples, very simple digital communication subscriber units **4** may

be provided without the necessity for video displays, in the manner later described. Other examples are site alarms for remote monitoring of open doors, fires, failure, temperature, etc. Two-way paging services are also thus made available, or telemeter in location or condition of delivery trucks, etc. Furthermore, with full service video display TV installation at a subscriber station **4**, the feasibility of moving such remote units to different locations in a house, office, or car is established. Accordingly this invention is in part directed to the provision of portable or mobile interactive subscriber stations and communication units for interactive video data service systems compatible with FCC standards. With the lower power transmitters provided, adjustments of power in the subscriber units may be avoided by simple AGC at the remote receiver terminals. Smaller and portable home units are also possible. There is considerable advantage of longer battery life for portable units.

A further substantial advantage to the invention is the ability to handle point-to-point connections nationwide under peak traffic conditions with very little subscriber waiting time for access to the system. The system protocol for reception of messages and response at the subscriber units in the chart form of FIG. **3** illustrates the number, typically 640, of subscribers X that can be simultaneously using the system at any cell site **5**. With reference again to FIG. **2**, thus assume that each of ten fixed remote receiver stations **20A–20N** within the cell area (**19**) is capable of processing 64 on-air subscriber units X. This results because the milliwatt powered subscriber units X are adapted for transmission in a single one of the ten subdivided areas or zones **22**, with provisions preventing interference with adjacent zones **22A**, **22B**, etc.

Other system advantages are: (1) that low power subscribers use the system at outer cell boundaries, thereby reducing chances for inter-cell interference, (2) that the expansion of the system may occur by adding subdivided zones as the subscriber base grows, (3) that the passive local remote receive-only receives have no problems in meeting FCC interactive video data service conditions, (4) and that capital, power and operating costs substantially decrease.

With reference now to FIG. **3**, to transmit with ten subscriber units X in the respective zones **22** of FIG. **2**, the protocol assigns in a timed broadcast period **30** a home unit (HU) response time interval **31**, at an accumulated 5.1 kbaud response rate. Each of these switched-in user home units then transmits a digital message superimposed by modulation on the 218–219 MHz band subcarrier. The broadcast time interval **32** permits the cell site transmitter **8** of FIG. **2** to broadcast a message including a (ringing) signal that may include an address code number for activating a single home unit within the cell area **19** of FIG. **2**. Each home unit has a built in address code that must be used to activate that unit **14** of FIG. **2**, and the central data switch control unit maintains a directory of all such numbers in the nationwide network. The broadcast time interval **33** provides a time gap for checking errors and for providing desirable control signals. Guard gaps **36** are supplied between successive broadcast periods **30**, also identifiable as r-f frames.

With reference again to FIG. **3**, the r-f frames permit transmission at 5.1 kbaud for each of say ten subdivisions **22** of FIG. **2**. Thus the cell stores in a buffer the ten multiplexed home unit data rates to load the buffer at a 51 kbaud rate. A total data rate for the main cell area **19** of FIG. **2** is 51 kbaud from the ten simultaneous responses from the separate subdivisions **22** of FIG. **2**. Assuming no errors and 1000 bit messages from each home unit, with 3,000 home units trying to get their message through ten channels, the waiting time

5,481,546

7

for a "line" would be less than one minute without contention, thereby minimizing the necessity of "redialing".

The legends in the right hand column show that each remote receiver station 20A–20N is assigned a corresponding communication frequency bandwidth $f_1$–$f_n$, thereby isolating the communications from subscriber units X in each subdivision 22 within the cell area 19 as shown in FIG. 2. The length of the r-f frames 30 is 12.4 milliseconds including a guard band 36 of about 120 microseconds.

Typical message protocol is illustrated in FIG. 4 for fixed frame message lengths of 30 bytes of eight bits. This fixed length is important in minimizing access time to the system under peak load conditions, since there will be substantially no need air time incurred while a subscriber is awaiting to be connected or disconnected. Various functional categories are typically included in the broadcast interval 32 as shown in the blocks. Of note is the home unit ID section which addresses the unit to be activated (similar to a telephone number), and the Packet ID byte for accumulating a sequence of home unit response frames into a packet. All messages and protocols are consistent with the transmission of data implicitly as part of a video message during the vertical blanking interval or transmission over a digital r-f link parallel to a video channel. However, as will be more particularly set forth later, it is pertinent to synchronize timed data within the nationwide system, even taking into account differences in travel time of radio waves (see U.S. Pat. No. 4,591,906), and for this reason the technique described in U.S. Pat. No. 4,755,871, Jul. 5, 1988 for Control of RF Answer Pulses in a TV Answer Back System may be used to synchronize transmissions with the TV carrier signal from the cell site transmitter and to program all the multiplexed timing slots for avoiding idle on-air time. Thus, this system departs from any former telephone switching system art which is asynchronously switched.

As seen from FIGS. 1, 2, 4 and 5, the nationwide transmission of messages from the individual subscriber home units 4, (X) longer than 240 bits require several frames, with accumulation into packets, identifiable in the broadcast frame 32. The cell site transmission system 40 thus processes a set of packets in the manner shown in FIG. 5 to accumulate subscriber messages of variable length in a set of serial transmissions for transmitting to the satellite at higher transmission frequency. Accordingly packet builders 41, 41A, etc. are individually assigned to a responding one of simultaneously active subscribers until the subscriber's variable length message of n 592 bit frames is completed, and after pricing 42 the messages are accumulated 43, synchronously timed 45 and transmitted to the satellite 44. These accumulated messages are received at the central data station 2 for switching, adding pertinent subscriber data and a receiving address and retransmitting over the satellite at a receiving point, such as a further subscriber or a service provider.

Now FIGS. 6A and 6B relate to the communication sequences within the local base station repeater cell area (19, FIG. 2) between home units 4, the cell site utilizing local base station repeater cell 3 and local remote stationary receivers 20A–20N. Note that the home unit 4 is also designated as an interactive data appliance (IDA), a general term including subscriber video stations, digital alarms, or the like, and portable units.

The data flow chart of FIG. 6B relates to a "set-up" and response sequence of intercommunications between the respective subscriber units 4, (IDA) local remote fixed station subdivision receivers 20A–20A, (RR) and the cell site utilizing local base station repeater cell 3. Synchronization is controlled by the carrier frequency $Tx_a$ of the cell

8

transmitter upon which the subscriber unit 4 locks. Then the subscriber unit 4 initiates a response which includes both the subscriber ID and the cell ID for the purpose of handoff between cells with portable units or fringe area cells.

The remote receiver 20 receives the subscriber's transmission on its frequency $RX_{au}$, and passes an acknowledgement to the base station repeater cell 3 for sampling transmission and auditing the transmission routing. Thus base station repeater cell 3 selects the local remote receiver 20A–20N, etc. that receives the best subscriber signal. Note that the local remote receiver 20 receives both the transmissions from the cell transmitter frequency at $Rx_{a1}$ and the communications at its assigned frequency $Rx_{au}$, and similarly the subscriber unit transmits on two alternative frequencies, one tuned to a particular remote receiver 20 frequency.

The base station repeater cell 3 then relays the best frequency back to the subscriber unit 4 for tuning in and finishing communications with the best and only local remote receiver 20. This is the end of the "set up" period and the start of the transmission period, during which the message bits are relayed to the base station repeater cell 3 by the local remote receiver 20 tuned in, and are at the base station repeater cell 3 processed and relayed into the network to the central data hub via the VSAT link. Note that the gap 33 between the base station repeater cell 3 broadcast interval 32 and the home unit response interval 31 is used for the set up function so that a single frame period covers the procedure of FIG. 6B through the sending of a single frame of the message from the subscriber unit. If transmission conditions change, a succeeding frame of the subscriber's message thus could be transmitted from a different remote receiver at a different frequency. Thus the packet ID byte portion of FIG. 4 is significant for reassembling the message frames into a single message packet (also identified). The arbitrary cell identification umber 486 is similar to a telephone exchange area code designation in the identification of the cell or the subscriber's complete ID address.

This set up procedure is important for "hand-off" of a portable unit from one stationary local remote receiver site 22 to another as fringe areas are encountered, such as at borders 25 between two local remote receiver activity sites 22 (FIG. 2). Similarly the portable units can move from cell to cell when adjacent cells are present such as in urban areas, requiring similar hand-off procedure. The hand-off may be initiated in different ways.

As above described, the base station repeater cell 3 may initiate the hand-off of a subscriber 4 from a local remote receiver 20 in one zone to another in a different zone within the subdivided cell. Thus a signal strength (RSSI) measurement may serve as a criterion for handoff, with the cell directing the subscriber into a set-up routine when signals below a threshold, –80 dBm for example, are encountered. Since the subscriber unit 4 stores the message data, it is retained until the set-up procedure is completed in about 50 milliseconds.

Alternatively the subscriber unit software may cause the subscriber unit 4 to place itself in a set-up routine when the RSSI goes below a chosen threshold value, so that the home unit response is transmitted only after set-up with a satisfactory cell or cell sub-division zone (22) connection of proper signal strength.

When the subscribers 4 are transportable from cell to cell, the packets (FIG. 5) should be stored at the data processing center 2 rather than at the base station repeater cell 3 level. Each packet carries an identification of the subscriber for this purpose and the packet ID is carried in the broadcast frame (FIG. 4) for such processing. Thus at the central hub

9

(2) a packet of three frames could be derived from two different cells, generally adjacent in geographical relationship. Note the cell ID in the subscriber's transmissions (FIG. 6B), which is used for control purposes.

Also with reference to FIG. 2, the possibility of fringe hand off errors or interfering signals between cells is avoided by the allocation of different transmission frequencies for communicating with the geographically adjoining local remote receiver stations (20) in the adjacent base station repeater cell areas (19, 26). Thus, in the vicinity of overlapping base station repeater cell regions 19 and 26, the related frequencies $f_x$, $f_y$ assigned to adjacent local remote receivers 20X and 20Y may avoid interference problems between local remote receiver stations 20 in different adjacent base station repeater cell territories.

Critical timings in the messages processed within the base station repeater cell site (19, FIG. 2) are discussed in relationship to FIGS. 7A and 7B. For keeping the message bits accurately synchronized within the system, the delays in transit time of r-f transmissions must be accounted for. Those transit times are noted in FIG. 7A, and the transmitted message frame timings are set forth in FIG. 7B. The frames are sequentially separated by a 120 microsecond guard band. The approximate 2.7 microsecond delay within the cell area (19) of 2 miles diameter is encountered between the subscriber (IDA) 4 and the closest local remote receiver station 20 of approximately ten such stations distributed about the base station repeater cell. This is of no significance since by the use of fifty microsecond pulse widths in the communications that is less than 6% of the pulse width and thus no range adjustment is needed for that propagation induced delay. The base station repeater cell 3 thus adjusts its synchronization with system timing of the received IDA responses after accounting for the approximately two times 10.6 microsecond (average) delay time for the transmissions to IDA 4 and back to base station repeater cell 3.

FIGS. 8A and 8B set forth the FCC approved bands for licensed interactive communications, thus allocating fifteen channels of bandwidth capable of carrying the messages under the conditions described herein.

FIGS. 9A and 9B respectively illustrate portable subscriber units afforded by this invention for interactive two-way wireless communications in a cell compatible with FCC standards for interactive video data services of the simplified digital appliance type (9A) and the more comprehensive video display type (9B).

In the simplified version of FIG. 9A, the transceiver 50 permits two-way wireless communications in the 218–219 MHz bands set forth in FIG. 8, and compatible with the functions hereinbefore set forth such as in connection with FIG. 6A. The double headed arrow notation for the radio-waves at antenna 49 signifies two way wireless communication. For digital communications, an input register 51 for received digital data is supplied and an output register 52 for retaining interactive subscriber entered messages from transducer 53, typically a manual keyboard or a digital sensing instrument. Digital display means may be provided for subscriber viewing of either or both register contents. Thus the data processor 54, by way of suitable software controls the system with different modes of operation such as the manual control 55 suitable to keyboard input of data from a subscriber, or an automatic monitoring control mode 56 for relaying an alarm or inventory reading at a subscriber's coin operated vending machine. The frequency control section 57 serves to monitor and set the transmission carrier frequency during set up procedures for transmission to a

10

most favorable fixed local remote receiver (20) station. Also it serves as the system clock to synchronize the transmission frequency of digital data pulses with the system by means of locking to a TV station carrier signal, for example. The unique identification number 58 is built into each subscriber unit and serves similar to a telephone number as a screen for incoming messages directed to that subscriber unit and as an identification of the source of messages sent from an individual subscriber. General software control technology for operation of the subscriber units and systems of the disclosed system are known in the art as set forth in the before mentioned prior patents and patent applications.

This interactive data appliance embodiment of the invention provides a number of innovative features and significant advantages, all compatible with operations within the parameters of a nationwide network of FCC licensed local interactive video data service cells, either for interactive communication within the local cell or for interactive communications nationwide over the network. The software controlled data processor makes the utility of the appliance substantially universal in terms of introduction of modes of operation to match with and integrate into machinery or systems and to provide a variety of features for manual control of interactivity by a subscriber. The simplicity of the digital mode of communication makes the unit simple, low cost and small in size for ideal portability and long life from battery power. It is of major importance to have the ability in an interactive video data service installation for portable movement of a subscriber unit for providing communication capabilities formerly limited to nationwide mobile telephone systems and further providing a range of interactivities not hitherto feasible.

The embodiment of FIG. 9B provides for interactivity in conjunction with video displays, and in particular as related to broadcast television programs. Thus the conventional television receiver 60 with the wireless communication link 63 communicates with the interactive data appliance 61 for the type of service described in U.S. Pat. No. 5,101,267, for example. Therefore the manual control unit 62 controls the TV receiver 60 and the interactive data appliance, which in this case may be termed a home unit or subscriber station. The portability feature made possible by this invention permits such a unit to be moved next door or put into a car or van for movement within or across cell boundaries with good digital synchronous communication contact within the nationwide network of cells, which utility has not heretofore been known or feasible in interactive video data systems.

It is therefore evident from this disclosure that the state of the art is advanced. Accordingly the features of novelty believed descriptive of the spirit and nature of the invention are set forth with particularity in the following claims:

I claim:

1. A base station configuration in a two-way communication interactive video network having network hub switching center means for routing communications from and to a plurality of subscriber units comprising:

subscriber units dispersed at various locations within a predetermined base station geographic area,

local base station repeater cell means for communicating with identified individual subscriber units within a local base station geographic area associated with said local base station repeater cell means, said local base station repeater cell means further comprising:

base station data processing and transmission means for transmitting to a set of said local subscriber units contained within said local base station geographic

5,481,546

**11**

area associated with said local base station repeater cell means and receiving from a subset of said local set of subscriber units multiplexed synchronously related digital data messages of variable lengths for point-to-point communication between said local base station repeater cell means and said subset of said local subscriber units,

reception means for receiving and processing data messages from said set of local subscriber units comprising a local remote receiver disposed within one of a plurality of cell subdivision site partitioned from said local base station geographic area associated with said local base station repeater cell means, said plurality of cell subdivision sites dispersed over said local base station geographic area, each local remote receiver adapted for receiving-only low power digital messages transmitted from said local subscriber units within range of said local remote receiver, and

a set of local subscriber transceiver units including low power mobile units located within said local base station geographic area, each of said local subscriber transceiver units adapted to communicate with said local base station repeater cell means by way of digital data signals of variable lengths synchronously related to a base station broadcast signal and timed for multiplexed message transmission.

2. A two-way communication interactive video network system having network hub switching center means for routing communications to and from a plurality of subscriber units comprising:

base station repeater cell means for communicating with a plurality of subscriber units, said base station repeater cell means and said plurality of subscriber units disposed in a respective geographic area, said base station repeater cell means further comprising:

data processing and transmission means for transmitting to and receiving from at least one of said plurality of said subscriber units multiplexed synchronously related data messages of variable lengths, such that point-to-point communication between said base station repeater cell means and said at least one of said plurality of subscriber units is possible,

reception means for receiving and processing said multiplexed synchronously related data messages from said at least one of said plurality of subscriber units and relaying said multiplexed synchronously related data messages from said at least one of said plurality of subscriber units to said base station repeater cell means.

3. The two-way communication interactive video network system of claim 2 wherein said point-to-point communication between said base station repeater cell means and said at least one of said plurality of said subscriber units is accomplished via digital data modulated on an r-f carrier.

4. The two-way communication interactive video network system of claim 3 wherein said point-to-point communication between said base station repeater cell means and said at least one of said plurality of said subscriber units is accomplished via digital data modulated on an r-f carrier frequency of approximately 218 MHz.

5. The two-way communication interactive video network system of claim 2 wherein said plurality of subscriber units are further comprised of:

low power mobile units located within said respective geographic area, each of said low power mobile units adapted to communicate with said base station repeater cell means by way of digital data signals of variable

**12**

lengths synchronously related and timed for multiplexed message transmission with said base station repeater cell means.

6. The two-way communication interactive video network system of claim 2 wherein said plurality of subscriber units are further comprised of:

digital message organization means for disassembling said multiplexed synchronously related data messages of variable lengths and for transmitting data in a sequence of fixed length transmission frames.

7. The two-way communication interactive video network system of claim 2 wherein said reception means further comprises:

at least one local remote receiver disposed within a respective at least one base station repeater cell means subdivision site wherein said at least one cell subdivision site is partitioned from said respective geographic area associated with said base station repeater cell means, said at least one local remote receiver adapted for receiving-only low power digital messages transmitted from said subscriber units within range of said at least one local remote receiver and for relaying said low power digital messages to said base station repeater cell means.

8. The two-way communication interactive video network system of claim 2 further including a plurality of said base station repeater cell means each of said plurality of said base station repeater cell means for communicating with a corresponding plurality of subscriber units wherein each of said plurality of said base station repeater cell means and said corresponding plurality of subscriber units are disposed in a common geographic area.

9. The two-way communication interactive video network system of claim 8 wherein each of said plurality of said base station repeater cell means has a respective at least one local remote receiver associated therewith, said respective at least one local remote receiver disposed within a respective at least one base station repeater cell means subdivision site partitioned from said respective geographic area associated with said respective base station repeater cell means, said at least one local remote receiver adapted for receiving-only low power digital messages transmitted from said subscriber units within range of said at least one local remote receiver and for relaying said low power digital messages to said corresponding base station repeater cell means.

10. The two-way communication interactive video network system of claim 9 further comprising:

means for transmitting messages from each of said at least one base station repeater cell means subdivision sites on a different carrier frequency.

11. The two-way communication interactive video network system of claim 8 further comprising:

hub switching center means located remotely from said plurality of base station repeater cell means for routing designated digital data messages between a first plurality of subscriber units and a corresponding first base station repeater cell in a first geographic area and a second plurality of subscriber units and a corresponding second base station repeater cell located in a second geographic areas.

12. The two-way communication interactive video network system of claim 2 wherein said data processing and transmission means of said base station repeater cell means further comprises:

message accumulation means for storing and retransmitting digital message packets received from said at least one of said plurality of subscriber units, said message

5,481,546

**13**

packets comprising a sequence of subscriber transmission frames, and

means for retransmitting said message packets to a hub switching center of an interactive video network system via a satellite.

**13.** The two-way communication interactive video network system of claim **2** further comprising:

means for compensating for the time of propagation of said multiplexed synchronously related data messages between said subscriber units and said data processing means of said base station repeater cell means.

**14.** A digital cellular communication system comprising in combination, a cell site divided into a plurality of subdivided zones, a plurality of subscriber units with identity numbers based in said cell site, a cell site communication system including a digital transmitter for communication

**14**

with individual identified subscriber units geographically located within the cell site, a set of receive only digital receivers positioned in said subdivided zones, each said digital receiver being coupled by a transmission link with the cell site communication system to relay received digital communications, and a set of said subscriber units comprising portable wireless digital communication units with a limited power digital transmitter having a transmitting power for transmissions within the area of the subdivided zones and a receiver for reception of digital messages from said cell site digital transmitter, said transmissions of said subscriber units to said receive only digital receivers synchronously related to said digital messages transmitted by said cell site digital transmitter.

*   *   *   *   *

US005481546C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (7651st)

# United States Patent
Dinkins

(10) **Number:** US 5,481,546 C1

(45) **Certificate Issued:** Aug. 3, 2010

(54) **INTERACTIVE NATIONWIDE DATA SERVICE COMMUNICATION SYSTEM FOR STATIONARY AND MOBILE BATTERY OPERATED SUBSCRIBER UNITS**

(75) Inventor: **Gilbert M. Dinkins**, Herdon, VA (US)

(73) Assignee: **Eon Corporation**, Reston, VA (US)

**Reexamination Request:**
No. 90/010,382, Jan. 9, 2009

**Reexamination Certificate for:**
Patent No.: **5,481,546**
Issued: **Jan. 2, 1996**
Appl. No.: **08/240,147**
Filed: **May 10, 1994**

### Related U.S. Application Data

(63) Continuation of application No. 07/966,414, filed on Oct. 26, 1992, now Pat. No. 5,388,101.

(51) **Int. Cl.**
| | |
|---|---|
| *H04H 20/00* | (2006.01) |
| *H04H 60/00* | (2006.01) |
| *H04B 7/185* | (2006.01) |
| *H04N 7/24* | (2006.01) |
| *H04N 7/173* | (2006.01) |
| *H04Q 9/00* | (2006.01) |
| | H04Q 3/58 |

(52) **U.S. Cl.** ............... 370/329; 348/E7.07; 375/E7.025; 455/445; 455/454; 455/507; 455/560; 725/118; 725/123; 725/131; 725/63

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,288,802 A | 7/1942 | Hammond, Jr. | |
| 2,992,427 A | 7/1961 | Franco | |
| 3,041,450 A | 6/1962 | Parker | |

| | | | |
|---|---|---|---|
| 3,271,511 A | 9/1966 | Valensi | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 1 131 316 | 9/1982 |

(Continued)

OTHER PUBLICATIONS

Federal Communications Commission, Auctions, Auction 2, Interactive Video and Data Services (IVDS), Jul. 28, 1994–Jul. 29, 1994, 2 pgs.

(Continued)

*Primary Examiner*—Roland G Foster

(57) **ABSTRACT**

In a two-way interactive communication video network having a network switching center for point-to-point communications between subscribers at different geographic locations, a local base station configuration is provided for facilitating low power battery operated portable subscriber units. The local subscriber units surrounding a base station are adapted for multiplex transmission of digital messages synchronously related to a broadcast television signal for system coordination. Digital messages are transmitted from the local subscriber units to the base station data processing facility through a set of receive only cell site subdivision zones distributed over the base station transmitter geographical range, which communicate with the base station data processing facility over a communication link such as wired cable. Messages are compiled and relayed by satellite to a network switching center transmitter site for nationwide point-to-point communications. Small-size, inexpensive, low-power, portable, digital-transmitting subscriber units are introduced compatible with interactive video data system standards with the ability to cross subdivision and cell zones. Thus, monitoring of inventory, temperature, and other parameters for passive automatic alarm systems and the like, as well as active mobility of subscriber units for meter reading and the like is made possible with direct low-cost nationwide real time reporting capability.



# US 5,481,546 C1
Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,761,940 A | 9/1973 | Hollingsworth |
| 3,854,633 A | 12/1974 | Strenglein |
| 3,882,393 A | 5/1975 | Epstein |
| 4,037,158 A | 7/1977 | Eastmond |
| 4,056,779 A | 11/1977 | Toler |
| 4,096,440 A | 6/1978 | Okasaka |
| 4,128,740 A | 12/1978 | Graziano |
| 4,144,496 A | 3/1979 | Cunningham et al. |
| 4,144,497 A | 3/1979 | Andrea, III |
| 4,220,923 A | 9/1980 | Pelchat et al. |
| 4,228,540 A | 10/1980 | Ogita |
| 4,245,245 A | 1/1981 | Matsumoto et al. |
| 4,313,220 A | 1/1982 | Lo et al. |
| 4,317,130 A | 2/1982 | Brown |
| 4,321,705 A | 3/1982 | Namiki |
| 4,352,955 A | 10/1982 | Kai et al. |
| 4,369,520 A | 1/1983 | Cerny, Jr. et al. |
| 4,481,670 A | 11/1984 | Freeburg |
| 4,482,895 A | 11/1984 | Weinberg |
| 4,485,385 A | 11/1984 | Ralston |
| 4,495,648 A | 1/1985 | Giger |
| 4,509,198 A | 4/1985 | Nagatomi |
| 4,513,412 A | 4/1985 | Cox |
| 4,513,415 A | 4/1985 | Martinez |
| 4,521,878 A | 6/1985 | Toyonaga |
| 4,525,861 A | 6/1985 | Freeburg |
| 4,528,656 A | 7/1985 | Morais |
| 4,550,443 A | 10/1985 | Freeburg |
| 4,578,815 A | 3/1986 | Persinotti |
| 4,591,906 A | 5/1986 | Morales-Garza et al. |
| 4,633,463 A | 12/1986 | Mack |
| 4,644,351 A | 2/1987 | Zabarsky et al. |
| 4,646,082 A | 2/1987 | Engel et al. |
| 4,659,878 A | 4/1987 | Dinkins |
| 4,660,045 A | 4/1987 | Clark |
| 4,675,863 A | 6/1987 | Paneth et al. |
| 4,704,733 A | 11/1987 | Kawano |
| 4,723,266 A | 2/1988 | Perry |
| 4,727,590 A | 2/1988 | Kawano et al. |
| 4,737,978 A | 4/1988 | Burke et al. |
| 4,747,160 A | 5/1988 | Bossard |
| 4,750,036 A | 6/1988 | Martinez |
| 4,755,871 A | 7/1988 | Morales-Garza et al. |
| 4,783,843 A | 11/1988 | Leff et al. |
| 4,792,948 A | 12/1988 | Hangen et al. |
| 4,799,062 A | 1/1989 | Sanderford, Jr. et al. |
| 4,799,253 A | 1/1989 | Stern et al. |
| 4,801,940 A | 1/1989 | Ma et al. |
| 4,849,963 A | 7/1989 | Kawano et al. |
| 4,866,431 A | 9/1989 | Andros et al. |
| 4,870,410 A | 9/1989 | Andros et al. |
| 4,875,038 A | 10/1989 | Siwiak et al. |
| 4,875,039 A | 10/1989 | Andros et al. |
| 4,882,765 A | 11/1989 | Maxwell et al. |
| 4,901,307 A | 2/1990 | Gilhousen et al. |
| 4,907,290 A | 3/1990 | Crompton |
| 4,928,177 A | 5/1990 | Martinez |
| 4,940,963 A | 7/1990 | Gutman et al. |
| 4,941,200 A | 7/1990 | Leslie et al. |
| 5,020,093 A | 5/1991 | Pireh |
| 5,036,389 A | 7/1991 | Morales |
| 5,056,107 A | 10/1991 | Johnson et al. |
| 5,081,703 A | 1/1992 | Lee |
| 5,090,050 A | 2/1992 | Heffernan |
| 5,093,786 A | 3/1992 | Derks |
| 5,101,267 A | 3/1992 | Morales-Garza |
| 5,117,449 A | 5/1992 | Metroka et al. |
| 5,117,502 A | 5/1992 | Onoda et al. |
| 5,128,934 A | 7/1992 | Jasinski |
| 5,152,002 A | 9/1992 | Leslie et al. |
| 5,153,582 A | 10/1992 | Davis |
| 5,155,689 A | 10/1992 | Wortham |
| 5,162,790 A | 11/1992 | Jasinski |
| 5,175,867 A | 12/1992 | Wejke et al. |
| 5,177,604 A | 1/1993 | Martinez |
| 5,179,559 A | 1/1993 | Crisler et al. |
| 5,187,806 A | 2/1993 | Johnson et al. |
| 5,223,923 A | 6/1993 | Morales-Garza |
| 5,224,120 A | 6/1993 | Schilling |
| 5,224,150 A | 6/1993 | Neustein |
| 5,239,670 A | 8/1993 | Schwendeman et al. |
| 5,282,204 A | 1/1994 | Shpancer et al. |
| 5,315,635 A | 5/1994 | Kane et al. |
| 5,327,478 A | 7/1994 | Lebowitz |
| 5,335,246 A | 8/1994 | Yokev et al. |
| 5,337,044 A | 8/1994 | Folger et al. |
| 5,396,537 A | 3/1995 | Schwendeman |
| 5,408,679 A | 4/1995 | Masuda |
| 5,430,759 A | 7/1995 | Yokev et al. |
| 5,432,841 A | 7/1995 | Rimer |
| 5,436,960 A | 7/1995 | Campana, Jr. et al. |
| 5,444,698 A | 8/1995 | Kito |
| 5,475,863 A | 12/1995 | Simpson et al. |
| 5,479,472 A | 12/1995 | Campana, Jr. et al. |
| 5,546,444 A | 8/1996 | Roach, Jr. et al. |
| 5,633,872 A | 5/1997 | Dinkins |
| 5,638,369 A | 6/1997 | Ayerst et al. |
| 5,663,715 A | 9/1997 | Godoroja |
| 5,710,976 A | 1/1998 | Hill et al. |
| 5,711,007 A | 1/1998 | Lin et al. |
| 5,715,516 A | 2/1998 | Howard et al. |
| 5,737,691 A | 4/1998 | Wang et al. |
| 5,740,534 A | 4/1998 | Ayerst et al. |
| 5,809,397 A | 9/1998 | Harthcock et al. |
| 5,852,780 A | 12/1998 | Wang et al. |
| 5,903,842 A | 5/1999 | Wang et al. |
| 5,912,917 A | 6/1999 | Engelbrecht et al. |
| 5,990,806 A | 11/1999 | Mock et al. |
| 6,023,230 A | 2/2000 | Dorenbosch et al. |
| 6,035,207 A | 3/2000 | Wang et al. |
| 6,044,252 A | 3/2000 | Dorenbosch |
| 6,097,969 A | 8/2000 | Angus et al. |
| H1877 H | 10/2000 | Van Etten et al. |
| 6,173,157 B1 | 1/2001 | Godoroja et al. |
| 6,173,189 B1 | 1/2001 | Lockhart |
| 6,282,428 B1 | 8/2001 | Ho et al. |
| 6,469,997 B1 | 10/2002 | Dorenbosch et al. |
| 6,515,971 B2 | 2/2003 | Nelson et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 1 205 140 | 5/1986 |
| CA | 1 269 441 | 5/1990 |
| CA | 1 281 126 | 3/1991 |
| DE | 28 39 864 | 4/1980 |
| EP | 0 049 280 | 4/1982 |
| EP | 0 085 575 | 8/1983 |
| EP | 0 201 254 | 11/1986 |
| EP | 0 280 543 | 8/1988 |
| EP | 0 282 347 | 9/1988 |
| EP | 0 402 809 | 12/1990 |
| EP | 0 475 348 | 3/1992 |
| EP | 0 486 229 | 5/1992 |
| EP | 0 501 706 | 9/1992 |
| EP | 0 712 215 A2 | 5/1996 |
| EP | 1 378 815 A2 | 1/2004 |
| FR | 2 672 756 | 8/1992 |
| GB | 924 145 | 4/1963 |
| GB | 1 295 845 | 11/1972 |
| GB | 2 203 018 | 10/1988 |
| JP | 59-147585 | 8/1984 |
| JP | 2-193423 | 7/1990 |

US 5,481,546 C1

Page 3

JP      2-193424    7/1990
JP      2-193425    7/1990
JP      63-219238   9/1998
WO      85/01854    4/1985
WO      87-07109    11/1987
WO      88-09969    12/1988
WO      91-02435    2/1991
WO      91/08652    6/1991
WO      91/15071    10/1991
WO      92/00636    1/1992
WO      92/02084    2/1992
WO      93/07691    4/1993
WO      93/14580    7/1993
WO      94/10803    5/1994

OTHER PUBLICATIONS

Baker, "An Introduction to Multistatic Radar," College of Engineering and Computer Science, ANU, NATO Research and Technology Organisation, May 2009, pp. 2–1–2–20.

Newton's Telecom Dictionary, 16th Expanded & Updated Edition, Feb. 2000, p. 560.

Newton's Telecom Dictionary, 16th Expanded & Updated Edition, Feb. 2000, p. 917.

Newton's Telecom Dictionary, Fifth Expanded & Updated Edition, Dec. 1992, p. 560.

Newton's Telecom Dictionary, Fifth Expanded & Updated Edition, Dec. 1992, p. 917.

Feher et al., "Simultaneous Transmission of Digital Phase–Shift Keying and of Analog Television Signals," IEEE Transactions on Communications, Dec. 1975, pp. 1509–1514.

Barber, "Cofrequency Cross–Polarized Operation of a 91 Mbit/s Digital Radio," IEEE Transactions on Communications, vol. COM–32, No. 1, Jan. 1984, pp. 87–91.

"New Products and Accessories for Two–Way Radio Systems," Communications News, Aug. 1995, pp. 64–69.

Evans, "MMDS Technology—An International Opportunity," MTX Telecom Services, Inc., Canada, 1986, pp. 321–325.

Feldman et al., "A Study on the Technical Feasibility of Terrestrial Omnidirectional Television Transmissions in the 12–GHz Band," IEEE Transactions on Communication Technology, vol. COM–17, No. 4, Aug. 1969, pp. 475–480.

Hearson, "Unusual Propagation Factors in Point–to–Point Microwave System Performance," IEEE Transactions on Communication Technology, vol. COM–15, No. 4, Aug. 1967, pp. 615–625.

Hewitt et al., "A Cost Effective 19GHz Digital Multipoint Radio System for Local Distribution Applications," ICC '84, Links for the Future, Science, Systems & Services for Communications, IEEE International Conference on Communications, May 14–17, 1984, RAI Congress Centre, Amsterdam, The Netherlands, 16 pgs.

Jakubowski, "A New Generation of High–Power Cellular Repeaters," The Antenna Specialists Company, Cleveland, Ohio, May 1990, pp. 24–28.

Jakubowski, "Propagation Considerations of Low Power Cellular Boosters and Case Histories," The Antenna Specialists Company, Cleveland, Ohio, May 1989, pp. 523–527.

Koch et al., "Transmitting Antenna with Cosecant–Shaped Vertical Pattern for the 12–GHz Television System," IEEE Transactions on Communications, vol. COM–22, No. 9, Sep. 1974, pp. 1391–1393.

Kuramoto et al., "Second Generation Mobile Radio Telephone System in Japan," IEEE Communications Magazine, vol. 24, No. 2, Feb. 1986, pp. 16–21.

Mohamed et al., "29 GHz Point–to–Point Radio Systems for Local Distribution," Br Telecom Technology Journal, vol. 2, No. 1, Jan. 1984, pp. 29–40.

Shindo, "Radio Subscriber Loop System for High–Speed Digital Communications," International Conference on Communications, Denver, Colorado, Jun. 14–18, 1981, pp. 66.1.1–66.1.5.

Tanenbaum, "Computer Networks," Prentice–Hall, Inc., 1981, pp. 250–273.

Towaij et al., "The Microcell Land Mobile Radio System," Vehicular Technology Conference, May 1983, pp. 247–250.

Wireless Modem for ARDIS (IBM Library Document #GX27–4000–01); 1995, 135 pgs.

Kaunismaa et al., "On Frequency Radio (OFR) Repeater as Fade Filler," Kaval Electronics, Inc., Markham, Ontario, L3R 4N4, Canada, Jan. 1, 1989, IEEE, pp. 528–531.

Beaman, "Vehicular Mounted Repeater in Emergency Medical Services (EMS) Communications," IEEE Transactions on Vehicular Technology, vol. VT–28, No. 4, Nov. 1979, pp. 307–310.

Howat, "Cell Like Performance Using the Remotely Controlled Cellular Transmitter," NYMEX Mobile Communications, Pearl River, NY 10965, Jan. 1, 1989 IEEE, pp. 535–541.

Jog, et al., "A Modern Communication System for Maharashtra Police," Jan. 1, 1989 IEEE, pp. 538–541.

Rustad et al., "New Radio Networks for Tactical Communication," IEEE Journal on Selected Areas in Communications, vol. 8, No. 5, Jun. 1990, pp. 713–727.

Vaddiparty et al., Satellite System for Tactical MILSAT-COM Applications, Ford Aerospace Corporation, Palo Alto, CA., Jun. 29, 1990, pp. 0278–0288.

Isberg, "Radio Communication in Subways and Mines Through Repeater Amplifiers and Leaky Transmission Lines," Comsul, Ltd., San Francisco, CA., Vehicular Technology Conference, 1978, 28th IEEE, vol. 28, publication date Mar. 22–24, 1978, current version published Jun. 19, 2006, pp. 248–254.

Antonio et al., "OmniTRACS: A Commercial Ku–Band Mobile Satellite Terminal and its Applicability to Military Mobile Terminals," Qualcomm, Inc., San Diego, CA, Jan. 1, 1988 IEEE, pp. 0761–0764.

Chang et al., "Computer–Based Communication System for Police," Chung Shan Institute of Science and Technology, Taiwan, Republic of China, Jan. 1, 1989 ICCST, Zurich Switzerland, pp. 251–254.

Carlisle, "Edison's Netcomm Project," Southern California Edison Company, Rosemead, CA, Sep. 1988, pp. B5–1–B5–4.

Bustillo et al., "Datamovil: A Practical Implementation of Tradamo Mobile Data Transmission Protocol," Area de I+D Sistemas de Telecomunicacion, Madrid, Spain, Jan. 1, 1989, IEEE, pp. 31–37.

LeFloch et al., "Digital Sound Broadcasting to Mobile Receivers," CCETT (Centre Commun d'Edutes de Telediffusion et Telecommunucations) 35512 Cesson Sevigne, France, Jun. 9, 1989 IEEE, Manuscript received Jun. 9, 1989, pp. 493–503.

Waters et al., "Plans and Studies in the EBU for Satellite Broadcasting of Sound Radio," EBU Review Technical, Nos. 241–242, Jun./Aug. 1990, pp. 70–81.

# US 5,481,546 C1
Page 4

Shelswell et al., "Digital Audio Broadcasting: The First UK Field Trial," BBC Research Data Report, Jan. 1, 1991, pp. 1–24.

Frankel et al., "An Overview of the Army/DARPA Distributed Communications and Processing Experiment," IEEE Journal on Selected Areas in Communications, vol. SAC–4, No. 2, Mar. 1986, pp. 207–215.

Bannister et al., "The Australian Digital Radio Concentrator System—DRCS," Telecom Australia, Rural Telecommunications, Jan. 1, 1988, publication date May 23–25, 1988, current version published Aug. 6, 2002, pp. 56–62.

LeFloch, "Channel Coding and Modulation for DAB," First International Symposium on Digital Audio Broadcasting, Montreux, Switzerland, Jun. 8–9, 1992, 12 pgs.

Ratliff et al., "The Convergence of Satellite and Terrestrial System Approaches to Digital Audio Broadcasting with Mobile and Portable Receiver," EBU Review, Nos. 241–242, Jun./Aug. 1990, 14 pgs.

Ratliff, "EBU/DAB Studies for a New Digital Sound Radio Broadcasting System—CD Quality for Mobiles," Technical Symposium, New Horizons in Electronic Media, 1st World Electronic Media Symposium, Oct. 4–7, 1989; Palexpo, Geneva, Switzerland, pp. 377–284.

Voyer et al., "Digital Audio Broadcasting Experimentation and Planning in Canada," EBU Review Technical, Manuscript Received Feb. 15, 1991, 11 pgs.

Lery et al., "Extending HDTV Coverage Using Low Power Repeaters—a Cellular Approach," General Instrument Corporation—VideoCipher Division, San Diego, CA, IEEE Transactions on Broadcasting, vol. 38, No. 3, Sep. 1992, pp. 145–150.

Al–Kadi, "Integration of Two Telecommunication Services: Mobile Radio and Rural Subscriber Radio," Electrotechnics, 1988, Conference Proceedings on Area Communication, EUROCON 88, Stockholm, Sweden, publication date Jun. 13–17, 1988, current version published Aug. 6, 2002, pp. 322–325.

PerComm, Inc., E80 User's Guide, Sep. 23, 2003, 58 pgs.

Wireless Application Development, Issues and Guidelines Paging Systems Emphasis, Motorola Personal Networks Group, Jan. 1, 1999, 59 pgs.

ReFLEX Rules, The Role of Pervasive Low–Cost Networks and Devices in the Future of Mobile Data Messaging, A Sag Harbor Group White Paper, Jan. 1, 2001, 59 pgs.

Buckenbarn et al., "ReFLEX Wireless Data Technology, Why ReFLEX has become the Industry Standard for Wireless Data Delivery," USA Mobility, Sep. 5, 2000, 2nd version, Jul. 9, 2004, 20 pgs.

Skytel Attribute Characterization, SkyTel WCTP 1.1/WCTP 1.2 Beta Release 1, Document #S266 Revision 1.02, Sep. 11, 2002, 31 pgs.

Sudhir Murthy, Lexington Consulting Company, Lexington, MA, "Data Communication with Remote Sensors Using Reflex Narrowband PCS Technology," Final Report for ITS–IDEA Project 74, Transporation Research Board, National Research Council, Dec. 2001, 34 pgs.

Motorola Talkabout T900, The T900 and SkyTel Service: The Low–Cost Wirelesss Solution to Tough Communication Problems, Jan. 1, 2001, 2 pgs.

Motorola Timeport P935, SkyTel and the P935: The Best Way to Stay Informed, Organized and Connected, Jan. 1, 2001, 2 pgs.

USA Mobility, One Source for Wireless, Federal Sales–Department of Defense (DOD), Blanket Purchase Agreement (BPA) Jul. 24, 2006, 2 pgs.

Sytechl Corporation, "Off the Air" and "Switch" Based Pager Intercept System, Jan. 1, 2003, 4 pgs.

Bellis, "Pager Testing with a Specially Equipped Signal Generator," Technology Industry, Industry: Email Alert RSS Feed, Hewlett–Packard Journal, Feb. 1998, 3 pgs.

Rysavy, "Making the Call with Two–Way Paging," Network Computing, Jan. 15, 1997, 4 pgs.

Somers, "A Cost Effective Approach to C&I AMR and Power Quality, Power Reliability Reporting," United Telecom Council, Phoenix, AZ, Jun. 28, 2000, 16 pgs.

The Wireless Communication Transfer Protocol (WCTP) Protocol Specification, Personal Communications Industry Association, Jun. 6, 2000, 141 pgs.

SkyTel, Using Your AccessLink Pager, AccessLink Pager Instructions, Jan. 1, 1997, 5 pgs.

ATCOM Wireless, Inc., AT100 User Guide, Jan. 1, 2004, 80 pgs.

Motorola, PageWriter 2000X User Guide, Jan. 1, 1999, 90 pgs.

Motorola, Timeport Personal Interactive Communicator User's Guide, Jan. 1, 2000, 170 pgs.

Unication, m90 Messenger, Advanced 2–Way Messaging Device, User's Guide, Jan. 1, 2006, 66 pgs.

SmartSynch News, SmartSynch to Develop Key Component for Elster Two–Way AMI System, Jackson MS, Oct. 23, 2006, 2 pgs.

Alpha Security Concepts, Shreveport/Bossier City, LA, A Brinks Home Security Authorized Dealer, Help Protect Your Home! Jan. 1, 2008, 3 pgs.

All Page of Houston, Houston TX, Local, State or Nationwide Paging, Be it . . . Numeric, Alphanumeric or Two Way Pagers! Jan. 1, 2003, 1 pg.

American Messaging, Partner P900—Features, Jan. 1, 2006, 1 pg.

American Messaging, Paging Products, Jan. 1, 2006, 2 pgs.

American Messaging, American Messaging's Contract with the State of Texas, Jan. 1, 2006, 5 pgs.

American Messaging, 2–Way Paging Coverage Maps, Jan. 1, 2006, 1 pg.

Unilex, The Power of Knowing, Frequently Asked Questions, Jan. 1, 2007, 2 pgs.

Frost & Sullivan Profile, Strategies and Competitive Analysis, SmartSynch Meter System, Jan. 1, 2000, 4 pgs.

American Messaging, Intelligent Remote Control (IRC), Jan. 1, 2006, 2 pgs.

Inilex, The Power of Knowing, The Power of Tracking, The Kepler Advantage, Jan. 1, 2007, 3 pgs.

The Paging Information Resource, ReFLEX Device Status Report and Directory, Jan. 1, 2003, 6 pgs.

American Messaging, P900 2–Way Pager for $49.95, Jan. 1, 2006, 1 pg.

A Complete Control and Monitoring Solution—Motorola's CreataLink 2 XT Two–Way Data Transceiver Can Provide Wireless Communications Between Devices and People, Business Wire, Sep. 1, 1999, 2 pgs.

American Messaging, New to 2–Way?, Jan. 1, 2006, 3 pgs.

American Messaging, Enhanced Services Pricing, Jan. 1, 2006, 3 pgs.

SmartSynch News, "SmartSynch Acquires CreataLink 2XT Product Line from Motorola," Jackson, MS, Mar. 11, 2002, 2 pgs.

**US 5,481,546 C1**

Page 5

Access My Library, "SmartSynch Buys CreataLink 2XT. (Strictly Business).(Brief Article)(Company Profile)," Mississippi Business Journal, Mar. 25, 2002, 2 pgs.

Transmission and Distribution World, "SmartSynch to Develop Key Component for Elster Two–Way AMI System," Oct. 25, 2006, 3 pgs.

SkyTel Telemetry Case Study, Automating Meter Reading: SmartSynch Leverages the SkyTel Network, Jan. 1, 2003, 2 pgs.

SkyTel M2M Case Study, Automating Meter Reading: Smartsynch Leverages the SkyTel Network, Jan. 1, 2009, 2 pgs.

The SmartSynch Advantage, Jan. 1, 2005, 9 pgs.

Initex, The Power of Knowing, The Power of Tracking, The Kepler, Jan. 1, 2007, 3 pgs.

AMR/AMI Case Study, "Trico Electric Cooperative Puts SmartSynch SmartMeters to Work," Nov. 2008, 2 pgs.

WebLink Wireless Approves Advantra Telemetry Module; Baran to be Available for Development and Purchase, Dallas, Texas, Dec. 9, 2002, 2 pgs.

Nigthhawk—Take Remote Control, CCU–1, Jan. 1, 2006, 1 pg.

Nigthhawk—Take Remote Control, CEO–700, Jan. 1, 2006, 1 pg.

Nigthhawk—Take Remote Control, HYDRO 1, Jan. 1, 2006, 1 pg.

Nigthhawk—Take Remote Control, PT1LC, Jan. 1, 2006, 1 pg.

Nigthhawk—Take Remote Control, Welcome to Nigthhawk Systems, Jan. 1, 2006, 1 pg.

Jal, TMCnet Contributing Edicor, Nighthwak Systems Intros New Two–Way Wireless Product Line, Nov. 4, 2008, 3 pgs.

Aberdeen Group Profile, "The Business Case for Smart Metering," SmartSynch, Jan. 1, 2002, 6 pgs.

American Messaging, Product Archive, Jan. 1, 2006, 5 pgs.

Motorola, Timeport World Message Pager, Model PF1500, User's Guide, Jan. 1, 1999, 13 pgs.

All Page of Houston, Two–Way Pagers from All PageII, Jan. 1, 2003, 1 pg.

Inilex, The Power of Knowing, The Power of Telemetry, Telemetry, Jan. 1, 2007, 2 pgs.

Consumer Complaints Board, Brinks Home Security, Jan. 1, 2009, 9 pgs.

Brinks Business Security, Business Security Products & Equipment, Jan. 1, 2009, 4 pgs.

SmartSynch, Case Study: Florida Power & Light, Jan. 1, 1998, 3 pgs.

ReFLEX 50 Hardware Spedicifations, Jan. 1, 2000, 2 pgs.

SkyTel, Comprehensive End–to–End Solutions, Jan. 1, 2008, 1 pg.

SkyTel, Serving the End–User Business and Government Marketplace, Jan. 1, 2008, 1 pg.

SkyTel, Serving Application Developers and Other M2M Solutions Providers, Jan. 1, 2008, 1 pg.

SkyTel, SkyTel vs. Other Wireless Providers, Jan. 1, 2008, 2 pgs.

SkyTel, M2M Solutions, Powering Innovations in Machine–to–Machine Communications, Jan. 1, 2008, 1 pg.

SkyTel, Service/Device User Guides, Jan. 1, 2008, 3 pgs.

SkyTel Skywriter, Motorola Timeport P935, A Powerful, Flexible Communications Package and PIM Device, Jan. 1, 2001, 1 pg.

SkyTel, Products & Services: SkyTel Telemetry Services—Technology, Advanced Messaging Network, Jan. 1, 2008, 2 pgs.

SkyTel, Products & Services: SkyTel Telemetry Services—Network Access Program, Jan. 1, 2008, 2 pgs.

SkyTel, ReFLEX, Jan. 1, 2008, 1 pg.

SkyTel, Products & Services: SkyTel Product Portfolio, Jan. 1, 2008, 2 pgs.

SkyTel, ReFLEX Developer Tools, Jan. 1, 2008, 2 pgs.

SkyTel, Partnerships: Developer Resources Center—Email Solutions/SMTP, Jan. 1, 2008, 4 pgs.

SkyTel, Partnerships: Developer Resources Center—Technical Support, Jan. 1, 2008, 1 pg.

SkyTel, Partnerships: Development Resources Center—SNPP, Jan. 1, 2008, 9 pgs.

SkyTel, Partnerships: Developer Resources Center—TAP, Jan. 1, 2008, 8 pgs.

Motorola, Talkabout, Personal Interactive Communicator, Model T900, User's Guide, Oct. 2001, 91 pgs.

SkyTel, Partnerships: Development Resources Center—WCTP, Jan. 1, 2008, 4 pgs.

SkyTel, Partnerships: Developer Resources Center—Terminal Emulation, Jan. 1, 2008, 1 pg.

Consumer Affairs.com/Brinks Security Complaints, May 5, 2009, 16 pgs.

SkyTel, Hunetec H200, Performance Spefications, Jan. 1, 2004, 1 pg.

USA Mobility, M2M Services—Overview, Jul. 2, 2008, 2 pgs.

The Paging Information Resource, An Introduction to Two–Way Technology, Mar. 25, 2009, 12 pgs.

USA Mobility, M2M Services—Overview, Mar. 25, 2009, 12 pgs.

SkyTel ST900 Two–Way Pager, User's Manual, Oct. 2005, 20 pgs.

SkyTel, The Unication M90 Offers the Latest in Advanced 2Way Messaging Features, Jan. 1, 2008, 1 pg.

Brinks Rapid Security, Jan. 1, 1998, 4 pgs.

Inilex, Kepler Plus, Jan. 1, 2007, 1 pg.

Inilex, Kepler, Jan. 1, 2007, 1 pg.

Inilex, Advantra, Karti ReFLEX Module, Jan. 1, 2007, 1 pg.

Advantra, Advanced Transmission Solutions, Karli, Jan. 1, 2007, 1 pg.

Inilex, Advantra, Barran ReFLEX Module, Jan. 1, 2007, 1 pg.

Advantra, Advanced Transmission Solutions, Barran, Jan. 1, 2007, 1 pg.

Numeric Pagers from Allpage, Brand New Messenger m90 Two Way Pager by Unication, Jan. 1, 2003, 2 pgs.

Inilex, Advantra, Wirlki ReFLEX Module, Jan. 1, 2007, 1 pg.

SmarthSynch, A3 Alpha SmartMeter, Elster, May 5, 2009, 4 pgs.

SmarthSynch, SmartSynch Quick Facts, May 5, 2009, 1 pg.

SmarthSynch, SmartSynch, Inc., May 5, 2009, 2 pgs.

SmarthSynch, Advanced Communication Network, May 5, 2009, 2 pgs.

SmarthSynch, 1–210+c SmartMeter, May 5, 2009, 4 pgs.

SmarthSynch, kV2c SmartMeter, May 5, 2009, 4 pgs.

SmarthSynch, Managed Services Solution, May 5, 2009, 2 pgs.

SmarthSynch, Sentinel GPRS SmartMeter, May 5, 2009, 4 pgs.

SmarthSynch, Advanced Communication Network, May 5, 2009, 2 pgs.

USA Mobility, Solutions, M2M Services, Mar. 20, 2009, 1 pg.

USA Mobility, Keeping Sprint Connected, Mar. 20, 2009, 3 pgs.

USA Mobility, One Source for Wireless, National Accounts—Products and Services, Mar. 20, 2009, 4 pgs.

USA Mobility, Motorola T900, Mar. 19, 2009, 1 pg.

USA Mobility, Motorola TimePort P935, Mar. 19, 2009, 1 pg.

USA Mobility, Advanced 2–Way Messaging Device, M90 Messenger, Mar. 10, 2009, 2 pgs.

USA Mobility, Reliability of ReFLEX, Mar. 10, 2009, 2 pgs.

USA Mobility, Wireless Messaging—Products and Services, Mar. 10, 2009, 1 pg.

The Paging Information Resource, Two–Way Pagers and Telemetry Modules, ReFLEX Device Status Report and Directory, Mar. 10, 2009, 6 pgs.

SmartSynch, Creatalink 2XT Data Transceiver, Jan. 1, 1998, 1 pg.

SmartSynch, SmartSynch News, SmartSynch to Develop Key Component for Elster Two–Way AMI System, Oct. 23, 2006, 2 pgs.

Carrier, Alliance Partners, SkyTel Telemetry Services, Jan. 1, 2009, 1 pg.

SkyTel M2M Case Study, Remote Energy Management: ComfortChoice® from Carrier Corporation, Jan. 1, 2009, 2 pgs.

Carrier ComfortChoice®, Verifiable Demand Response, Two–Way Communicating Thermostat, Jan. 1, 2008, 4 pgs.

Carrier Comfort Choice, Jan. 1, 2009, 1 pg.

Carrier, Questions??? ComfortChoice, Jan. 1, 2009, 1 pg.

Carrier, Energy Management, Jan. 1, 2009, 1 pg.

Carrier, Comfort Choice, Questions??? Curtailment Process, Jan. 1, 2009, 1 pg.

Carrier, ComfortChoice, System Elements and Hardware, Jan. 1, 2009, 1 pg.

US 5,481,546 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1-14** is confirmed.

\* \* \* \* \*

US005481546C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (8615th)

# United States Patent

Dinkins

(10) **Number:** US 5,481,546 C2

(45) **Certificate Issued:** Oct. 4, 2011

(54) **INTERACTIVE NATIONWIDE DATA SERVICE COMMUNICATION SYSTEM FOR STATIONARY AND MOBILE BATTERY OPERATED SUBSCRIBER UNITS**

(75) Inventor: **Gilbert M. Dinkins**, Herdon, VA (US)

(73) Assignee: **Eon Corporation**, Herndon, VA (US)

**Reexamination Request:**
No. 90/011,265, Oct. 6, 2010

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,481,546** |
| Issued: | **Jan. 2, 1996** |
| Appl. No.: | **08/240,147** |
| Filed: | **May 10, 1994** |

Reexamination Certificate C1 5,481,546 issued Aug. 3, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 07/966,414, filed on Oct. 26, 1992, now Pat. No. 5,388,101.

(51) **Int. Cl.**

| | |
|---|---|
| *H04N 7/24* | (2006.01) |
| *H04N 7/173* | (2006.01) |
| *H04B 7/185* | (2006.01) |
| *H04Q 7/12* | (2006.01) |
| *H04Q 7/14* | (2006.01) |
| *H04H 9/00* | (2006.01) |
| *H04H 3/00* | (2006.01) |

(52) **U.S. Cl.** ............... **370/329**; 348/E7.07; 375/E7.025; 455/445; 455/454; 455/507; 455/560; 725/118; 725/123; 725/131; 725/63

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,955,140 | A | 5/1976 | Stephens et al. |
| 4,696,034 | A | 9/1987 | Wiedemer |

| | | | |
|---|---|---|---|
| 4,706,121 | A | 11/1987 | Young |
| 4,908,834 | A | 3/1990 | Wiedemer |
| 4,947,244 | A | 8/1990 | Fenwick et al. |
| RE33,417 | E | 10/1990 | Bhagat et al. |
| 4,972,457 | A | 11/1990 | O'Sullivan |
| 5,144,648 | A | 9/1992 | Bhagat et al. |
| 5,144,663 | A | 9/1992 | Kudelski et al. |
| 5,278,891 | A | 1/1994 | Bhagat et al. |
| 5,327,478 | A | 7/1994 | Lebowitz |
| 5,396,228 | A | 3/1995 | Garahi |
| 5,475,585 | A | 12/1995 | Bush |
| 6,167,278 | A | 12/2000 | Nilssen |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 1310688 | 11/1992 |
| CA | 1310699 | 11/1992 |
| WO | 91/03900 | 3/1991 |

*Primary Examiner*—Ovidio Escalante

(57) **ABSTRACT**

In a two-way interactive communication video network having a network switching center for point-to-point communications between subscribers at different geographic locations, a local base station configuration is provided for facilitating low power battery operated portable subscriber units. The local subscriber units surrounding a base station are adapted for multiplex transmission of digital messages synchronously related to a broadcast television signal for system coordination. Digital messages are transmitted from the local subscriber units to the base station data processing facility through a set of receive only cell site subdivision zones distributed over the base station transmitter geographical range, which communicate with the base station data processing facility over a communication link such as wired cable. Messages are compiled and relayed by satellite to a network switching center transmitter site for nationwide point-to-point communications. Small-size, inexpensive, low power, portable, digital-transmitting subscriber units are introduced compatible with interactive video data system standards with the ability to cross subdivision and cell zones. Thus, monitoring of inventory, temperature, and other parameters for passive automatic alarm systems and the like, as well as active mobility of subscriber units for meter reading and the like is made possible with direct low-cost nationwide real time reporting capability.



US 5,481,546 C2

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1** and **14** is confirmed.

Claim **2** is determined to be patentable as amended.

Claims **3** and **5-11**, dependent on an amended claim, are determined to be patentable.

Claims **4**, **12** and **13** were not reexamined.

**2**. A two-way communication interactive video network system having network hub switching center means for rout-

**2**

ing communications to and from a plurality of subscriber units comprising:

base station repeater cell means for communicating with a plurality of subscriber units, said base station repeater cell means and said plurality of subscriber units disposed in a respective geographic area, said base station repeater cell means further comprising:

data processing and transmission means for transmitting to and receiving from at least one of said plurality of said subscriber units multiplexed synchronously related data messages of variable lengths, *wherein at least one data message that is received is synchronously related to at least one data message that is transmitted,* such that point-to-point communication between said base station repeater cell means and said at least one of said plurality of subscriber units is possible,

reception means for receiving and processing said multiplexed synchronously related data messages from said at least one of said plurality of subscriber units and relaying said multiplexed synchronously related data messages from said at least one of said plurality of subscriber units to said base station repeater cell means.

\*    \*    \*    \*    \*

# United States Patent [19]

**Dinkins**

[11] **Patent Number:** **5,592,491**

[45] **Date of Patent:** **Jan. 7, 1997**

[54] **WIRELESS MODEM**

[75] Inventor: **Gilbert M. Dinkins**, Herndon, Va.

[73] Assignee: **EON Corporation**, Reston, Va.

[21] Appl. No.: **348,618**

[22] Filed: **Dec. 2, 1994**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 966,414, Oct. 26, 1992, Pat. No. 5,388,101.

[51] **Int. Cl.$^6$** ........................................................ **H04J 3/16**
[52] **U.S. Cl.** ........................... **370/277**; 455/11.1; 379/59
[58] **Field of Search** .................................. 370/95.1, 95.2,
370/95.3, 60, 60.1, 94.1, 94.2, 75, 32, 97;
455/34.1, 34.2, 57.1, 58.2, 56.1, 50.1, 51.1,
54.1, 33.1, 33.2, 33.3, 11.1, 13.1, 13.2,
13.3, 13.4, 15, 16; 375/211, 222; 379/4

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| 5,282,204 | 1/1994 | Shpancer et al. | ........................ | 370/95.1 |
| 5,494,698 | 8/1995 | Kito | ........................................ | 370/95.1 |

*Primary Examiner*—Douglas W. Olms
*Assistant Examiner*—Dang Ton
*Attorney, Agent, or Firm*—Cushman Darby & Cushman IP Grop of Pillsbury Madison & Sutro, LLP

[57] **ABSTRACT**

A system and method for communicating between local subscriber units and a local base station repeater cell in a two-way communication interactive video network. In one embodiment, a modem is used to enable communications between a subscriber unit and a local base station repeater cell when the subscriber units are unable to receive rf transmissions from the local base station repeater cell. The local base station repeater cell is connected via a telephone line to the modem. Data communications are sent from the local base station repeater cell to the modem. The modem is also connected via and rf link to the subscriber unit. The modem then transmits the data communications received from the local base station repeater cell to the subscriber unit. Responses from the subscriber unit are then transmitted over the rf link from the subscriber unit to the modem. The modem then transmits the responses over the telephone line to the local base station repeater cell.

**23 Claims, 3 Drawing Sheets**



**U.S. Patent**          Jan. 7, 1997          **Sheet 1 of 3**          **5,592,491**

# FIG. 1 (Prior Art)



# FIG. 2





FIG. 3

A0210

5,592,491

# 1

## WIRELESS MODEM

This is a continuation-in-part of a application Ser. No. 07/966,414, filed Oct. 26, 1992, by G. Dinkins, entitled "Interactive Nationwide Data Service Communication System For Stationary And Mobile Battery Operated Subscriber Units", which issued as U.S. Pat. No. 5,388,101.

## TECHNICAL FIELD

This invention relates to an interactive two-way data service network, and more particularly, to communication within an interactive two-way broadcast data service network.

## BACKGROUND ART

Communication within an interactive two-way broadcast data service network is described in detail in application Ser. No. 07/966,414, filed Oct. 26, 1992 now U.S. Pat. No. 5,388,101 G. Dinkins, entitled "Interactive Nationwide Data Service Communication System For Stationary And Mobile Battery Operated Subscriber Units" which is incorporated herein by reference. In such a system, a local base station repeater cell comprises a central transmitter and data processing site for transmitting digital data to individual low-cost, portable, battery-operated, milliwatt transmitter, subscriber units within a local base station designated area. A plurality of receive only stations, remote receivers, are distributed throughout the local base station designated area and are connected by wire, cable, microwave link, or radio to the local base station repeater cell. The remote receivers process and relay transmitted digital data received from the individual subscriber units. Thus, the local base station repeater cell transmits data directly to the individual subscriber units. The milliwatt transmitter individual subscriber units, however, do not transmit data directly back to the local base station repeater cell. Instead, the individual subscriber units transmit to a remote receiver which then relays the data to the local base station repeater cell. The use or remote receivers allows the individual subscriber units to transmit data using power in the milliwatt range.

Unfortunately, under certain conditions, individual subscriber units are unable to receive transmissions from the local base station repeater cell. For example, a user may purchase a subscriber unit and place the subscriber unit in an area which is not yet equipped with or is not covered by a local base station repeater cell. Additionally, a subscriber unit may be located within range of a local base station repeater cell, but may be positioned, for example, in a basement or other physical location which prevents the subscriber unit from receiving transmissions from the local base station repeater cell.

In an attempt to alleviate reception problems, local base station repeater cells have been situated with overlapping coverage to produce strong signals throughout a given area. However, such placement of local base station repeater cells is extremely costly due to the number of local base station repeater cells required, and such "crowded" placement of the local base station repeater cells is not always practical. In a further attempt to deal with ineffective communication between the local base station repeater cell and the subscriber unit, the location of the user is determined at the time of sale of the subscriber unit to the user. However, even if the user's location is within an area covered by the local base station repeater cell, the subscriber unit might still be placed in a physical location which prevents the subscriber unit

# 2

from receiving signals from the local base station repeater cell.

Thus, the need has arisen for a system to enable communications between a subscriber unit and a local base station repeater cell in areas where such communication has previously been impaired, which does not require the addition of numerous costly local station repeater cells, which is not dependent on the physical location of the subscriber unit, and which does not significantly increase the cost of communication within the interactive two-way broadcast data service network.

## DISCLOSURE OF THE INVENTION

It is therefore an object of the present invention to provide a system to enable communications between a subscriber unit and a local base station repeater cell in areas where such communication has previously been impaired, which does not require the addition of numerous costly local station repeater cells, which is not dependent on the physical location of the subscriber unit, and which does not significantly increase the cost of communication within the interactive two-way broadcast data service network. The above object has been achieved using a modem which is used to enable communications between a subscriber unit and a local base station repeater cell when the subscriber units are unable to receive rf transmissions from the local base station repeater cell. The local base station repeater cell is connected via a telephone line to the modem. Data communications are sent from the local base station repeater cell to the modem. The modem is also connected via an rf link to the subscriber unit. The modem then transmits the data communications received from the local base station repeater cell to the subscriber unit. Responses from the subscriber unit are then transmitted over the rf link from the subscriber unit to the modem. The modem then transmits the responses over the telephone line to the local base station repeater cell. In so doing, two-way communications in an interactive broadcast network are achieved even in conditions which have previously prevented such communications.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and form a part of this specification, illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention:

FIG. 1 shows a Prior Art interactive broadcast system wherein a local base station repeater cell transmits data directly to a subscriber unit.

FIG. 2 shows a communication system in an interactive broadcast system wherein a modem enables communication between a local base station repeater cell and a subscriber unit over one of two separate paths in accordance with the present invention.

FIG. 3 shows another embodiment of a communication system in an interactive broadcast system wherein a modem enables communication between a subscriber unit and a network hub switching center in accordance with the present invention.

## BEST MODE FOR CARRYING OUT THE INVENTION

Reference will now be made in detail to the preferred embodiments of the invention, examples of which are illustrated in the accompanying drawings. While the invention

5,592,491

3

will be described in conjunction with the preferred embodiments, it will be understood that they are not intended to limit the invention to these embodiments. On the contrary, the invention is intended to cover alternatives, modifications and equivalents, which may be included within the spirit and scope of the invention as defined by the appended claims.

With reference now to Prior Art FIG. 1, an interactive broadcast network as set forth in application Ser. No. 07/966,414, filed Oct. 26, 1992, now U.S. Pat. No. 5,388,101 by G. Dinkins, entitled "Interactive Nationwide Data Service Communication System For Stationary And Mobile Battery Operated Subscriber Units" is schematically shown. As shown in Prior Art FIG. 1, a local base station repeater cell 10 communicates with a subscriber unit 12 over an rf link 14 of, for example 218–219 MHz. Subscriber unit 12 transmits data back to local base station repeater cell 10 via a remote receiver 16. That is, subscriber unit 12 transmits messages directly to remote receiver 16 over an rf link 18. Remote receiver 16 then transfers the messages received from subscriber unit 12 to local base station repeater cell 10 over, for example, hard wire link 20.

With reference still to Prior Art FIG. 1, under certain conditions, subscriber unit 12 is unable to receive transmissions via rf link 14 from local base station repeater cell 10. For example, subscriber unit 12 may be placed in an area which is not yet equipped with or is not covered by a local base station repeater cell. Additionally, subscriber unit 12 may be located within range of local base station repeater cell 10, but may be positioned, for example, in a basement or other physical location which prevents subscriber unit 12 from receiving transmissions from local base station repeater cell 10 over rf link 14.

With reference next to FIG. 2, a communication system including a modem 22 for enabling communication between a local base station repeater cell 10 and a subscriber unit 12 is shown. As shown in FIG. 2, subscriber unit 12 includes switching means such as, for example, an electronic switch 13 for selecting the path of communication between subscriber unit 12 and local base station repeater cell 10. Specifically, in the present embodiment, if subscriber unit 12 is able to detect rf signals from local base station repeater cell 10 switching means 13 assumes a default position "Path A". When switching means 13 of subscriber unit 12 selects Path A, subscriber unit 12 receives rf signals directly from local base station repeater cell 10 over rf link 14, and transmits data over an rf link 18 to remote receiver 16 which then transfers the data to local base station repeater cell 10 over hard link 20.

With reference again to FIG. 2, when subscriber unit 12 is unable to receive rf signals directly from local base station repeater cell 10, switching means 13 selects "Path B". Thus, if subscriber unit 12 is unable to receive rf signals from local base station repeater cell 10, communication between subscriber unit 12 and local base station repeater cell 10 occurs along Path B using modem 22. When switching means 13 of subscriber unit 12 selects Path B, local base station repeater cell 10 transmits messages to modem 22 via, for example, telephone line 24 and public switched network 25. Although a telephone line is used in the present embodiment, the present invention is also well suited to having local base station repeater cell 10 and modem 22 connected by, for example cable, or other means. As shown in FIG. 2, modem 22 communicates with subscriber unit 12 via an rf link 26. In the present embodiment, rf link 26 is at a frequency of approximately 218–219 MHz. Although a frequency of approximately 218–219 MHz is used in the present embodiment, the present invention is also well suited to the use of

4

other frequencies such as, for example, 902 MHz or 45 MHz. Subscriber unit 12 then responds to messages and transmits data messages to local base station repeater cell 10 via modem 22. That is, subscriber unit 12 sends a data message or response over rf link 26 to modem 22. Modem 22 then relays that message or response over link 24 back to local base station repeater cell 10. Thus, two-way communication between local base station repeater cell 10 and subscriber unit 12 is achieved.

With reference still to FIG. 2, in the present embodiment, when communicating over Path B, modem 22 is connected to local base station repeater cell 10 through telephone line 24 using, for example, either an 800 or 900 telephone number. Next, TV listings, for example are downloaded into modem 22 and into subscriber unit 12. The telephone link between subscriber unit 22 and local base station repeater cell 10 via modem 22 is broken after approximately 30 seconds allowing for normal use of the telephone line. Use of the link between subscriber unit 22 and local base station repeater cell 10 via modem 22 is protected by a serial number handshake. Initiation of auto dial-up on a daily or more frequent schedule by subscriber unit 12 insures that the data received by subscriber unit 12 remains current.

Referring still to FIG. 2, the present invention provides for two-way communication between local base station repeater cell 10 and subscriber unit 12 even if subscriber unit 12 is unable to receive rf signals directly from local base station repeater cell 10. Thus, two-way communication between local base station repeater cell 10 and subscriber unit 12 is achieved even when subscriber unit 12 is placed in an area which is not yet equipped with or is not covered by a local base station repeater cell. Additionally, subscriber unit 12 may be located within range of local base station repeater cell 10, but may be positioned, for example, in a basement or other physical location which prevents subscriber unit 12 from receiving transmissions from local base station repeater cell 10 over rf link 14. Furthermore, because subscriber unit 12 only has to transmit messages to nearby modem 22, subscriber unit 12 has a maximum power output in the milliwatt range.

With reference again to FIG. 2, by including remote receiver 16, the present invention is able to function in a standard manner as soon as subscriber unit 12 is able to receive rf signals from local base station repeater cell 10. That is, if subscriber unit 12 is moved, for example, from a basement which prevents the subscriber unit from receiving rf signals from local base station repeater cell 10 to an area in which subscriber unit 12 can receive rf signals from local base station repeater cell 10, conventional two-way communication is resumed. Thus, subscriber unit 12 would receive rf signals directly from local base station repeater cell 10, switching means 13 of subscriber unit 12 would select Path A, and subscriber unit 12 would respond or transmit data messages back to local base station repeater cell 10 via remote receiver 16 thereby eliminating the need for modem 22. Therefore, the present invention is able to compliment a standard two-way interactive data broadcast network and provide two-way communications even in conditions which have previously prevented such communications. Additionally, the present invention does not substantially increase the cost of the standard two-way interactive data broadcast network, and does not require additional local base station repeater cells.

With reference next to FIG. 3, another embodiment of the present invention is shown in which subscriber unit 12 communicates directly with a network hub switching center 30 via modem 22. As shown in the embodiment of FIG. 3,

5

in instances where no local base station repeater cell is located proximate to subscriber unit 12, two-way interactive communication is still possible. Because there is no local base station repeater cell, subscriber unit 12 is unable to receive rf signals from a local base station repeater cell. Thus, switching means 13 selects Path B, such that communication to and from subscriber unit 12 occurs through modem 22.

Referring again to FIG. 3, in the present embodiment, network hub switching center 30 communicates with modem 22 over hard wire link 32 and public switched network 33. Although a telephone line is used in the present embodiment, the present invention is also well suited to having local network hub switching center 30 and modem 22 connected by, for example cable, or other means. As shown in FIG. 3, modem 22 communicates with subscriber unit 12 via an rf link 26. In the present embodiment, rf link 26 is at a frequency of approximately 218–219 MHz. Although a frequency of approximately 218–219 MHz is used in the present embodiment, the present invention is also well suited to the use of other frequencies such as, for example, 902 MHz or 45 MHz. Subscriber unit 12 then responds to messages and transmits data messages to network hub switching center 30 via modem 22. That is, subscriber unit 12 sends a data message or response over rf link 26 to modem 22. Modem 22 then relays that message or response over link 32 back to network hub switching center 30. Thus, two-way communication between network hub switching center 30 and subscriber unit 12 is achieved.

With reference still to FIG. 3, in the present embodiment, modem 22 is connected to network hub switching center 30 through telephone line 32 using, for example, either an 800 or 900 telephone number. The telephone link between subscriber unit 22 and network hub switching center 30 via modem 22 is broken after approximately 30 seconds allowing for normal use of the telephone line. Use of the link between subscriber unit 22 and network hub switching center 30 via modem 22 is protected by a serial number handshake. Initiation of auto dial-up on a daily schedule by subscriber unit 12 insures that the data received by subscriber unit 12 remains current.

With reference again to FIG. 3, modem 22 is also adapted to communicate with a local base station repeater cell when a local base station repeater cell is located proximate to subscriber unit 12. That is, modem 22 is also able to transmit data through line 34 to a local base station repeater cell when a local base station repeater cell becomes available. Therefore, the present invention is able to compliment a standard two-way interactive data broadcast network and provide two-way communications even in conditions which have previously prevented such communications. Additionally, the present invention provides two-way communications even when a local base station repeater cell is not located proximate to a subscriber unit.

The present invention also provides several substantial benefits over a standard two-way interactive data broadcast network. The present invention can be used to provide wireless facsimile service, or to request pay-per-view services even when the subscriber unit is not able to receive rf signals from the local base station repeater cell. Likewise, the present invention also provides for immediate modem access even when the subscriber unit is located, for example, at poolside etc. Additionally, a single modem of the present communication system can be mounted in such a location as to be able to communicate via an rf link to numerous subscriber units placed within homes located, for example, along a single street or within the same neighborhood. In so

6

doing, the present communication system is able to collect data from a number of home appliances, etc.

The foregoing descriptions of specific embodiments of the present invention have been presented for purposes of illustration and description. They are not intended to be exhaustive or to limit the invention to the precise forms disclosed, and obviously many modifications and variations are possible in light of the above teaching. The embodiments were chosen and described in order to best explain the principles of the invention and its practical application, to thereby enable others skilled in the art to best utilize the invention and various embodiments with various modifications as are suited to the particular us contemplated. It is intended that the scope of the invention be defined by the claims appended hereto and their equivalents.

I claim:

1. A two-way communication network comprising:

a network hub switching center;

subscriber units dispersed at various locations within a predetermined geographic area, said subscriber units including switching means for selecting a communication path within said network,

local base station repeater cell communicating with identified individual subscriber units within a local base station geographic area associated with said local base station repeater cell, said local base station repeater cell further comprising,

base station data processing and communication unit for transmitting to a set of said subscriber units contained within said local base station geographic area associated with said local base station repeater cell and receiving from a subset of said set of local subscriber units multiplexed synchronously related digital data messages of variable lengths for point-to-point communication between said local base station repeater cell and said subset of said local subscriber units,

reception for receiving and processing data messages from said set of local subscriber units comprising a local remote receiver disposed within one of a plurality of cell subdivision sites partitioned from said local base station geographic area associated with said local base station repeater cell, said plurality of cell subdivision sites dispersed over said local base station geographic area, said local remote receiver being adapted to receive low power digital messages transmitted from said local subscriber units within range of said local remote receiver,

said set of local subscriber units including low power mobile units located within said local base station geographic area, each of said local subscriber units adapted to communicate with said local base station repeater cell by way of digital data signals of variable lengths synchronously related to a base station broadcast signal and timed for multiplexed message transmission, and

a modem communicatively coupled to said local subscriber units and said local base station repeater cell for transferring said multiplexed synchronously related digital data messages of variable lengths between said set of local subscriber units and said local base station repeater cell if said local subscriber units are unable to directly communicate with said local base station repeater cell.

2. The base station configuration of claim 1 wherein said modem and said local subscriber units are communicatively coupled via an rf link.

5,592,491

7

8

3. The base station configuration of claim 2 wherein said rf link between said modem and said local subscriber units is at an rf carrier frequency of approximately 218–219 MHz.

4. The base station configuration of claim 1 wherein said modem and said local base station repeater cell are communicatively coupled via a telephone line.

5. A method of communicating between subscriber units and a local base station repeater cell comprising the steps of:

determining whether a subscriber unit located with a base station geographic area associated with said local base station repeater cell is receiving a signal from said local base station repeater cell;

if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of:

transmitting outgoing data from said local base station repeater cell to said subscriber unit by directly transmitting a first outgoing data signal representative of said outgoing data from said local base station repeater cell to said subscriber unit, and

transmitting incoming data from said subscriber unit to said local base station repeater cell by transmitting a first incoming data signal representative of said incoming data from said subscriber unit to a receive only receiver unit and then transmitting a second incoming data signal also representative of said incoming data from said receiver unit to said local base station; and

if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of:

transmitting said outgoing data from said local base station repeater cell to said subscriber unit by transmitting a second outgoing data signal representative of said outgoing data from said local base station repeater cell to a modem and then transmitting a third outgoing data signal also representative of said outgoing data from said modem to said subscriber unit, and

transmitting said incoming data from said subscriber unit to said local base station repeater cell by transmitting a third incoming data signal representative of said incoming data from said subscriber unit to said modem and then transmitting a fourth incoming data signal also representative of said incoming data from said modem to said local base station.

6. The communication method of claim 5 wherein the step of transmitting said second outgoing data signal from said local base station repeater cell to said modem further comprises transmitting said second outgoing data signal from said local base station repeater cell to said modem via a telephone line.

7. The communication method of claim 5 wherein the step of transmitting said third outgoing data signal from said modem to said subscriber unit further comprises transmitting said third outgoing data signal from said modem to said subscriber unit via an rf link.

8. The communication method of claim 7 wherein the step of transmitting said third outgoing data signal from said modem to said subscriber unit via an rf link further comprises transmitting said third outgoing data signal from said modem to said subscriber unit at an rf carrier frequency of approximately 218–219 MHz.

9. The communication method of claim 5 wherein the step of transmitting said third incoming data signal from said subscriber unit to said modem further comprises transmitting said third incoming data signal from said subscriber unit to said modem via an rf link.

10. The communication method of claim 9 wherein the step of transmitting said third incoming data signal from said

subscriber unit to said modem via an rf link further comprises transmitting said third incoming data signal from said subscriber unit to said modem at an rf carrier frequency of approximately 218–219 MHz.

11. The communication method of claim 5 wherein the step of transmitting said fourth incoming data signal from said modem to said local base station repeater cell further comprises transmitting said fourth incoming data signal from said modem to said local base station repeater cell via a telephone line.

12. A digital cellular communication system comprising in combination:

a cell site divided into a plurality of subdivided zones,

a plurality of subscriber units with identity numbers based in said cell site,

a cell site communication system including a digital transmitter for communication with individual identified subscriber units geographically located within said cell site,

a set of receive only digital receivers positioned in said subdivided zones, each said digital receiver being coupled by a transmission link with said cell site communication system to relay received digital communications,

a set of said subscriber units comprising portable wireless digital communication units with a limited power digital transmitter having a transmitting power for transmissions within said subdivided zones,

a receiver for reception of digital messages from said cell site digital transmitter,

a modem communicatively coupled to said local subscriber units and said digital transmitter for transferring data between said subscriber units and said digital transmitter if said subscriber units are unable to communicate directly with said digital transmitter.

13. A two-way communication system comprising:

at least one subscriber unit disposed within a predetermined base station geographic area, said at least one subscriber unit including switching means for selecting a communication path within said communication system,

a network hub switching center for routing communications from and to said at least one subscriber unit, and

a modem communicatively coupled to said at least one subscriber unit and said network hub switching center for transferring multiplexed synchronously related digital data messages of variable lengths between said at least one subscriber unit and said network hub switching center if said at least one subscriber unit is unable to communicate directly with a local base station repeater cell, said modem also adapted for communicating with said local base station repeater cell if communication therebetween is not otherwise prevented.

14. The base station configuration of claim 13 wherein said modem and said at least one subscriber unit are communicatively coupled via an rf link.

15. The base station configuration of claim 14 wherein said rf link between said modem and said at least one subscriber unit are at an rf carrier frequency of approximately 218–219 MHz.

16. The base station configuration of claim 13 wherein said modem and said network hub switching center are communicatively coupled via a telephone line.

17. A method of communicating between a subscriber unit and a network hub switching center in a two-communication system comprising the steps of:

5,592,491

<table>
<tr><td>9</td><td>10</td></tr>
</table>

determining whether a subscriber unit located with a base station geographic area associated a said local base station repeater cell is receiving a signal from said local base station repeater cell;

if said subscriber unit is receiving a signal from said local base station repeater cell, performing the steps of:

transmitting outgoing data from said network hub switching center to said subscriber unit via said local base station repeater cell, and

transmitting incoming data from said subscriber unit to said network hub switching center via said local base station repeater cell; and

if said subscriber unit is not receiving a signal from said local base station repeater cell, performing the steps of:

transmitting said outgoing data from said network hub switching center to said subscriber unit by transmitting a first outgoing data signal representative of said outgoing data from said network hub switching center to a modem and transmitting a second outgoing data signal also representative of said outgoing data from said modem to said local base station repeater cell, and

transmitting incoming data from said subscriber unit to said network hub switching center by transmitting a first incoming data signal representative of said incoming data from said subscriber unit to said modem and transmitting a second incoming data signal also representative of said incoming data from said modem to said network hub switching center.

**18**. The communication method of claim **17** wherein the step of transmitting said first outgoing data signal from said network hub switching center to said modem further comprises transmitting said first outgoing data signal from said network hub switching center to said modem via a telephone line.

**19**. The communication method of claim **17** wherein the step of transmitting said second outgoing data signal from said modem to said subscriber unit further comprises transmitting said second outgoing data signal from said modem to said subscriber unit via an rf link.

**20**. The communication method of claim **19** wherein the step of transmitting said second outgoing data signal from said modem to said subscriber unit via an rf link further comprises transmitting said data from said modem to said subscriber unit at an rf carrier frequency of approximately 218–219 MHz.

**21**. The communication method of claim **17** wherein the step of transmitting said first incoming data signal from said subscriber unit to said modem further comprises transmitting said first incoming data signal from said subscriber unit to said modem via an rf link.

**22**. The communication method of claim **21** wherein the step of transmitting said first incoming data signal from said subscriber unit to said modem via an rf link further comprises transmitting said first incoming data signal from said subscriber unit to said modem at an rf carrier frequency of approximately 218–219 MHz.

**23**. The communication method of claim **17** wherein the step of transmitting said second incoming data signal from said modem to said network hub switching center further comprises transmitting said second incoming data signal from said modem to said network hub switching center via a telephone line.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.            : 5,592,491                                    Page 1 of 1
APPLICATION NO. : 08/348618
DATED                   : January 7, 1997
INVENTOR(S)        : Gilbert M. Dinkins

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

At column 6, line 65 (in claim 2); column 7, line 1 (in claim 3); and column 7, line 4 (in claim 4):
The text "base station configuration" should read --two-way communication network--

At column 7, line 26 and line 43 (in claim 5):
The text "base station" should read --base station repeater cell--

At column 8, line 55 (in claim 14), column 8, line 58 (in claim 15); and column 8, line 62 (in claim 16):
The text "base station configuration" should read --two-way communication system--

At column 9, lines 21-22 (in Claim 17):
The text "local base station repeater cell" should read --subscriber unit--

Signed and Sealed this

Seventeenth Day of November, 2009

David J. Kappos
*Director of the United States Patent and Trademark Office*

# United States Court of Appeals
## for the Federal Circuit

*EON Corp. IP Holdings LLC v. Silver Spring Networks, Inc.,* 2015-1237, -1270

### CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by DURIE TANGRI LLP, Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **March 9, 2015** counsel has authorized me to electronically file the foregoing **Brief for Defendant-Appellant (confidential and non-confidential versions)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

DANIEL R. SCARDINO
CATHERINE B. HARRIS
JOHN L. HENDRICKS
RAYMOND W. MORT, III
JOHN M. MURRELL
REED & SCARDINO LLP
301 Congress Avenue
Austin, TX 78701
(512) 474-2449
dscardino@reedscardino.com
bharris@reedscardino.com
jhendricks@reedscardino.com
mmurrell@reedscardino.com
rmort@reedscardino.com

Additionally, the confidential copy will be emailed and also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

March 9, 2015                                    /s/ John C. Kruesi, Jr.
                                                John C, Kruesi, Jr.
                                                Counsel Press

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

The brief contains <u>11,265</u> words, excluding the parts of the brief exempted by

Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and

the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in Times New Roman, 14 point font.

DATED:  March 9, 2015                    DURIE TANGRI LLP


                                         By   /s/ Mark A. Lemley
                                              MARK A. LEMLEY

                                              *Attorneys for Defendant-Appellant Silver
                                              Spring Networks, Inc.*