**Nos. 2015-1237, 2015-1270**

# In the United States Court of Appeals
### for the
# Federal Circuit

_____

**EON CORP. IP HOLDINGS LLC,**
*Plaintiff–Cross-Appellant,*

*v.*

**SILVER SPRING NETWORKS, INC.,**
*Defendant–Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Texas,
Case No. 6:11-cv-00317-JDL, Judge John D. Love.

_____

**NONCONFIDENTIAL OPENING BRIEF
FOR PLAINTIFF–CROSS-APPELLANT,
EON CORP. IP HOLDINGS LLC**

DANIEL R. SCARDINO
JOHN L. HENDRICKS
RAYMOND W. MORT, III
C. BENTLEY HARRIS
MATTHEW MURRELL
REED & SCARDINO LLP
301 Congress Ave, Ste 1250
Austin, Texas 78701
512-474-2449
*Attorneys for Plaintiff–Cross-Appellant*

May 29, 2015

# CERTIFICATE OF INTEREST

Counsel for <u>Cross-Appellant EON Corp. IP Holdings LLC</u> certifies the following:

1. The full name of every party or amicus represented by me is:

   EON Corp. IP Holdings LLC

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   EON Corp. IP Holdings LLC

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   EON Corp. IP Holdings LLC is a wholly owned subsidiary of EON Corporation.

4. The names of all the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   REED & SCARDINO LLP: Daniel R. Scardino, Raymond W. Mort III, Craig S. Jepson, C. Bentley Harris, Jeff Johnson, Cary D. Ferchill, Debra Dennett, Jason W. Deats, John L. Hendricks, Matthew Murrell
   THE DACUS FIRM:  Deron Dacus

*/s/  Daniel R. Scardino*
DANIEL R. SCARDINO
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-279-7904
dscardino@reedscardino.com

May 29, 2015

*Counsel for Cross-Appellant,*
*EON Corp. IP Holdings LLC*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES .....................................................................vi

STATEMENT OF RELATED CASES ....................................................xi

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUE ON CROSS-APPEAL...........................2

SUMMARY OF ARGUMENT .................................................................3

COUNTER-STATEMENT OF FACTS .....................................................5

    A.   History of the Parties......................................................................5

          1.   EON Corporation Developed Two-Way Network Technology That Is Central to the Operation of Utility Smart Grids.....................5

          2.   Silver Spring Is a Young Company that Benefited from the Federal Stimulus's Focus on Smart Grid Development.....................6

    B.   The Patents-in-Suit Claim Interactive Two-Way Networks that Include Automated Meter Reading Used in Smart Grids. .........................7

    C.   The Accused Products Are Silver Spring Network Components Used in Wireless Smart Grid Networks. ..................................................10

    D.   At Claim Construction, the District Court Determined that "Portable" and "Mobile" Should Be Given Their Plain and Ordinary Meaning, and Silver Spring Did Not Raise the Direction of Data Transmission in the '491 Patent...................................................11

    E.   At Trial, EON Demonstrated that Silver Spring Infringed the Patents-In-Suit by Manufacturing, Selling, and Operating Network Components Used in Utility Smart Grids. ...............................................12

          1.   The Experts Agreed on the Plain and Ordinary Meaning of "Portable" and "Mobile." ..................................................................13

2.    EON's Expert Demonstrated that Silver Spring's Networks Infringed Claims 1 and 2 of the '491 Patent. ....................................13

3.    The Testimony of EON's Damages Expert Was Thorough and Analyzed the Key Factors Regarding a Hypothetical Negotiation Between the Parties.......................................................14

F.    Post-Trial Proceedings ...........................................................15

1.    Silver Spring Raised Several Claim Construction Arguments for the First Time After Trial...............................................15

2.    The District Court Rejected Silver Spring's Argument Regarding a New Trial on Damages Because the Record Was Sufficient To Support the Damages Award. ...................................16

3.    The District Court Remitted the Damages Award Based on a Defense that Silver Spring Waived. ..................................................16

ARGUMENT ...................................................................................17

I.    SILVER SPRING HAS FAILED TO DEMONSTRATE THAT THE DISTRICT COURT ERRED REGARDING THE TERMS "PORTABLE" AND "MOBILE." ................................................17

A.    The District Court Did Not Err in Refusing to Adopt Silver Spring's Noninfringement-Based Construction Because Silver Spring Failed To Justify Any Deviation from Plain and Ordinary Meaning. ..................................................................18

B.    The District Court Did Not Delegate the Task of Resolving a Claim Construction Dispute to the Jury. ..................................21

1.    The Facts in This Case Do Not Support an Impermissible *O2 Micro* Dispute. .................................................................22

2.    Silver Spring's Attempt to Manufacture a Claim Scope Dispute Out of Testimony and Attorney Argument to Which It Did Not Object Has Been Routinely Rejected by this Court........23

3.    Even if the Alleged Testimony and Attorney Argument Were Improper, the Error Is Harmless. ...................................25

C.   The Evidence Presented at Trial Created a Reasonable Basis To Support the Jury's Finding that Silver Spring's Products Meet the "Portable" and "Mobile" Requirements of the Patents............................28

II.   SILVER SPRING'S POST-HOC ATTACK ON THE '491 PATENT SHOULD BE REJECTED BECAUSE SILVER SPRING FAILED TO RAISE *ANY* OF ITS ARGUMENTS UNTIL AFTER THE VERDICT.........34

A.   Silver Spring Waived the Right To Argue that "Transmit" Precludes Infringement Because It Failed To Raise *Any* Arguments Regarding Downstream Communication During Claim Construction or at Trial. ...........................................................35

B.   The District Court Did Not Submit an Impermissible Question of Claim Scope to the Jury Because Silver Spring Never Raised the Issue Pre-Verdict. ....................................................................37

C.   Silver Spring Has Failed To Demonstrate Clear Error in Either EON's Interpretation of the '491 Patent or the Jury's Finding of Infringement. ............................................................................39

D.   Silver Spring's Argument that the Claim's Preamble Is Limiting Was Waived Because Silver Spring Failed To Raise It Below. ..............41

III.  A NEW TRIAL ON DAMAGES IS NOT WARRANTED BECAUSE THE TRIAL COURT DID NOT ERR BY RULING THAT THE DAMAGES AWARD WAS BASED ON SUBSTANTIAL EVIDENCE....................................................................................42

A.   Under the Appropriate Standard of Review, Silver Spring Must Demonstrate an Absolute Absence of Evidence To Support the District Court's Finding. ........................................................43

B.   A New Trial Is Not Required Because The Record Contains Substantial Evidence Supporting the Damages Verdict. .........................44

1.   EON's Damages Expert Gave Credible, Relevant Testimony that the Parties Would Have Negotiated for EON's Patents as a Package. ......................................................................44

2.   This Court Does *Not* Require a New Trial on Damages When an Infringement Finding Is Vacated. ................................48

IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN REMITTING THE DAMAGES AWARD BASED ON AN IMPLIED LICENSE BECAUSE SILVER SPRING *NEVER ARGUED* THAT SUCH A DEFENSE EXISTED. ................................................................52

    A. The District Court's Remittitur Is Reviewed for an Abuse of Discretion. ..............................................................................53

    B. The District Court Abused Its Discretion Because It Relied on an Affirmative Defense of Implied License that Was Clearly and Unquestionably Waived. ........................................................53

        1. Silver Spring's Answers Did Not Properly Assert Implied License Based on the Landis+Gyr Settlement Agreement Because the Agreement Post-Dated Those Answers. ......................54

        2. Silver Spring Did Not Raise The Defense Of "Implied License" In the Proposed Joint Final Pretrial Order.........................56

    C. The District Court Abused Its Discretion By Allowing Silver Spring To Amend Its Answer To Include the Nonexistent Affirmative Defense of "Joint and Several Liability." ............................57

    D. The District Court Abused Its Discretion by Considering and Granting Silver Spring's Post-Trial JMOL. ..............................................61

        1. Silver Spring Failed To Preserve *Any* Affirmative Defenses for Post-Trial Briefing. ....................................................61

        2. In Its Post-Trial JMOL Briefing, Silver Spring *Again* Asserted Joint and Several Liability as a "Defense."......................................62

    E. The District Court Abused Its Discretion by Determining that the Landis+Gyr Agreement Warranted a Remittitur of the Damages Award. ..................................................................................64

CONCLUSION ........................................................................................69

CERTIFICATE OF SERVICE .............................................................70

CERTIFICATE OF COMPLIANCE....................................................71

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages 4, 14, 16, 17, 61, 63, 65, and 68 discloses information regarding the royalty rate or the calculation of damages by the parties or the district court.

The material omitted on page 33 describes and/or characterizes how Silver Spring's technology works.

The material omitted on pages 55, 65, and 67 discloses information regarding the terms of a confidential settlement agreement between EON Corp. IP Holdings LLC and Landis+Gyr.

The material omitted on page 59 is a quotation from a sealed document, Silver Spring's Reply In Support of Its Motion for Leave To File Amended Answer to EON's Third Amended Complaint (Dkt. No. 545), in which Silver Spring characterizes its joint and several liability theory.

The material omitted on pages 65, 66, 67, and 68 discloses confidential financial information about Silver Spring's sales and business operations, some of which appears in the sealed Declaration of Mr. Eric Dresselhuys.

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Accentra, Inc. v. Staples, Inc.*,
500 F. App'x 922 (Fed. Cir. 2013) ........................................................48, 49, 51

*Arsement v. Spinnaker Exploration Co.*,
400 F.3d 238 (5th Cir. 2005) ...............................................................................56

*Automated Med. Labs. v. Armour Pharm. Co.*,
629 F.2d 1118 (5th Cir. 1980) ............................................................................54

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ............................................................................41

*Broadcom Corp. v. Qualcomm Inc.*,
543 F.3d 683 (Fed. Cir. 2008) ................................................................36, 37, 38

*IRIS Corp. v. Japan Airlines Corp.*,
769 F.3d 1359 (Fed. Cir. 2014) ..........................................................................49

*Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*,
72 F.3d 872 (Fed. Cir. 1995) ........................................................................54, 63

*Coats v. Penrod Drilling Corp.*,
61 F.3d 1113 (5th Cir. 1995) ..............................................................................59

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*,
460 F.3d 1349 (Fed. Cir. 2006) ..............................................................21, 36, 41

*Cordis Corp. v. Boston Scientific Corp.*,
561 F.3d 1319 (Fed. Cir. 2009) ..........................................................................36

*Cybor Corp. v. FAS Techs., Inc.*,
138 F.3d 1448 (Fed. Cir. 1998) (en banc) ....................................................44, 47

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ....................................................................44, 47

*Duro-Last, Inc. v. Custom Seal, Inc.*,
321 F.3d 1098 (Fed. Cir. 2003) ..........................................................................62

*E-Pass Techs., Inc. v. 3Com Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003) ........................................................39

*Forman v. Davis*,
   371 U.S. 178 (1962)..........................................................................60

*Function Media LLC v. Google Inc.*,
   708 F.3d 1310 (Fed. Cir. 2013) ................................................*passim*

*Hoechst Celanese Corp. v. BP Chems. Ltd.*,
   78 F.3d 1575 (Fed. Cir. 1996) ........................................................19

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ........................................................61

*In re '318 Patent Infringement Litig.*,
   583 F.3d 1317 (Fed. Cir. 2009) ......................................................26

*In re Watts*,
   354 F.3d 1362 (Fed. Cir. 2004) ......................................................26

*Ingraham v. U.S.*,
   808 F.2d 1075 (5th Cir. 1987) ........................................................54

*Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*,
   554 F.3d 1010 (Fed. Cir. 2009) ................................................*passim*

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ..........................................................53

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
   628 F.3d 1359 (Fed. Cir. 2010) ......................................................36

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ......................................................48

*Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.*,
   128 F.3d 872 (5th Cir. 1997) ..........................................................60

*Mayeaux v. La. Health Serv. & Indem. Co.*,
   376 F.3d 420 (Fed. Cir. 2004) ........................................................60

*McClure v. Ashcroft*,
    335 F.3d 404 (5th Cir. 2003) ...............................................53, 60, 64

*McQuaig v. McCoy*,
    806 F.2d 1298 (5th Cir. 1987) ...........................................................38

*Morgan v. Swanson*,
    659 F.3d 359 (5th Cir. 2011) .............................................................66

*Munoz v. Strahm Farms, Inc.*,
    69 F.3d 501 (Fed. Cir. 1995) .............................................................26

*NTP, Inc. v. Research in Motion, Inc.*,
    418 F.3d 1282 (Fed. Cir. 2005) .....................................................49, 51

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) .................................................*passim*

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................19

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008) .......................................................40

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
    553 U.S. 617 (2008).........................................................................58

*ResQNet.com Inc. v. Lansa, Inc.*,
    828 F. Supp. 2d 688 (Fed. Cir. 2011) .........................................49, 50

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) (en banc) .......................................19

*Szemraj v. Principi*,
    357 F.3d 1370 (Fed. Cir. 2004) .......................................................26

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*,
    411 F.3d 1369 (Fed. Cir. 2005) .......................................................53

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
    69 F.3d 512 (Fed. Cir. 1995) ...........................................................43

*Ventana Med. Sys., Inc. v. Biogenex Lab., Inc.*,
  473 F.3d 1173 (Fed. Cir. 2006) .......................................................... 39

*Verizon Services Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) ................................................... 45, 50

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*,
  602 F.3d 1325 (Fed. Cir. 2010) ................................................. *passim*

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) .......................................................... 19

*Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*,
  479 F.3d 1330 (Fed. Cir. 2007) ........................................................ 25

*Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*,
  103 F.3d 1571 (Fed. Cir. 1997) ........................................................ 68

*Weinar v. Rollform Inc.*,
  744 F.2d 797 (Fed. Cir. 1984) .......................................................... 23

*West v. Drury Co.*,
  412 F. App'x 663 (5th Cir. 2011) ..................................................... 38

*Whitserve, LLC v. Computer Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ..................................................... 43, 44

*Woodfield v. Bowman*,
  193 F.3d 354 (5th Cir. 1999) ..................................................... *passim*

**FEDERAL STATUTES**

28 U.S.C. § 2111 (2014) .................................................................... 26

**RULES**

Fed. R. Civ. P. 8(c) ........................................................................... 56

Fed. R. Civ. P. 50(a) .................................................................. 28, 61

Fed. R. Civ. P. 61 ............................................................................. 26

**OTHER AUTHORITIES**

5 Charles Alan Wright & Arthur R. Miller,
  *Federal Practice and Procedure* § 1278, at 477 (3d ed. 2015)..........................53

Restatement (Third) Of Torts:
  Apportionment Liab. § 10 (2000) ........................................................................59

## STATEMENT OF RELATED CASES

Appellant Silver Spring Networks, Inc. filed an appeal in matter 2015-1237, and Cross-Appellant EON Corp. IP Holdings LLC filed a cross-appeal in matter 2015-1270.  EON knows of no other related cases to the appeal or cross-appeal.

## JURISDICTIONAL STATEMENT

EON adopts the Jurisdictional Statement in Appellant's Opening Brief.

Appellant's Brief at 2.

## STATEMENT OF THE ISSUE ON CROSS-APPEAL

1.  Did the district court abuse its discretion by remitting the damages award based on an implied license defense that Silver Spring never raised?

## SUMMARY OF ARGUMENT

Appellant Silver Spring argues that the record is riddled with errors that require multiple findings of infringement to be reversed and a $12.99 million damages award to be vacated. In its zeal to jettison the entire verdict, Silver Spring tells a curated story, omitting that the majority of facts about which it complains on appeal were not disputed pre-trial nor objected to during trial. Only *after* losing did Silver Spring find errors in the record, arguing several new positions in its post-trial briefing. Now, Silver Spring rehashes positions that the district court rejected. This Court has repeatedly rejected the approach Silver Spring takes on appeal, cherry picking the record to create post-hoc "errors" that went unprotested when they occurred.

Silver Spring first alleges that the district court impermissibly submitted a claim dispute regarding the terms "portable" and "mobile" to the jury, and that insufficient evidence supported the jury's verdict on those terms. But Silver Spring fails to demonstrate how its construction of "portable" and "mobile" are supported by the intrinsic record, fails to reconcile its lack of objection to *any* of the evidence or arguments of which it now complains, and fails to come to terms with the agreement by all experts on the definition of the terms during trial. The same is true of Silver Spring's additional attack on the '491 Patent and its alleged limitation regarding downstream transmission of digital data messages. Silver

Spring made no such argument or objections at claim construction, in pretrial filings, or during trial, waiving any right to make such an argument now.

Silver Spring also argues that this Court requires a new trial on damages where one of multiple findings of infringement underlying a damages award is vacated. But again, Silver Spring tells an incomplete story. This Court's jurisprudence does not require a new trial on damages where, as here, the record supports the damages award (or an alternative award) irrespective of the noninfringement finding. As the record reflects, *both* damages experts based their royalty rates on the family of asserted patents, not individual claims, providing support for the existing damages award.

On cross-appeal, EON asserts that the district court erred by remitting the damages award from $18.80 million to $12.99 million based on an implied license derived from a settlement agreement between EON and a co-defendant. Despite Silver Spring's failure *to ever assert* an implied license defense based on the agreement, waiving the defense before, during, and after the trial, the district court took Silver Spring's factual analysis regarding a different theory and created an implied license defense. This abuse of discretion deprived EON of █████████ and is reversible error.

## COUNTER-STATEMENT OF FACTS

### A. History of the Parties

#### 1. EON Corporation Developed Two-Way Network Technology That Is Central to the Operation of Utility Smart Grids.

Cross-Appellant EON Corp. IP Holdings, LLC ("EON") is a wholly owned subsidiary, and the patent licensing division, of EON Corporation. A397. Known prior to 1993 as TV Answer, in the late 1980s, the company applied for and was allocated wireless spectrum by the Federal Communications Commission ("FCC") for its proposed innovative wireless data and telemetry services. A397. In turn, the company's investors, management team, and board of directors, which included then-Hewlett-Packard director and former Reagan science advisor George A. "Jay" Keyworth and former FCC Chairman Mark Fowler, directed the company's engineers to file a series of domestic and international patents for the various data technologies the company had developed. A376, A378.

The patents-in-suit were borne out of that effort, as they were developed in house at EON and have always been owned by the company. A378. The inventor of those patents, Mr. Gilbert Dinkins, was the lead engineer at EON and sought to improve and expand the wireless service the company provided. A376–78. In the early 1990s, he applied for and received U.S. Patent Nos. 5,388,101 (the "'101 Patent"), 5,481,546 (the "'546 Patent"), and 5,592,491 (the "'491 Patent"). A379–80. Mr. Dinkins recognized that his wireless data network architecture would be

applicable in myriad contexts beyond interactive television, including two-way data messaging, advanced meter reading, remote monitoring of assets, and other applications detailed in the patents. A381.

In the late 1990s, EON partnered with utilities and other companies in pilot projects that tested the wireless meter reading described in the patents, demonstrating the technology's ability to minimize costly outages by diagnosing problems and rerouting power. A399. Despite the success of EON's inventions, utility companies were not willing to implement the patented technology because deploying fixed-network wireless systems was, at the time, too expensive. A399.

A decade later, the federal government set aside $3.4 billion in stimulus funding for utility companies, making fixed-network wireless meter reading and control a feasible option. A466. Shortly thereafter, two-way meter reading infrastructure was widely adopted throughout the United States. A466. EON's technology is found throughout the resultant smart grid; as Silver Spring has noted, nearly 94% of the industry has licensed EON's foundational fixed-network wireless telemetry technology for utility meter monitoring and control. A1301.

### 2. Silver Spring Is a Young Company that Benefited from the Federal Stimulus's Focus on Smart Grid Development.

Formed in 2002, Appellant Silver Spring Networks, Inc. ("Silver Spring") generated little revenue during the first six years of its existence. A467. In the wake of federal stimulus funding, Silver Spring doubled its existing customer base

by modifying its core technology to include smart grid technology that EON accused of infringement in the action below. A526. In 2009, the year the smart grid stimulus program began, Silver Spring's annual revenue increased to $200 million, and its market share rose from 0% to 30%. A467–68. At trial, Mr. Eric Dresselhuys, a Silver Spring founder and current Executive Vice President of Global Development, revealed that the management group at Silver Spring converted $98 million dollars of its post-stimulus revenue into stock compensation grants for itself and other Silver Spring employees. A529–30. Silver Spring has been accused of patent infringement by at least four other companies besides EON during the three years prior to the trial in this case. A532.

## B. The Patents-in-Suit Claim Interactive Two-Way Networks that Include Automated Meter Reading Used in Smart Grids.

The '101 and '546 Patents are communication system patents that cover the same technology. A379–80. The '491 Patent is a continuation-in-part of the '101 Patent and provides an additional path to the networks disclosed in the '101 and '546 Patents. A380. Despite Silver Spring's intimations to the contrary, automated meter reading—the technology at issue in this case—is specifically contemplated and described in the specification of the patents-in-suit. For example, the '101 Patent's Abstract explicitly states:

> Small-size, inexpensive, low-power, portable, digital-transmitting subscriber units are introduced compatible with interactive video data system standards with the

> ability to cross subdivision and cell zones. Thus,
> monitoring of inventory, temperature, and other
> parameters for passive automatic alarm systems and the
> like, as well as active mobility of subscriber units *for
> meter reading and the like* is made possible with direct
> low-cost nationwide real time reporting capability.

A163 at Abstract.

The specifications of the '101 and '546 Patents encourage the deployment of the disclosed fixed-wireless digital communication network for meter reading. A173 at 6:5–10. ("Accordingly, this invention encourages such additional interactive services in the network as typified by meter reading . . . in a manner saving so much manpower and expense as to be viable economically in this type of interactive video data service system.").

The '491 Patent builds on the technology of the '101 and '546 Patents by describing a two-way digital communication network with alternative paths for communicating into the network (*e.g.*, utility meters and other monitoring devices).[1] Under certain conditions, a subscriber unit is unable to communicate into the network.[2] To overcome this problem, the '491 Patent discloses "a modem which is used to enable communications between a subscriber unit and a local base

---

[1] Subscriber units may be used, for example, in utility meters, A173 at 6:5–8, alarms, A173 at 6:14–17, and other monitoring devices, A173 at 6:14–17.

[2] For example, a subscriber unit may be located in a basement that prevents the unit from receiving transmissions from the local base station repeater cell. A211 at 1:44–52.

station repeater cell when the subscriber units are unable to receive rf transmissions from the local base station repeater cell." A211 at 2:22–27. The specification explains that the object of the invention is to provide a method for maintaining communication over an alternate path, even when the primary communication path is unavailable, that does not significantly increase the cost of communication. A211 at 2:14–22.



Alternative communication paths allow subscriber units and the network operator to adapt to dynamic conditions such as interference, subscriber unit

---

[3]  Figure 2 shows a subscriber unit 12 in communication with a local base station repeater cell 10 across alternate paths. *See* A212 at 3:39–42 (describing communication over "Path A," the default position, or "Path B" when Path A is unavailable). Thus, the '491 Patent discloses a system and method for "two-way communication between local base station repeater cell 10 and subscriber unit 12" even in circumstances in which communication was previously impaired. A212 at 4:23–27.

location, and network congestion that adversely affect communication quality. A212 at 4:27–32. Thus, the '491 Patent advanced the automatic meter reading arts by allowing for vastly improved communication capacity and coverage under dynamic conditions.

### C. The Accused Products Are Silver Spring Network Components Used in Wireless Smart Grid Networks.

Silver Spring's AMI communication network components are used as a wireless communication network to facilitate communication between home networking devices, such as water, gas, and electric smart meters, and Silver Spring application servers that route messages to and from meters and devices across the network. Silver Spring communication modules (the accused subscriber units) communicate wirelessly with Silver Spring's access points (the accused base stations) either directly or through a Silver Spring relay (the accused remote receiver). A478 at 168:17–25. Digital data messages transmitted from the accused subscriber units upstream, including meter reading information, alarm information, temperature readings, and security information, are sent to Silver Spring's UtilityIQ server (the accused network hub switching center). A479 at 170:13–23. Silver Spring's UtilityIQ server sends control signals downstream to give commands for the operation of the meters. A593 at 88:1–6, 89:14–16.

The accused subscriber units, Silver Spring communication modules in smart meters, are portable/mobile devices that are carried around for installation

into buildings and other various locations.   A593 at 88:1–6, 89:14–16.   Once a network is implemented, the communication modules have the ability to work from anywhere within the network coverage area.   A430 at 107:20–108:12; A550–51 at 104:13–105:15; A417 at 54:13–24.   Meters containing Silver Spring modules self-configure upon installation and register with multiple access points so that they may switch communication paths if a primary access point is obstructed or if they are moved to another location.[4]   A426 at 91:4–92:10; A440 at 14:25–16:11. If a meter malfunctions, it can be easily detached from its location and replaced in minutes.   A592 at 81:22–23; A594 at 89:14–16.

### D. At Claim Construction, the District Court Determined that "Portable" and "Mobile" Should Be Given Their Plain and Ordinary Meaning, and Silver Spring Did Not Raise the Direction of Data Transmission in the '491 Patent.

During *Markman*, Silver Spring argued that the terms "portable" and "mobile" carried the same meaning, and proposed the identical construction for both terms of "capable of being easily and conveniently moved from one location where the subscriber unit is operable to a separate location where the subscriber

---

[4]   Silver Spring argues that there is no evidence that the meters self-configure if they are relocated.   *See* Appellant's Brief ("BB") at 25.   However, at trial, video testimony of Silver Spring executives Mr. Dresselhuys and Mr. Don Reeves, and testimony of Silver Spring's chief scientist, George Flammer, revealed that the meters automatically self-configure and are able to communicate with the network when plugged-in anywhere in the network.   A415 at 48:17–25, A417 at 54:7–55:14 (Dresselhuys); A418 at 58:8–16, A419 at 62:24–63:25 (Reeves); A550 at 104:13–105:15 (Flammer).

units is operable, and designed to operate without a fixed location." A1153; *see also* A306–07. The district court rejected Silver Spring's construction, describing it as "a long and unnecessarily complicated definition," and emphasized that Silver Spring's proposal was "[u]ltimately . . . only adding an infringement-based agenda that complicates the plain and ordinary meaning of the terms as they are read in the context of the claims." A307–08. The court then determined that the patent's use of the terms was not "inconsistent with their plain and ordinary meanings – *i.e.,* 'capable of being carried or moved about' . . . or 'capable of being easily and conveniently transported.'" A307–08.

On appeal, Silver Spring also contends that the '491 Patent requires digital data communication in a particular direction. But Silver Spring did not request claim construction regarding the direction of data message transmission between the base station and subscriber units in Claims 1 or 2 of the '491 Patent.

### E. At Trial, EON Demonstrated that Silver Spring Infringed the Patents-In-Suit by Manufacturing, Selling, and Operating Network Components Used in Utility Smart Grids.

At trial, EON asserted twelve claims. A45–46. The jury found that Silver Spring directly infringed Claims 19 and 20 of the '101 Patent, Claim 3 of the '546 Patent, and Claims 1 and 2 of the '491 Patent, awarding EON $18.80 million in damages. A68, A70. Several issues at trial pertain to the instant appeal.

### 1. The Experts Agreed on the Plain and Ordinary Meaning of "Portable" and "Mobile."

At trial, experts for both parties testified that the plain and ordinary meaning of "portable" and "mobile" was "capable of being easily moved," and did not require that the subscriber units be operable while moving.  A616 at 180:1–19; A590–91 at 75:16–20, 77:8–11.  EON's expert testified that the accused meters were portable and mobile, and Silver Spring's expert testified that utility meters were portable under his interpretation of the plain and ordinary meaning: "[Y]ou can carry it around.  It's portable."  A593 at 88:5–6.[5]  At trial, Silver Spring did not object to testimony related to the terms "portable" or "mobile."  Likewise, Silver Spring did not request a limiting jury instruction related to the terms, nor did it bring any alleged claim scope dispute to the court's attention before the verdict.

### 2. EON's Expert Demonstrated that Silver Spring's Networks Infringed Claims 1 and 2 of the '491 Patent.

Regarding Claims 1 and 2 of the '491 Patent, EON's infringement expert analyzed the communication between and among the base station, subscriber units, and the remote receiver elements present in Claims 1 and 2 of the '491 Patent. A424 at 82:5–19.  He then demonstrated how the claim elements are present in Silver Spring's accused network.  A427–39 at 96:12–125:15.  Silver Spring did not

---

[5]  This concession would apply equally to "portable" and "mobile" because Silver Spring contended below that the terms had the same meaning.  *See* A1153; A306–07.

object to the expert's testimony or EON's arguments related to Claims 1 or 2 of the '491 Patent.  Further, Silver Spring did not offer a different interpretation of the claims at trial, nor did it request a limiting jury instruction related to the scope of the claims.

### 3. The Testimony of EON's Damages Expert Was Thorough and Analyzed the Key Factors Regarding a Hypothetical Negotiation Between the Parties.

EON's damages expert Daniel Lindsay testified that the parties would have negotiated a royalty rate ██████████████████████████████ during the infringement period.  A477 at 164:5–7.  Regarding the *Georgia–Pacific* factors, Mr. Lindsay testified that the value of EON's two-way communication technology in the smart meter market was high.  A488–89.  Given the importance of that technology, Mr. Lindsay testified that the parties would have negotiated for EON's patents as a package of technology vis-à-vis individual patents or claims, A508, a fact that Silver Spring's expert did not dispute, as he also offered an unchanging lump-sum payment regardless of the number of patents or claims infringed, A601.  Mr. Lindsay also testified that several financial considerations would have affected the negotiation, including knowledge that the smart-meter economy was set for a boom due to stimulus funding.  A491–94.  At the end of trial, the jury was given an unapportioned verdict form for damages without objection from Silver Spring, and returned a verdict of $18.80 million.  A70.

### F. Post-Trial Proceedings

#### 1. Silver Spring Raised Several Claim Construction Arguments for the First Time After Trial.

After trial, Silver Spring moved for judgment as a matter of law ("JMOL") arguing that there was insufficient evidence to demonstrate that the accused devices were portable/mobile.  The district court found that "[Silver Spring's expert's] testimony as to the portability of the accused meters, coupled with testimony of [EON's expert], wherein he equates the terms 'portable' and 'mobile,' provided a sufficient evidentiary basis to support the jury's finding."  A7.  The court also rejected Silver Spring's complaints of allegedly improper testimony and attorney arguments, finding that Silver Spring waived its right to argue error because it failed to object to those facts at trial.  A7–8.

Silver Spring also argued that EON had submitted insufficient evidence to demonstrate infringement of Claims 1 and 2 of the '491 Patent.  The district court rejected those arguments, determining that the jury was entitled to accept the expert's reading of the claims and that the evidence was sufficient to support the jury's finding of infringement.  A14–16.  Silver Spring moved for reconsideration, arguing for the first time that the district court impermissibly submitted a question of claim scope to the jury, contending that "claims 1 and 2 of the '491 patent require transmission of data messages in a downstream direction."  A34.  The district court rejected this late-stage claim construction attack, noting that Silver

Spring's original argument was "whether the jury's finding of infringement as to claims 1 and 2 of the '491 patent was supported by sufficient evidence," which it had already resolved.  A35.

### 2. The District Court Rejected Silver Spring's Argument Regarding a New Trial on Damages Because the Record Was Sufficient To Support the Damages Award.

Despite its vacatur of the finding of infringement on Claim 3 of the '546 Patent, the district court concluded that EON had provided sufficient evidence for an unapportioned damages award.  A26.  The district court found sufficient evidence based on the testimony of EON's damages expert regarding the hypothetical negotiation, the testimony of Silver Spring's damages expert who relied on a single lump sum damages amount, and Silver Spring's failure to object to the non-apportionment of damages on the jury verdict form.  A26.

### 3. The District Court Remitted the Damages Award Based on a Defense that Silver Spring Waived.

Relevant to the cross-appeal, the district court remitted the jury's damages award from $18.80 million to $12.99 million based on the affirmative defense of implied license.  A27–32.  Despite Silver Spring's failure to include its implied license defense in the Joint Pretrial Order, or otherwise argue it before, during, or even after trial, or to move for JMOL or a new trial on implied license affirmative defense, *see infra* Part IV.A, the district court reduced the damages award by ██████ ██████ based on a settlement agreement between EON and a co-defendant.  In its

post-trial briefing, Silver Spring asserted a "joint and several liability" "defense," never referencing "implied license." A860–67; A956–57. Despite EON's argument that no such defense existed, the district court concluded that "Silver Spring's attempt to assert joint and several liability as a defense [was] inappropriate," but that its arguments were "best characterized as an implied license defense." A28.

The district court then accepted Silver Spring's post-trial factual assertions, presented in a declaration of Mr. Dresselhuys. The court made a factual finding that Silver Spring sold modules to a co-defendant who took a license with EON, despite contradictory testimony at trial from Mr. Dresselhuys that Silver Spring's modules were "primarily" sold to utility companies, *not* the co-defendant. *See* A32; A520 at 143:15–17. The court gave Silver Spring the benefit of an implied license based on those post-trial factual findings and remitted the damages award ███████.

## ARGUMENT

## I. SILVER SPRING HAS FAILED TO DEMONSTRATE THAT THE DISTRICT COURT ERRED REGARDING THE TERMS "PORTABLE" AND "MOBILE."

Silver Spring appeals the jury's finding that Silver Spring's products satisfy the "portable" and "mobile" limitations of the '101 Patent on two grounds. First, Silver Spring argues that the district court's determination that these terms be

given their "plain and ordinary meaning" required the jury to resolve a claim construction dispute in conflict with *O2 Micro*. Second, Silver Spring argues that the evidence EON presented at trial was insufficient to support the jury's findings that Silver Spring's products meet the "portable" and "mobile" limitations. Neither of these arguments is sustainable based on the record and the controlling law.

**A. The District Court Did Not Err in Refusing to Adopt Silver Spring's Noninfringement-Based Construction Because Silver Spring Failed To Justify Any Deviation from Plain and Ordinary Meaning.**

As a precursor to its *O2 Micro* argument, Silver Spring contends that the district court erred by finding that "portable" and "mobile" should be given their plain and ordinary meaning.[6] In its *Markman* briefing, Silver Spring proposed that "portable" and "mobile" should be construed the same, as "capable of being easily and conveniently moved from one location where the subscriber unit is operable to a second location where the subscriber unit is operable, and designed to operate without a fixed location." A1153; A306–07.

The district court rejected Silver Spring's proposed construction, concluding that it "[u]ltimately . . . only add[ed] an infringement-based agenda that

---

[6] Although Silver Spring frames the argument as an *O2 Micro* issue, it separately accuses the district court of erring by rejecting its proposed construction. But Silver Spring points to nothing in the record that demonstrates either that the patent warrants departure from the terms' plain and ordinary meaning or that its construction responds to that departure. *See* A306–08.

complicates the plain and ordinary meaning of the terms as they are read in the context of the claims."  A308; *see SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) ("A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device.").

Indeed, Silver Spring could not have demonstrated that the terms depart from their plain and ordinary meaning.  The '101 Patent specification describes "portable or mobile interactive subscriber stations" that establish "the feasibility of moving such remote units to different locations in a house, office, or car." A173 at 6:19–23 ("Accordingly this invention is in part directed to the provision of portable or mobile interactive subscriber stations.").  Further, the specification *expressly contemplates* that mobile subscriber units as described in the invention include applications for "meter reading."  A173 at 6:5–8; *see also* A163 at Abstract.  In such applications, meters are portable and mobile because they can be moved from one location to another and still communicate throughout the network.

In accordance with *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc),[7] the district court properly focused on the specification and claim

---

[7] Under *Phillips*, deviation from the plain-and-ordinary-meaning rule must be supported by evidence in the intrinsic record that the patentee intended to imbue the term with a different meaning than would be understood in the art at the time of the invention.  415 F.3d at 1326; *accord Vitronics Corp. v.*

language to determine that Silver Spring failed to demonstrate that the use of the terms within the specification was inconsistent with their plain and ordinary meaning.   A307–08.   Silver Spring makes the same error here—it fails to demonstrate that anything in the patents warrants a departure from the terms' plain and ordinary meaning.   Accordingly, this Court should reject—just as the district court did—Silver Spring's attempt to create a construction to support its noninfringement position, with no basis in the intrinsic record.

For the first time on appeal, Silver Spring insists that the terms require that the subscriber units "be operated while in motion."   Appellant's Brief ("BB") at 23; *see also* BB at 24 (insisting that Silver Spring modules cannot infringe because "they cannot detect electricity use while they are in transit").   Silver Spring has *never* contended that the terms require such functionality.   In its claim construction briefing, Silver Spring proposed that the terms only required operation at two different locations, but not operation in transit.   A1153.   Further, Silver Spring expressly conceded that it was not arguing for such a limitation: "Defendants do not ask the Court to construe 'portable' and 'mobile' as requiring the claimed subscriber units to move around at the same moment they are transmitting and

---

*Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996).

receiving data messages."[8]  A1156.  At trial, its expert conceded that the patent did not require the units to be operable while moving.    A592 at 83:21–24. Accordingly, Silver Spring has waived its right to make this argument on appeal. *See Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006).

### B. The District Court Did Not Delegate the Task of Resolving a Claim Construction Dispute to the Jury.

Silver Spring argues that the district court's refusal to adopt its construction created an impermissible shift of duties under *O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008).  BB at 23, 25.  But Silver Spring's sole argument is based on nothing more than the district court's allowance of the jury to hear testimony from experts and arguments made by EON's counsel *to which Silver Spring never objected*, which does not warrant reversal.  *See, e.g.*, *Function Media LLC v. Google Inc.*, 708 F.3d 1310 (Fed. Cir. 2013).  Moreover, the testimony that Silver Spring relies on for its *O2 Micro* argument actually goes to the factual issue of infringement; it does not rehash claim construction arguments but is pointed to the portability and mobility of the accused devices.

---

[8]  Indeed, Silver Spring's decision to differentiate its argument was likely a strategic decision given that the district court had previously rejected the operability-in-motion argument in a prior case.  *See* A235–37.  Nevertheless, Silver Spring's failure to urge the "operable while moving" construction below and, moreover, its disavowal of that position during claim construction, waives the argument for all time.

Determining as a matter of fact that the accused devices are portable and mobile is a proper issue for a jury and cannot warrant reversal under *O2 Micro*. Finally, the record demonstrates that where the experts discussed the terms, they agreed upon their meaning.

### 1. The Facts in This Case Do Not Support an Impermissible *O2 Micro* Dispute.

Although Silver Spring cherry picks testimony to demonstrate a purported *O2 Micro* dispute, the full record reflects that no dispute occurred. At trial, experts for both parties agreed that the plain and ordinary meaning of "portable" and "mobile" was "capable of being easily moved," and that the subscriber units did not have to be operable while moving. A590 at 75:16–20; A591 at 77:8–11; A616 at 180:1–19. Importantly, Silver Spring's own expert conceded that meters were portable under *his* own view of the plain and ordinary meaning of the terms:

> [O]ne way of characterizing mobile is to say whether [a device is] easily moved . . . . [I]n the broadest sense, yes, you can carry [a meter] around. *It's portable.*

A590 at 75:16–20 (emphasis added); *see also* A593 at 88:1–6. Because Silver Spring had already conceded that portable and mobile were "synonymous," A1153, its expert's admission that meters are portable also constitutes an admission that they are mobile.

In contrast to the facts in *O2 Micro*, the parties did not invite the jury to choose between alternative meanings of the terms, but instead, only to evaluate

whether the accused communication modules were mobile and portable under the plain and ordinary meaning of the terms as explained by the experts.[9] Thus, there was no actual claim scope dispute presented to the jury. *See Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1334 (Fed. Cir. 2010) (finding no *O2 Micro* dispute where the parties "did not invite the jury to choose between alternative meanings").

## 2. Silver Spring's Attempt to Manufacture a Claim Scope Dispute Out of Testimony and Attorney Argument to Which It Did Not Object Has Been Routinely Rejected by this Court.

In both *Function Media LLC v. Google Inc.*, 708 F.3d 1310 (Fed. Cir. 2013), and *Verizon v. Cox*, this Court rejected an appellant's efforts, like Silver Spring's attempt here, to manufacture a disputed issue of claim scope from the infringement testimony of competing experts. Moreover, where, as here, the appellant was silent at trial on the purported claim-scope testimony (or invited some of the testimony it now complains of on cross-examination),[10] the post-*O2 Micro* cases do not require a remand to the district court for construction of the term.

---

[9]    In *O2 Micro*, the jury was permitted to hear testimony by experts that rehashed the disputed positions each party took at *Markman*. 521 F.3d at 1361–62. By contrast, the testimony from both parties in the instant case assumed the plain and ordinary meaning of the disputed terms, and was directed to whether Silver Spring's products infringed *under* that meaning. The claim scope dispute that occurred between the parties at *Markman* was not reprised in expert testimony at trial.

[10]    Silver Spring points to testimony of EON's validity expert, Dr. Jay Kesan, as impermissible claim-scope testimony. *See* A641 at 74:14–75:21. Dr. Kesan

Silver Spring faults the district court for not "communicat[ing] to the jury its understanding of the plain meaning of the terms 'mobile and portable' or the fact that they must be distinguished from fixed and stationary." BB at 25. Silver Spring's arguments are again rebuffed by the record, which demonstrates that Silver Spring *never requested* such an instruction from the court. Nor did Silver Spring ever object at trial to any of the testimony or argument that it now claims forced the jury to address and resolve a claim construction dispute. Silver Spring's attempt to repackage these facts as an *O2 Micro* dispute is strikingly similar to arguments this Court rejected in *Function Media*.

In *Function Media*, the appellant argued that the district court had improperly submitted the issue of claim scope to the jury for three claim terms, one of which was disputed at *Markman*. As Silver Spring does here, the appellant in *Function Media* argued that expert testimony at trial, and statements made by the opposing party's attorneys, demonstrated an *O2 Micro* issue. This Court rejected the analysis, stating that "this is not a case, like *O2 Micro*, in which it disputed the scope of the claims, but rather a posttrial attempt to re-characterize improper

---

was tasked with discussing prior art, and the testimony Silver Spring cites was elicited on cross-examination, making it invited error. *Cf. Weinar v. Rollform Inc.*, 744 F.2d 797, 805 (Fed. Cir. 1984) ("It also disregards the 'invited error' rule in that much of the testimony now objected to was elicited by Weinar's counsel on cross examination. Counsel did not move to strike any answer as nonresponsive and cannot now be heard to complain that the witness answered his questions.").

arguments as issues of claim construction." 708 F.3d at 1326. The *Function Media* court analogized that case to *Verizon v. Cox*, 602 F.3d 1325, noting that in both cases the appellant "had the opportunity to object during trial or request limiting instructions, but never did so." 708 F.3d at 1326 (citing *Verizon*, 602 F.3d at 1334–35). This Court should reject Silver Spring's similar attempts to create a dispute that did not exist at trial because Silver Spring failed to object to the testimony that underlies its position.

### 3. Even if the Alleged Testimony and Attorney Argument Were Improper, the Error Is Harmless.

Silver Spring has failed to demonstrate that *but for* the purported errors regarding claim scope at trial, the outcome of the trial would have been different. As an initial matter, Silver Spring has failed to show that statements made by EON's counsel or witnesses—to which it did not object—were sufficiently erroneous to make this case exceptional or that substantial interests of justice are at stake. *Cf. Function Media*, 708 F.3d at 1327 (finding no plain error based on improper arguments where appellant failed to demonstrate misstatements were sufficiently erroneous as to make case exceptional).

Even if the Court determines that the district court impermissibly submitted a question of claim scope to the jury, "[n]ot every error warrants a remand." *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 479 F.3d 1330, 1340 (Fed. Cir. 2007). An error does not warrant reversal if it is harmless.

*See* 28 U.S.C. § 2111 (2014); *see also* Fed. R. Civ. P. 61; *In re '318 Patent Infringement Litig.*, 583 F.3d 1317, 1327 n.12 (Fed. Cir. 2009) (collecting cases). As this Court has stated, "[t]he common law rule of harmless error . . . requires us to disregard 'errors or defects in the decision on appeal which do not affect the substantial rights of the parties.'" *Szemraj v. Principi*, 357 F.3d 1370, 1374 (Fed. Cir. 2004) (brackets removed) (quoting 28 U.S.C. § 2111 (2000)).

Under the rule, an appellant must demonstrate that, *but for* the error, the outcome below would have been different:

> The purpose of this rule is to avoid wasteful proceedings on remand where there is no reason to believe a different result would have been obtained had the error not occurred. . . . Thus, to prevail the appellant must not only show the existence of error, but also show that the error was in fact harmful because it affected the decision below.

*In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004); *accord Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 504 (Fed. Cir. 1995) ("The correction of an error must yield a different result in order for that error to have been harmful and thus prejudice a substantial right of a party.").

The Court's decision in *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010 (Fed. Cir. 2009), is informative. In that case, the defendant argued that the parties were allowed to submit impermissible evidence regarding claim scope to the jury. *Id.* at 1016. This Court rejected that challenge, in part, because

-26-

the error was harmless. *Id.* at 1019. Because there was sufficient evidence submitted to the jury to support its findings under the proper construction, the defendant in that case could not demonstrate that its substantial rights were affected because the outcome would have been the same. *Id.*

Here, Silver Spring cannot demonstrate that *but for* the alleged errors at trial, it would have prevailed. As an initial matter, Silver Spring never argued that portable or mobile meant that the subscriber unit had to be operable while moving, so that argument has been waived. *See supra* Part I.A. Further, viewing the evidence, and all reasonable inferences from the evidence, in the light most favorable to EON, the record demonstrates that the jury concluded that Silver Spring's modules were portable and mobile, even under Silver Spring's proposed construction, rendering the error harmless. *See* A616–17 at 180:13–181:10; A784–85 at 55:25–57:14. Indeed, the record contains evidence that both parties' experts utilized the same meaning of the terms, and Silver Spring's expert testified that, under that construction, the devices were portable (and, by extension, mobile, given Silver Spring's claim construction position that the two terms were "synonymous"). *See supra* Part I.B.1; *see infra* Part I.C. Because Silver Spring cannot demonstrate that it would have prevailed at trial *but for* the alleged *O2 Micro* dispute, the court's purported error is harmless.

### C. The Evidence Presented at Trial Created a Reasonable Basis To Support the Jury's Finding that Silver Spring's Products Meet the "Portable" and "Mobile" Requirements of the Patents.

Turning to the record, there was ample evidence at trial to provide a reasonable basis for the jury's conclusion that the accused modules were portable and mobile. Judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). "We review the denial of a motion for judgment as a matter of law or for a new trial under the law of the regional circuit." *Verizon*, 602 F.3d at 1331. "[O]n appeal of a motion for JMOL, 'the evidence, as well as all reasonable inferences from it, are viewed in the light most favorable to the verdict.'" *Kinetic*, 554 F.3d at 1021 (quoting *Arsement v. Spinnaker Exploration Co.*, 400 F.3d 238, 249 (5th Cir. 2005)).

The experts for *both* parties opined that the plain and ordinary meaning of portable and mobile means "capable of being easily moved," and that the terms did not require a device to be operable while moving. A616 at 180:1–12 (EON's expert), A590–91 at 75:16–20, 77:12–15 (Silver Spring's expert). EON provided evidence that the modules were portable and mobile under the plain and ordinary meaning of the term that Silver Spring advocated at trial, providing evidence sufficient to support the verdict:

> So what the Court was saying – saying is that mobile means capable of being easily moved. So the capability

> has to be there, but not that it actually has to move . . . So
> my opinion is that the mobile element is found in the
> Silver Spring products, especially in light of reading the
> patent specification.

A616–17 at 180:13–181:10.

Notably, Silver Spring's own expert conceded that meters were portable

under his interpretation of the plain and ordinary meaning of the terms:

> [O]ne way of characterizing mobile is to say whether [a
> device is] easily moved . . . . [I]n the broadest sense, yes,
> you can carry [a smart meter] around.  *It's portable.*

A593 at 88:1–6 (emphasis added).[11]  He also testified that the accused meters are

carried around for installation into buildings, and that a meter is easily detached

from its location so that a new meter can be installed:

> If it breaks, you take it out; you replace it; you put a new
> meter in . . . . yes, you can carry it around . . . . How long
> does it take to take one of those meters out? I don't
> know.  Maybe a few minutes.

A592 at 81:22–24; A593 at 88:5–6; A594 at 89:14–16.

Silver Spring also introduced video evidence that showed the jury that

meters generally were not bolted to the houses where they were installed, but

rather they were plugged into a socket allowing for removal.  Silver Spring's

expert corroborated those facts:

---

[11]  As EON has noted, this concession applies equally to portable *and* mobile given
Silver Spring's concession that the terms are "synonymous."  *See* A1153;
A306–07.

> Q: . . . [T]hose meters when they're installed aren't actually bolted to the house, are they? Instead, there's a retaining ring that slips – after you put the meter in the socket, it's plugged in like you would plug in[] your vacuum cleaner into a socket. There's prongs that go in, and it starts working . . . Is that your understanding?
>
> A: I think that's a pretty accurate characterization of what you said . . . .

A590 at 76:11–25. Indeed, Silver Spring's expert conceded that the meters were not bolted permanently to the house in order for them to be operational, but that the retaining ring was merely used to prevent theft (vis-à-vis permanent installment). *Id.*[12]

Silver Spring attempts to distract the Court from this evidence by making arguments that are irrelevant to the portable/mobile inquiry. For example, it repeatedly argues that meters cannot detect electricity while in transit, that customers are not intended or permitted to move the meters, and that the devices

---

[12] On cross-examination, Silver Spring's expert also conceded that several of the characteristics that Silver Spring points to in its Opening Brief, like connecting a device to electrical power, securing a device to protect it from theft, leaving a device in a location for an extended period of time, and docking a device to a semi-permanent fixture, do not prevent that device from being portable and mobile under the plain and ordinary meaning of those terms. A590 at 76:4–25; A591–92 at 77:1–83:24. The '101 Patent's recitation of wireless communication systems like home alarm systems (which are installed into a structure) corroborates that reading of portable/mobile. *See, e.g.*, A163 at Abstract; A173 at 6:14–15.

are not battery-powered.[13]  BB at 24, 31.  Silver Spring never argued that the terms

portable or mobile require operability while moving and has waived that position.

*See supra* Part I.A.  Further, these contentions have no bearing on whether there is

sufficient evidence to support the verdict because the sufficiency inquiry is only

concerned with evidence that *supports* the prevailing party's position.  *See Kinetic*,

554 F.3d at 1021

 Silver Spring also attempts to cast doubt on the jury's finding by citing

testimony and closing argument[14] that relates to the claim limitation "facilities for

communicating from subscriber units when moved through different geographic

zones."  BB at 30 (citing A426 at 91:16–92:10).  The testimony from Dr. Harry

Bims, EON's infringement expert, demonstrates that a Silver Spring meter

"moves" from one geographic zone to another when it switches communication

---

[13]  For example, Silver Spring repeatedly points to the device's use of 240 VAC and the need for a professional technician to install or remove it.  BB at 12, 24.  But those facts are inapposite in light of testimony *by both experts* that the devices are easily transported.  *See, e.g.*, A616–17 at 180:13–181:10; A593 at 88:1–6.  In addition, such testimony fails to demonstrate a claim scope dispute, as it addresses whether certain characteristics of the accused devices make them infringing devices.

[14]  As a threshold matter, and as the district court found, Silver Spring waived any error based on attorney argument regarding "facilities to communicate" by failing to object to it.  A7–A8 (citing *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988)) ("SSN waived its opportunity to object to the alleged impropriety of EON's closing arguments when it remained silent and let the case go to the jury.").

paths from its primary access point to its secondary access point due to some other obstruction to the communication:

> [T]he subscriber unit may initially communicate over this vertical path, or it may move that path and communicate over a different path to a different base station in a different geographic area. And that's what the patent specification calls the movement that's talked about in this section and all throughout the specification.

A426.

That testimony neither creates a claim scope dispute nor demonstrates insufficient evidence. Silver Spring labels Dr. Bims' viewpoint "far-fetched," BB at 30, but omits that, on direct examination, its *own expert* corroborated that subscriber units utilize different paths of communication in the network:

> Q. What's your understanding of the claim mobile portable requirement in these claims?
>
> A Well, I'll describe a little bit more about the claim construction that the Court has offered on this, but really you're talking about the subscriber units that are mobile or portable themselves.
>
> . . . .
>
> Now, if that subscriber unit moves to a different cell area and tries to communicate back to the receive-only receiver in the first one, well, it's not a strong enough signal. It's got to pick a different receive-only receiver. . . .
>
> So the -- *the subscriber units, when they're described as portable or mobile, can move within an area or can move between areas and then use the remote receivers to get back to that base station.*

*See* A784–85, at 55:25–57:14 (emphasis added).   There can be no *O2 Micro* dispute where opposing experts offer corroborative testimony regarding the patent's meaning.

Further, Dr. Bims' testimony supports the jury's finding: the Silver Spring module's self-configuration to multiple access points allows for physical movement of the meters from one location to another because the meter is able to automatically detect and communicate with various base stations from more than one communication path, making it unbounded to a specific network location.[15] *See* A1564 (" ██████████████████████████████████████ ██████████████████████████████████████ ██████    ██████████████████████████████ ██████████████████████████████████████ ██████████████████████████ ").

Based on the extensive expert testimony that Silver Spring meters can be carried, detached for replacement, and removed without difficulty, the jury concluded that Silver Spring meters are "capable of being easily moved" and that

---

[15] This testimony alone constitutes sufficient evidence to demonstrate that the accused devices are portable and mobile because their ability to self-configure their location in the network (and automatically communicate thereafter) enables them to communicate throughout the network *and* be used interchangeably anywhere in the network, thus making them "capable of being easily moved" throughout the network.  *See* A550 at 104:13–105:15; A1564.

the claim terms "mobile" and "portable" were met.   In viewing the evidence, and all reasonable inferences, in the light most favorable to EON, it is clear that the jury's finding of infringement should stand as a matter of law.  *See Kinetic*, 554 F.3d at 1021.  Accordingly, the Court should reject Silver Spring's arguments and affirm the judgment.

## II.    SILVER SPRING'S POST-HOC ATTACK ON THE '491 PATENT SHOULD BE REJECTED BECAUSE SILVER SPRING FAILED TO RAISE *ANY* OF ITS ARGUMENTS UNTIL AFTER THE VERDICT.

In its Opening Brief, Silver Spring contends that this Court should reverse the jury's finding that Silver Spring infringed Claims 1 and 2 of the '491 Patent, arguing that a specific term in those claims—"transmit"—precludes infringement. Specifically, Silver Spring contends that those claims require data messages to be communicated downstream in the claimed networks, from the base station repeater cell to the subscriber unit.  This Court should reject Silver Spring's attempt to litigate this claim construction issue—which it only brought after the verdict—for several reasons.

Foremost, Silver Spring has waived its ability to bring the argument because "transmit" was not at issue during claim construction or disputed at trial.  Silver Spring never contended that "transmit" had a special meaning regarding the direction of communication, and never objected to any testimony regarding the term at trial.  Instead, Silver Spring bases its newly minted claim construction

argument on the district court's finding that there was insufficient evidence to support infringement of Claim 3 of the '546 Patent. Silver Spring's arguments, however, overlook that it has waived any such argument and ignore the material differences in the wording and meaning of the separate claims in the '491 and '546 Patents.

Silver Spring also alleges error under *O2 Micro*, arguing that the district court impermissibly submitted a question of the scope of "transmit" to the jury. But Silver Spring's arguments are simply a retread of the arguments that it made in its Motion for Reconsideration, which the district court rejected because Silver Spring's post-hoc, post-infringement, subjective reading of the claims were an obvious attempt to reject the jury's finding.

Finally, Silver Spring's substantive assault on the '491 Patent falls short. Its late-game interpretation of "transmit" finds no support in the patent itself, and the jury's finding of infringement is based on sufficient evidence presented at trial. The Court should reject Silver Spring's obvious attempt to litigate these issues for the first time post-verdict.

### A. Silver Spring Waived the Right To Argue that "Transmit" Precludes Infringement Because It Failed To Raise *Any* Arguments Regarding Downstream Communication During Claim Construction or at Trial.

Silver Spring argues that Claims 1 and 2 of the '491 Patent require downstream communication of data messages from the base station repeater cell to

the subscriber unit.  BB at 34.  However, Silver Spring never requested claim construction regarding the direction of data message transmission between the base station and subscriber units nor brought the issue of claim scope to the court's attention prior to the close of evidence.  *See* A1142.  In fact, it did not even raise this issue in its JMOL briefing.  *See* A822–23.  Instead, it raised the issue for the first time in a Motion for Reconsideration asking the district court to reconsider its JMOL Order.  A1041.  In resolving the issue, the district court rightfully rejected Silver Spring's attempt to litigate a claim construction issue for the first time post-verdict.  A1044–45.

As this Court has repeatedly noted, "litigants waive their right to present new claim construction disputes if they are raised for the first time after trial." *Conoco*, 460 F.3d at 1359; *accord Broadcom Corp. v. Qualcomm Inc*., 543 F.3d 683, 694 (Fed. Cir. 2008); *see, e.g.*, *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) (finding waiver where appellant "first asserted the claim construction argument it presses on appeal in a post-trial motion"); *Cordis Corp. v. Boston Scientific Corp.,* 561 F.3d 1319, 1338–39 (Fed. Cir. 2009) (same).  For this reason alone, the Court should reject Silver Spring's attempt to create a post-hoc claim construction issue where none existed because Silver Spring has waived its right to make that argument on appeal.

## B. The District Court Did Not Submit an Impermissible Question of Claim Scope to the Jury Because Silver Spring Never Raised the Issue Pre-Verdict.

Silver Spring contends—without contesting the term during claim construction or objecting to testimony during trial—that the district court impermissibly allowed the jury to determine the scope of "transmit" in the '491 Patent. Silver Spring made the same argument, for the first time, in its post-trial Motion for Reconsideration of the JMOL Order. A1041. The district court flatly rejected Silver Spring's attempt to create an issue where none existed reasoning that, in raising the argument for the first time in its post-JMOL briefing, it was improper for the court to address the issue as one of claim construction. A35.

The district court's holding is correct. Silver Spring's reliance on *O2 Micro* is misplaced because its failure to preserve the argument is fatal to its attack now. This Court has consistently rejected an appellant's attempts to frame challenges on appeal as claim construction issues governed by *O2 Micro* where that appellant never brought an alleged claim scope dispute to the trial court's attention prior to or during trial. *See, e.g.*, *Verizon*, 602 F.3d at 1334 (rejecting *O2 Micro* challenge where appellant "never identified at any time during the proceedings before the district court any specific claim term that was misconstrued or that needed further construction"); *Broadcom*, 543 F.3d at 694 (rejecting *O2 Micro* challenge where proposed construction was first raised in post-trial motions). Unlike the appellant

in *O2 Micro*, Silver Spring never requested construction of the term "transmit" in Claims 1 or 2 of the '491 Patent nor identified any problem with accepting the "plain and ordinary meaning" of the claim terms as related to the direction of data message transmission, making its attempt to frame the issue as an *O2 Micro* issue futile. *See Broadcom*, 543 F.3d at 694.

Even if the Court finds that Silver Spring has not waived its right to raise an *O2 Micro* issue, Silver Spring's substantive arguments fail. Although Silver Spring *now* points to testimony and attorney argument that allegedly created an impermissible issue of claim scope, Silver Spring's reliance on such arguments is misplaced. To begin, at trial, Silver Spring failed to object to *any* of the statements on which it now relies[16] or ask for a limiting instruction, which is, again, fatal to its argument. *See Function Media*, 708 F.3d at 1327 (finding no *O2 Micro* dispute where appellant "neither identified a problem with construction nor requested further interpretation during trial"). Further, Silver Spring has failed to demonstrate that an actual dispute exists because it does not point to any contrary

---

[16] For this reason alone, any attempt by Silver Spring to utilize the arguments is waived. *See West v. Drury Co.*, 412 F. App'x 663, 670–71 (5th Cir. 2011) (affirming district court's exclusion of evidence where court ruled that defendant "waived its argument by failing to object to the testimony at the time the testimony was introduced."); *McQuaig v. McCoy*, 806 F.2d 1298, 1303 (5th Cir. 1987) (finding arguments that testimony was prejudicial waived because defendant did not object or otherwise seek to limit court's consideration of testimony, and made no showing of plain error).

testimony regarding claim scope that would put the meaning of the term in conflict. *See Verizon*, 602 F.3d at 1334 (rejecting arguments of claim scope dispute under *O2 Micro* where expert testimony of appellant did not contradict appellee's interpretation of the claims).

### C. Silver Spring Has Failed To Demonstrate Clear Error in Either EON's Interpretation of the '491 Patent or the Jury's Finding of Infringement.

Should the Court reach Silver Spring's substantive arguments regarding the '491 Patent and the jury's finding of infringement, Silver Spring's arguments fall below the threshold that would require the Court to vacate the jury's finding of infringement. Silver Spring argues that the '491 Patent requires downstream communication of digital data messages from the base station to the subscriber units. BB at 34. But the claims contain no such requirement. Whereas the plain language of Claims 1 and 2 require communication to and from the subscriber units, the claims do not require that *data messages* specifically are sent *down from* a base station to subscriber units, only that data messages be sent *up to* the base station from the subscriber units.[17]

---

[17] Silver Spring quotes an embodiment disclosed in the specification to argue that the local base station repeater cells *always* transmit data messages directly to subscriber units. But "each claim does not necessarily cover every feature disclosed in the specification." *Ventana Med. Sys., Inc. v. Biogenex Lab., Inc.,* 473 F.3d 1173, 1181 (Fed. Cir. 2006) ("When the claim addresses only some of the features disclosed in the specification, it is improper to limit the claim to other, unclaimed features."); *see also E-Pass Techs., Inc. v. 3Com Corp.,* 343

Indeed, Claims 1 and 2 of the '491 Patent require only that a base station *receives* multiplexed synchronously related digital data messages of variable lengths. A213 at 6:27–35 ("*receiving from* a subset of said local subscriber units multiplexed synchronously related digital data messages of variable lengths" (emphasis added)). This is further evidenced by the phrase "multiplexed synchronously related digital data messages," which modifies the base station's receipt of communication from the subscriber unit, not the transmission of communication from the base station to the subscriber unit.[18] The district court found this evidence sufficient to uphold the jury's finding of infringement as to the

---

F.3d 1364, 1370 (Fed. Cir. 2003) ("An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them.").

[18] Indeed, this is the key reason why Silver Spring's attempt to marry the '491 and the '546 Patents falls short. Contrary to Silver Spring's assertions, Claim 3 of the '546 is not identical to claim 1 of the '491; it is a separate claim from a separate patent with unique limitations. *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1327–28 (Fed. Cir. 2008) (rejecting arguments of inconsistent findings based on testimony that two patents "were so similar that if one contained capillaries, the other also contained capillaries" emphasizing "the jury was not required to accept [an expert's] opinion."). Furthermore, Claim 3 in the '546 Patent is a dependent claim of Claim 2, which provides for a base station repeater cell with "data processing and transmission means for *transmitting to and receiving from* at least one of said plurality of said subscriber units multiplexed synchronously related data messages of variable lengths." A196 at 11:35–40 (emphasis added). In contrast to the plain language of Claim 1 of the '491 Patent, Claim 2 of the '546 Patent uses the phrase *multiplexed synchronously related data messages* to modify both the transmission of messages from the base station to the subscriber unit and the reception of messages from the subscriber unit to the base station.

claims. A16. Here, Silver Spring attempts to relitigate the issue as if this Court

has *de novo* review. That is not the case. *See Kinetic*, 554 F.3d at 1021; *Conoco*,

460 F.3d at 1359. Accordingly, the district court's judgment must be affirmed.

### D. Silver Spring's Argument that the Claim's Preamble Is Limiting Was Waived Because Silver Spring Failed To Raise It Below.

As Silver Spring acknowledges, as a general rule, a claim preamble "is often

treated as nonlimiting in nature." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952

(Fed. Cir. 2006). Nonetheless, Silver Spring attempts an end run by arguing that

the Court (sitting *en banc*) should find all preambles limiting, apply that rule

retroactively to the district court's claim constructions, and then determine that

EON failed to provide sufficient evidence to meet those limitations. BB 40 n.9.

Like its other arguments, Silver Spring failed to raise this position at claim

construction, or before, during, or after trial, waiving its right to make the

argument now. *See Conoco*, 460 F.3d at 1359. Silver Spring's decision to not

pursue the argument was a strategic choice it must now live with, as the district

court had previously conducted a thorough analysis demonstrating why the

Preamble in this instance was not limiting. A223–29 (noting, for example, that

"interactive video" was not meant to be restrictive because "the FCC did not intend

to limit the use of [its so-called Interactive Video and Data Service frequency]

band to interactive television," as it was merely a naming convention). Finally,

*even if* the Court were to reach the issue, there is sufficient evidence to demonstrate

that the preamble's limitations are met.  *See, e.g.*, A443 at 27:3–18 ("[S]ince there is information or communication happening in both directions, it's a two-way system.").

## III.  A NEW TRIAL ON DAMAGES IS NOT WARRANTED BECAUSE THE TRIAL COURT DID NOT ERR BY RULING THAT THE DAMAGES AWARD WAS BASED ON SUBSTANTIAL EVIDENCE.

The district court did not err in denying Silver Spring's motion for a new trial on damages because—as the district court found—the record contains substantial evidence that supports the award despite the court's post-trial finding that Claim 3 of the '546 Patent was not infringed.  EON's damages expert testified that the hypothetical negotiation regarding royalties would have focused on the patents-in-suit as an interrelated family (vis-à-vis as individual claims with discrete prices), which obviates the need for a new trial because there is substantial evidence that a single claim in that patent family would not have changed the royalty rate.

Silver Spring argues that this Court's jurisprudence purportedly requires a new trial on damages if multiple findings of infringement underpin a damages award and one of those findings is later vacated.  Like its other arguments, however, Silver Spring fails to contextualize its attack within the proper standard of review, omits critical facts in its retelling of the record, and provides an

incomplete view of this Court's jurisprudence. This Court should affirm the

district court's holding denying a new trial on damages.

### A. Under the Appropriate Standard of Review, Silver Spring Must Demonstrate an Absolute Absence of Evidence To Support the District Court's Finding.

This Court applies regional circuit law when reviewing damages issues

pursuant to "denials of motions for JMOL or new trial." *Function Media*, 708 F.3d

at 1317 (internal quotation marks omitted) (quoting *i4i Ltd. P'ship v. Microsoft*

*Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010); *accord Whitserve, LLC v. Computer*

*Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012). Under controlling Fifth Circuit

authority, Silver Spring's burden is to demonstrate "a clear showing of an absolute

lack of evidence" regarding the damages award:

> The Fifth Circuit "review[s] the denial of a motion for new trial brought on the ground that the verdict is against the great weight of the evidence for abuse of discretion, which . . . mean[s] that the denial will be affirmed unless there is *a clear showing of an absolute absence of evidence* to support the jury's verdict."

*Function Media*, 708 F.3d at 1317 (emphasis added) (brackets and ellipsis in

original) (quoting *Rivera v. Union Pac. R.R. Co.*, 378 F.3d 502, 506 (5th Cir.

2004)).

The district court's discretion to deny a new trial is broad: "The district court

has wide discretion in determining whether to grant a new trial under this

standard." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).

Thus, this Court reviews a district court's denial only for clear error: "A district court abuses its discretion when its decision is based on *clearly erroneous* findings of fact, is based on erroneous interpretations of the law, or is *clearly* unreasonable, arbitrary or fanciful." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc) (emphasis added); *accord Whitserve*, 694 F.3d at 26. Finally, when reviewing facts, this Court "*must presume* that the jury resolved all factual disputes in the prevailing party's favor." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1252 (Fed. Cir. 2014) (emphasis added) (brackets and internal quotation marks omitted) (quoting *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012) (applying Fifth Circuit law)).

### B. A New Trial Is Not Required Because The Record Contains Substantial Evidence Supporting the Damages Verdict.

#### 1. EON's Damages Expert Gave Credible, Relevant Testimony that the Parties Would Have Negotiated for EON's Patents as a Package.

In its post-trial briefing, Silver Spring argued both that EON's damages expert testimony was unreliable and inapposite, and that a new trial on damages was warranted if the court determined that any findings of infringement were vacated. *See* A18. The district court rejected both arguments. Silver Spring has abandoned the first position on appeal, and for good reason. The district court concluded that the EON's damages expert, Mr. Daniel Lindsay, gave credible,

relevant testimony regarding the royalty rate and hypothetical negotiation: "Mr. Lindsay's approach reflects a conservative and practical approach, wherein he methodically explained why he gave more weight to [an agreement between Silver Spring and a third party]," and "Mr. Lindsay's royalty rates calculation . . . was a practical approach aimed at ascertaining a royalty rate for an entire system or network with several revenue generating components." A22, A24.

On the new trial issue, Silver Spring attempted, as it does here, to persuade the district court that a new trial was warranted if the district court vacated one or more findings of infringement, relying heavily on *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007). A25–26. But the district court rejected that approach on several grounds, finding that "EON has provided sufficient justification for the Court to depart from the general rule." A26. First, the district court found that *Verizon* is not analogous to the instant facts because, *inter alia*, EON is opposing a new trial. *See* A26. Second, Silver Spring "made no objection to the apportionment of damages on the jury verdict form," and, in fact, conceded in its post-trial briefing that it was not objecting to the verdict form.[19] A26. Third, Silver Spring's damages expert, Mr. Chris Bakewell, "offered single lump sum damages amount that remained the same regardless of the number of

---

[19] *See Function Media*, 708 F.3d 1329–30 (applying Fifth Circuit law regarding waiver for failure to object to a general verdict form).

claims or patents found to be infringed."  A26; *see also* A601 at 119:25–120:11 (deriving lump sum royalty amount based on number of units sold rather than number of claims or patents infringed).

Finally, the court examined the testimony of Mr. Lindsay, who testified that the hypothetical negotiation would have focused on EON's patents as a family vis-à-vis on an ad hoc, claim-by-claim basis.  A26; *see* A508.  Accordingly, Mr. Lindsay noted that the value assigned by the parties would not have changed if a single claim was removed from the negotiations:

> [EON's attorney]. . . . At one point [Silver Spring's attorney] asked you about if the jury found that one or two of these patents are invalid, would that change your rate.
>
> . . . .
>
> Would that change your rate?
>
> A. No.
>
> Q. Explain to the jury why not.
>
> A. Well, I discussed it with the folks at EON, and my understanding . . . [is that] these are interrelated patents.
>
> Q. Did you say interrelated?
>
> A. Interrelated. These are interrelated. And from EON's perspective, they view -- they view these patents as a . . . family, if you will. When entering into a license agreement, they would view it as such, and they would enter into an agreement through the expiration of the last to expire of those patents. . . . I confirmed that with agreements produced by both Silver Spring and EON. And that's a consistent approach, a consistent term in

terms of through the expiration of the patents, and that's how I treated it.

. . . .

Q. And if you infringe one of the claims, then you charge the same rate as if you infringe 15 of them?

A. Yes.

A508. The inventor, Mr. Dinkins, also testified that the patents were all part of the same family and designed to be complimentary. A380 at 66:1–67:9. Indeed, the patents themselves suggest the same: the '546 Patent is a continuation of and coterminous with the '101 Patent, and the '491 Patent is a continuation-in-part of the '101 Patent. A191 at 1:6–7, A211 at 1:3–7.

Under the appropriate standard of review, that testimony is sufficient to support the district court's finding that a new trial is not warranted. Silver Spring's burden is to demonstrate "an absolute lack of evidence" supporting the district court's decision, *see Function Media*, 708 F.3d at 1317, which it cannot do. Further, assuming that the jury resolved the hypothetical negotiation issue regarding the family of patents in favor of EON, *see DDR Holdings*, 773 F.3d at 1252, the district court did not abuse its discretion because it was entitled to rely on that testimony and all inferences from it. *See Cybor Corp.*, 138 F.3d at 1460.

Nor is the district court's finding an error of law. The district court's deference to Mr. Lindsay's testimony is consistent with this Court's approach to the hypothetical negotiation underpinning a reasonable royalty rate. As the Court

-47-

has noted, "[c]reating a licensing agreement for patented technology is, at best, an inexact science." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009). Thus, credible analysis like Mr. Lindsay's testimony can illuminate *how* the parties would have negotiated: "In actual licensing negotiations, willing parties negotiating at arms-length do not necessarily generate and analyze precise economic data concerning the perceive value of a patented invention." *Id.*[20] Accordingly, Mr. Lindsay's testimony is definitive on the issue of whether a new trial is required.

### 2. This Court Does *Not* Require a New Trial on Damages When an Infringement Finding Is Vacated.

Silver Spring contends that the law requires a new trial when a court vacates some—but not all—findings of infringement underlying a non-apportioned damages verdict. But this Court's cases time and again demonstrate that it avoids requiring a new trial where the record contains evidence, as it does here, that can support a damages award. In *Accentra, Inc. v. Staples, Inc.*, 500 F. App'x 922 (Fed. Cir. 2013), a jury found that the defendant had infringed several claims across three patents. *Id.* at 931. On appeal, this Court vacated the infringement

---

[20] In addition, as the *Lucent* Court noted, a party that does not object to that approach at trial waives its ability to do so on appeal: "[T]he parties . . . each adopted the hypothetical negotiation approach, without objection. Both . . . must therefore accept that any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" 580 F.3d at 1325 (quoting *Unisplay*, 69 F.3d at 517).

findings regarding two patents. *Id.* In lieu of ordering a new trial, however, the Court vacated and remanded the damages case to the district court to determine what, *if any*, effect its non-infringement findings would have on the damages award: "Because we have vacated the judgment as to two of the three patents, we believe that the proper course is to vacate the damages award in its entirety and remand for further proceedings so that the district court can revisit the damages issue based on its reevaluation of the liability issues in light of this decision." *Id.*

Likewise, in *NTP, Inc. v. Research in Motion, Inc.*, 418 F.3d 1282, 1326 (Fed. Cir. 2005), the Court vacated a damages award that was based, in part, on several findings of infringement that were vacated on the appeal. 418 F.3d 1282, 1326 (Fed. Cir. 2005), *abrogation on other grounds recognized by IRIS Corp. v. Japan Airlines Corp.*, 769 F.3d 1359 (Fed. Cir. 2014). In lieu of ordering a new trial on damages, however, the Court remanded to the district court to determine what impact the appellate holding had on the damages award:

> [B]ecause the jury verdict did not specify the amount of infringing sales attributed to each individual patent claim, or the specific devices and services determined by the jury to infringe each separately asserted claim, the district court will have to determine the effect of any alteration of the jury verdict on the district court's damage award.

*NTP, Inc.*, 418 F.3d at 1326.[21]

---

[21] There is also support for the remand approach outside of the multiple-findings-of-infringement context. In *ResQNet.com*, the Court vacated a damages award

Silver Spring primarily relies on *Verizon v. Vonage*, 503 F.3d 1295, for the proposition that a new trial is required in this case because *Verizon* demonstrates "this exact this [sic] set of facts." BB at 42. The facts in *Verizon* and the instant case are far from an "exact" match. First, and foremost, the prevailing patentee in *Verizon* did not give the court "any reason to depart from [the] general rule" that vacating a specific finding of infringement requires a new trial on damages; indeed, it appears that the parties did not brief the issue and that the patentee did not oppose a new trial on damages. *Verizon*, 503 F.3d at 1310. Here, that is not the case: EON has provided multiple reasons why the general rule should not apply (*e.g.*, testimony that the negotiation would have focused on the family of patents, the district court's determination that a new trial was not necessary, and Silver Spring's unchanging lump sum damages model). Second, the cases are procedurally different. In *Verizon*, the primary issue on appeal was the jury's infringement finding; the parties failed to brief in any meaningful way the damages issue. *Id.* at 1302–10. Here, the issue of a new trial with a vacated infringement finding has already been heard and decided by the district court in post-trial motion

---

after determining that "the district court's award relied on speculative and unreliable evidence divorced from proof of economic harm . . . and is inconsistent with sound damages jurisprudence." 594 F.3d at 868. Instead of ordering a new trial, however, this Court remanded to the trial court to determine a reasonable royalty, which the trial court did after briefing and an evidentiary hearing on the matter. *See ResQNet.com Inc. v. Lansa, Inc.*, 828 F. Supp. 2d 688, 692, 694 (Fed. Cir. 2011).

practice.   Third, the *Verizon* trial record contained no support for the damages award (or an alternative damages award).   Here, that is simply not the case.   *See supra* Part III.B.1.

Silver Spring may attempt to argue that, at the very least, this Court should remand to the district court without orders for a new trial, as it did in *Accentra* and *NTP*, for the district court to re-determine damages.   But that argument ignores the unique posture of the instant case.   The *Accentra* and *NTP* remands were necessary for the district court to determine, *in the first instance*, what effect removing a finding (or findings) of infringement had on the damages award.   *See* 500 F. App'x at 931; 418 F.3d at 1326.   Here, that determination *has already been made* by the district court because the finding of infringement was vacated by the district court itself, not this Court.   Accordingly, the district court has already performed the action underlying the remand in *Accentra* and *NTP*, and determined that the damages award should remain intact.

In addition to the reasons discussed above, that determination is girded by the standard of review, which requires that this Court determine that the jury found in EON's favor on all findings of fact.   Through that lens, Mr. Lindsay's testimony regarding the parties' negotiation for the EON patents as a family—and Mr. Bakewell's seeming agreement with that statement—is presumed to be true.   In that light, there is simply no way that Silver Spring can demonstrate that the

district court committed clear error when it denied Silver Spring's motion for a new trial on damages.

## IV.  THE DISTRICT COURT ABUSED ITS DISCRETION IN REMITTING THE DAMAGES AWARD BASED ON AN IMPLIED LICENSE BECAUSE SILVER SPRING *NEVER ARGUED* THAT SUCH A DEFENSE EXISTED.

On cross-appeal, this Court should reverse the district court's remittitur of the damages award from $18.80 million to $12.99 million because the district court committed multiple errors in applying the affirmative defense of implied license— based on a settlement agreement between EON and Landis+Gyr (the "Landis+Gyr agreement")—to reduce the jury's award.  Despite Silver Spring's failure both to preserve an implied license defense *and* to argue implied license based on the Landis+Gyr agreement, the district court *sua sponte* converted Silver Spring's arguments into such a defense and adjudicated this new defense without allowing EON to respond or brief in opposition.

That decision was underpinned by a laundry list of reversible errors: the district court improperly granted Silver Spring's motion to amend its answer to include a non-existent defense theory; it erroneously reviewed Silver Spring's post-verdict JMOL motion despite Silver Spring's failure to preserve the issues pre-verdict; it applied an affirmative defense that Silver Spring never properly raised and to which EON was never provided an opportunity to respond; and it erred in its application of the affirmative defense where the factual record did not

support its conclusions.  Accordingly, this Court should overturn the trial court's application of an implied license defense and reverse the remittitur.

## A. The District Court's Remittitur Is Reviewed for an Abuse of Discretion.

Under Fifth Circuit law, "the grant or denial of a motion for a remittitur or a new trial is reviewed for an abuse of discretion."  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012) (citing *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 177 (5th Cir. 1992)).  "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts."  *McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir. 2003).  "Findings of fact are reviewed for clear error." *Woodfield v. Bowman*, 193 F.3d 354, 358 (5th Cir. 1999).

## B. The District Court Abused Its Discretion Because It Relied on an Affirmative Defense of Implied License that Was Clearly and Unquestionably Waived.

Silver Spring never pleaded implied license based on the Landis+Gyr agreement and did not raise such a defense in its pre-trial pleadings, which constitutes a waiver of the defense.  Under Fifth Circuit law,[22] the "failure to plead . . . [an affirmative] defense constitutes waiver."  *Woodfield*, 193 F.3d at 362; *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

---

[22] Regional circuit law governs the question of waiver of a defense. *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir. 2005).

*Procedure* § 1278, at 477 (3d ed. 2015).  Further, "a defendant . . . must plead an affirmative defense with enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced."  *Woodfield*, 193 F.3d at 362; *accord Ingraham v. U.S.*, 808 F.2d 1075, 1079 (5th Cir. 1987) ("A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense."); *Automated Med. Labs. v. Armour Pharm. Co.*, 629 F.2d 1118, 1122 (5th Cir. 1980) ("Although absolute specificity in pleading is not required, fair notice of the affirmative defense is.").

Under this Court's law, "the alleged infringer . . . ha[s] the burden of establishing the existence of an implied license as an affirmative defense." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995).  Silver Spring did not raise an implied license defense based on the Landis+Gyr agreement in its responsive pleadings, the Joint Pre-Trial Order, or its Motion to Amend its final Answer in the case.  Accordingly, it waived its right to rely or benefit from that defense and never established the existence of the license under the law.

### 1. Silver Spring's Answers Did Not Properly Assert Implied License Based on the Landis+Gyr Settlement Agreement Because the Agreement Post-Dated Those Answers.

There is little doubt that Silver Spring will point to its Answers, each including a boilerplate implied license affirmative defense, which reads in full:

> EON's claims are barred in whole or in part by the equitable doctrines of unclean hands, laches, estoppel, implied license, *in parti delicto* [sic], waiver, acquiescence, and/or other equitable doctrines.

*E.g.*, A1188 ¶ 5 (Answer to Am. Compl.); A1199 ¶ 5 (Answer to 2d Am. Compl.).[23]

The inclusion of the magic words "implied license," however, could not have put EON on notice of an implied license defense *based on the Landis+Gyr agreement*. That agreement with a co-defendant was executed on ██████████. *See* A1523–24. In contrast, all but one of Silver Spring's Answers *predated* the agreement by several months or years. *See* A1182 (Answer to Am. Complaint) (Dec. 19, 2011); A1194 (Answer to 2d Am. Compl.) (Apr. 23, 2012); A1206 (Am. Answer to 2d Am. Compl.) (Aug. 21, 2012); A1230 (2d Am. Answer to 2d Am. Compl.) (Sept. 24, 2012); A1263 (3d Am. Answer to 2d Am. Compl.) (Oct. 31, 2012); A1307 (Answer to 3d Am. Compl.) (Nov. 16, 2012).

The inclusion of the boilerplate "implied license" in these Answers, without factual specificity and *before* the Landis+Gyr agreement was ever executed, could not constitute an assertion of the defense because such an inclusion falls short of the Fifth Circuit's specificity requirement. *See Woodfield*, 193 F.3d at 362. In *Woodfield*, an insurance company failed to raise the affirmative defense of

---

[23] To be clear, Silver Spring never pleaded or argued, nor did the district court base its remittitur finding upon, an *express* license theory.

"consent to settle" after other parties settled their respective claims. *Id.* at 361. On appeal, the company asserted that it had pleaded the defense based on an affirmative defense paragraph that read, "the claims, demands, and causes of action asserted by [the third parties] are barred, or alternatively, reduced, by the doctrines of accord and satisfaction, transaction and compromise, waiver and/or release." *Id.* The Fifth Circuit rejected that argument, holding that such "boilerplate" defense pleading was insufficient under Fed. R. Civ. P. 8(c) to put the parties on notice of a "consent to settle" defense and that the defense was, therefore, waived.

### 2. Silver Spring Did Not Raise The Defense Of "Implied License" In the Proposed Joint Final Pretrial Order.

Even if the Court finds that the magic words "implied license" were enough to put EON on notice, Silver Spring waived the defense by failing to raise it—via *any* explanation of its position, including the words "implied license"—in pre-trial proceedings. *Cf. Arsement*, 400 F.3d at 245 ("It goes without saying that a pre-trial order controls the course and scope of a trial; a claim or issue not included in the order is waived, unless presented at trial without objection.").

On February 7, 2014, EON and Silver Spring filed their Proposed Joint Final Pretrial Order. A1397. Notably, Silver Spring *never* raised implied license as a defense in the Pretrial Order, which, under Fifth Circuit law, ends the inquiry. *See Arsement*, 400 F.3d at 245. Its "Statement," which summarizes its positions, does not mention implied license or the Landis+Gyr agreement. A1400. Nor does its

"Statement of Contentions," which lists twenty-two separate positions—including several defenses—that Silver Spring planned to take at trial and in post-trial briefing.  A1402–06.  Finally, Silver Spring's "Statement of Contested Issues of Fact and Law" was silent on the issue.  A1410–12.  At no time did Silver Spring properly raise implied license based on the Landis+Gyr agreement as an affirmative defense.

### C. The District Court Abused Its Discretion By Allowing Silver Spring To Amend Its Answer To Include the Nonexistent Affirmative Defense of "Joint and Several Liability."

The docket contains one Answer that post-dates the Landis+Gyr agreement: Silver Spring's Amended Answer to the Third Amended Complaint.  A1381 (May 23, 2014).  On February 21, 2014, two weeks *after* the parties filed their Pretrial Order, Silver Spring sought leave to amend its Answer to include two additional affirmative defenses: patent exhaustion and "joint and several liability."  A1353. In its motion, filed seven months *after* EON and Landis+Gyr reached an agreement, Silver Spring referenced the Landis+Gyr agreement but failed to raise the defense of implied license (much less argue that the agreement supported an implied license defense).  Instead, Silver Spring argued that the agreement prevented recovery under the affirmative "defense" doctrines of patent exhaustion and "joint and several liability."  *Id.*  EON responded by arguing that there were

insufficient facts to support a patent exhaustion theory and that "joint and several liability" was a liability theory, not an affirmative defense.  *See* A1361–63.

The motion was argued at the May 20, 2014 pretrial hearing, where Silver Spring's silence on "implied license" continued.  Instead, Silver Spring insisted that the facts fell within the defense of patent exhaustion, arguing that the doctrine prevented recovery from Silver Spring.  A1464–66.  EON, in turn, argued that the court should reject Silver Spring's arguments because they did not demonstrate the elements of patent exhaustion,[24] and that Silver Spring had failed to assert implied license: "They haven't brought an implied license defense. They have never pled implied or express license. What they have pled here was patent exhaustion, and it doesn't fit these facts."  A1478–79.  Even after EON's counsel raised the issue, however, Silver Spring *again* failed to address "implied license" or suggest that Silver Spring was asserting such a defense.  *See* A1479.  The record demonstrates that EON did everything that it could have, rejecting Silver Spring's newly asserted "defenses" and trying to make sense of what Silver Spring was asserting so that it had a fair opportunity to respond.

---

[24] EON argued that Silver Spring failed to demonstrate that it was "downstream" from Landis+Gyr for the purpose of rendering sales by Silver Spring an "authorized sale" under the doctrine.  A1474–76; *cf. Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008) (detailing the requirements of patent exhaustion).

From the bench, the court denied the addition of patent exhaustion but allowed the addition of "joint and several liability" as a defense: "I'm going to permit Silver Spring to amend *to add joint and several liability*."  A1479–80 (emphasis added).  Remarkably, the court then admitted that it was unsure that such a defense existed: "I'm not a hundred percent sure that's really the proper way to put this or necessary, but I want to be able to look at this."  A1480.  The next day, the district court issued an order echoing its position, allowing Silver Spring to amend its Answer to assert "joint and several liability" as an affirmative defense.  A1512 (noting that "Silver Spring may amend its answer to include the equitable defense of joint and several liability").

The district court's decision to allow the defense of "joint and several liability" is clear error.  First, no such defense exists.  At common law, "joint and several liability" is a tort liability theory that can be pled by a plaintiff against multiple tortfeasors.  *See* Restatement (Third) Of Torts: Apportionment Liab. § 10 (2000); *accord Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1124–30 (5th Cir. 1995) (discussing the history of joint and several liability); *see also* A1363 n.1 (arguing that the theory "is a theory of liability and not properly pled as a defense").  Silver Spring *agreed* with EON on this point, noting that joint and several liability "███████████████████████████████████."  A1369 n.1.  In addition, the district court clearly had an "equitable defense" in mind when it

granted Silver Spring's motion to amend. A1512. However, implied license is an affirmative defense at law, with distinct legal elements that must be met to be enforced. *See Lulirama Ltd., Inc. v. Axcess Broadcast Servs., Inc.*, 128 F.3d 872, 882 (5th Cir. 1997). That the district court allowed a joint and several liability theory, and then turned it post-trial into an implied license theory, is an "erroneous conclusion of law" that constitutes an abuse of discretion that requires reversal. *See McClure*, 335 F.3d at 408.

Second, the court committed error by finding that Silver Spring had good cause to amend its Answer. Under Fifth Circuit law, the "substantial reason[s]" enumerated in *Forman v. Davis*, 371 U.S. 178 (1962), justify denial of a motion to amend: "undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, or undue prejudice to the opposing party." *See Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (Fed. Cir. 2004). The district court abused its discretion because it ignored Silver Spring's repeated failure to cure deficiencies regarding its defenses based on the Landis+Gyr agreement.

Silver Spring had knowledge of the Landis+Gyr agreement *seven months* before it attempted to make any amendments to its Answer regarding that agreement. A1361–62. Silver Spring had several opportunities to assert a defense of implied license: it could have amended its Answer; it could have included *any* statement regarding the agreement or the words "implied license" in the Pretrial

Order; or it could have filed a motion for summary judgment on the issue.  When EON's counsel offered it an opportunity for correction at the pretrial hearing, its silence on "implied license" continued.  And the amendment certainly prejudiced EON—it prevented EON from developing a factual record counter to a defense that Silver Spring never pled, which deprived EON of ███████ duly awarded by a jury.  The district court erroneously categorized the facts relevant to the defense as "undisputed," *see infra* Part IV.E, precisely because Silver Spring's failure to present (timely or otherwise) an implied license defense gave EON no reason to uncover and assert controverting facts.

### D. The District Court Abused Its Discretion by Considering and Granting Silver Spring's Post-Trial JMOL.

#### 1. Silver Spring Failed To Preserve *Any* Affirmative Defenses for Post-Trial Briefing.

In addition to Silver Spring's failure to preserve implied license in its pretrial pleadings, *see supra* Part IV.B, Silver Spring failed to preserve any affirmative defenses pursuant to Fed. R. Civ. P. 50(a) for post-trial briefing.  It is well-settled that a party may not challenge an issue of law post-verdict if that party failed to file a pre-verdict motion for judgment as a matter of law.  *See* Fed. R. Civ. P. 50(a)(2) ("A motion for judgment as a matter of law . . . *must specify* the judgment sought and *the law and facts* that entitle the movant to judgment." (emphasis added)); *i4i*, 598 F.3d at 845 ("A party *must file* a pre-verdict JMOL on

all theories that it wishes to challenge with a post-verdict JMOL." (emphasis added)).   This requirement is exact and unforgiving: "The requirement for specificity is not simply the rule-drafter's choice of phrasing.   In view of a litigant's Seventh Amendment rights, it would be constitutionally impermissible for the district court to re-examine the jury's verdict and to enter JMOL on grounds not raised in the pre-verdict JMOL."   *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1107 (Fed. Cir. 2003) (citing *Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006, 1010 (5th Cir. 1998)).

Here, Silver Spring failed to raise *any* affirmative defense arguments in its pre-verdict motion for JMOL. At trial, Silver Spring moved for judgment as a matter of law on only three points: direct infringement, willful infringement, and EON's royalty rate.   A654–56 at 128:12–134:4 (direct infringement); A656 at 135:20–136:16 (willful infringement); A657–58 at 139:9–144:3 (royalty rate). Silver Spring raised no argument regarding the affirmative defenses of implied license, patent exhaustion, or "joint and several liability," nor did it mention any effect the Landis+Gyr agreement might have on the damages award.

### 2. In Its Post-Trial JMOL Briefing, Silver Spring *Again* Asserted Joint and Several Liability as a "Defense."

In its post-verdict JMOL briefing, Silver Spring once again pursued "joint and several liability" as an affirmative defense, despite its own pre-trial admission that no such "defense" existed and its failure to preserve it (or any other

affirmative defense) in a pre-verdict JMOL. A860. Notably absent from Silver Spring's briefing was *any mention* of implied license, much less an analysis of the appropriate legal test for implied license. *See* A860–66. For that reason alone, it was legal error for the district court to grant a remittitur based on implied license because Silver Spring failed to meet its "burden of establishing the existence of an implied license as an affirmative defense." *See Carborundum*, 72 F.3d at 878. EON responded to Silver Spring's JMOL by again observing that a "joint and several liability" defense did not exist. A922–25. And EON again noted that Silver Spring was not asserting an implied license defense. A925–28.

Despite this seemingly one-sided battle, the district court *denied* Silver Spring's "defense" of joint and several liability, re-appropriated the factual analysis from Silver Spring's joint and several liability defense to an implied license defense, and deprived EON of ██████████ based on a legal defense that Silver Spring *never raised*. Notably, the court did not merely rename a defense that Silver Spring had pleaded; rather, it denied the defense and added a new defense with distinct elements from the defense it denied. Emblematic of the court's reasoning, after *denying* the joint and several liability defense, is this statement from the court's JMOL order: "The only remaining argument Silver Spring has raised *is best characterized* as an implied license defense." A28 (emphasis added).

The district court's re-characterization of Silver Spring's analysis—after Silver Spring waived its right to argue implied license or to move for such a defense in a post-trial JMOL—is an abuse of discretion because it is based on a mistake of law that deeply prejudices EON. Indeed, there is little more that EON could have done: it responded to (and apparently defeated) every defense Silver Spring asserted. But EON did not get to respond to the district court's own assertion of an implied license defense. Accordingly, the district court's actions were fundamentally unfair to EON and should be reversed.

### E. The District Court Abused Its Discretion by Determining that the Landis+Gyr Agreement Warranted a Remittitur of the Damages Award.

Even if this Court determines that the district court should have examined the Landis+Gyr agreement post-verdict, the court abused its discretion by determining that the agreement supported an implied license that labeled Silver Spring as a "licensee supplier" of "licensed products." That finding is an abuse of discretion because it is a factual finding made in clear error both because it is unsupported by the evidence and because it should have been a question for the jury. *See McClure*, 335 F.3d at 408; *Woodfield*, 193 F.3d at 358. Accordingly, the Court should reverse the remittitur finding.

In its joint and several liability "defense," Silver Spring asserted that it supplied communication modules that were incorporated into meters manufactured

by Landis+Gyr, a codefendant. A860–61. Notably, this disputed fact was never presented during trial. Of the ██████ communication modules Silver Spring sold during the infringement period, it alleged for the first time in its post-trial briefing that approximately ██████ of those modules were incorporated into Landis+Gyr smart meters. A864. Thus, Silver Spring contended, the ██████ Landis+Gyr agreement absolved Silver Spring of liability for those ██████ modules. *Id.*

The district court found that Silver Spring was a "licensee supplier" under the Landis+Gyr agreement. A29. The district court's reasoning was based exclusively on the post-trial Declaration of Mr. Eric Dresselhuys, a Silver Spring founder and current Executive Vice President of Global Development, attached to Silver Spring's post-verdict Motion for JMOL. A28–29 (citing same). Mr. Dresselhuys' declaration, however, does not support the trial court's holding. For example, paragraph 15 reads, in relevant part:



A1517–18 (emphasis added).[25]

All that can be ascertained from the declaration is that ███████ Silver Spring modules *were incorporated* into Landis+Gyr smart meters. Nowhere does Mr. Dresselhuys state what portion of those ███████ modules was *sold* to Landis+Gyr. In paragraph 9, Mr. Dresselhuys recalls a Silver Spring interrogatory response that states:



A1516. Mr. Dresselhuys uses this same rhetoric throughout his declaration, never once stating that Silver Spring actually sold Landis+Gyr any of those ███████ modules that ended up in Landis+Gyr smart meters. Instead, he repeatedly states that ███████ modules were eventually *incorporated into* Landis+Gyr meters that were used by utility companies. *See, e.g.*, A1517 ¶ 14 ("██████████ ████████████████████████████████████████████

---

[25] These are legal conclusions, not statements of fact. *Cf. Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (disregarding a number of statements as factually unreliable, including "legal conclusions" and "conclusory statements").

████ .”); A1517 ¶15 (" ██████████████████████████████

██████████████████████████████████████████ .”).

Accordingly, the district court erred by making a factual finding that all ████

████ modules eventually incorporated into Landis+Gyr meters *were actually sold* to Landis+Gyr because Mr. Dresselhuys' declaration is silent on that point. Notably, the Landis+Gyr agreement would require such a relationship for a "licensee supplier":



A1529.

The district court's conclusion that this fact was "undisputed" was also error. *See* A29 n.13. Although EON did not dispute that Silver Spring's modules were incorporated into Landis+Gyr meters, EON *did* dispute the same fact issue it raises here: whether the ████████ modules at issue were *sold* or *supplied* to Landis+Gyr such that Silver Spring could be considered a "licensee supplier" under the Landis+Gyr agreement. In fact, at trial, Mr. Dresselhuys testified that the majority of its meters were sold *directly to utility companies*: "As I said, we primarily sell to utilities, in some cases municipalities in big cities." A520 at

143:15–17.  That testimony demonstrates that Silver Spring could have sold a substantial portion (up to all) of those ▓▓▓▓▓ modules to utilities themselves, who then "incorporated" the modules into the already purchased Landis+Gyr meters, arguably placing those sales outside of the license in the Landis+Gyr agreement.

It was error to conclude both that there was sufficient evidence to demonstrate that ▓▓▓▓▓ modules were sold or supplied directly to Landis+Gyr, and that such a fact was undisputed.[26]  It was also error for the court to conclude that the license should reduce the award by ▓▓▓▓▓.  Because the jury verdict of $18.80 million was unapportioned, there is no evidence that the jury awarded ▓▓▓▓▓, which was the calculation the district court presumably used to make the ▓▓▓▓▓ reduction based on the ▓▓▓▓▓ units that were purportedly incorporated into Landis+Gyr meters.

Based on those factual errors, this Court should reverse the trial court's application of an "implied license" defense and overturn the imposed remittitur.  In the alternative, should a portion of this case be remanded for further proceedings

---

[26]  As EON urged at the pretrial hearing, A1482, the underlying questions of fact regarding an implied license defense should have been determined in the first instance by the jury.  *See Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc.*, 103 F.3d 1571, 1579 (Fed. Cir. 1997) (noting that jury should resolve underlying factual determinations regarding implied license before the court resolves the ultimate question of law regarding whether an implied license exists).

on damages, the Court should vacate the remittitur and bar Silver Spring from bringing any license defense based on its failure to preserve the defense below.

## CONCLUSION

For the foregoing reasons, EON respectfully requests that this Court affirm the district court's findings of infringement, deny Silver Spring's request for a new trial, and hold that the district court impermissibly remitted the damages award.

Respectfully submitted,

/s/ Daniel R. Scardino
DANIEL R. SCARDINO
JOHN L. HENDRICKS
RAYMOND W. MORT, III
C. BENTLEY HARRIS
MATTHEW MURRELL
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-279-7904
dscardino@reedscardino.com

*Counsel for Cross-Appellant,*
*EON Corp. IP Holdings LLC*

May 29, 2015

## CERTIFICATE OF SERVICE

I certify that on May 29, 2015, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system, which will send notification of such filing to all registered participants.

   */s/  Daniel R. Scardino*   
DANIEL R. SCARDINO
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-279-7904
dscardino@reedscardino.com

*Counsel for Cross-Appellant,*
*EON Corp. IP Holdings LLC*

May 29, 2015

## CERTIFICATE OF COMPLIANCE

This Cross-Appellant's Principal Brief complies with the requirements of Federal Rules of Appellate Procedure 28.1 and 32, and Federal Circuit Rule 32:

1. Pursuant to Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i), this Cross-Appellant's Principal Brief meets the type-volume limitation because it contains no more than 16,500 words. Specifically, it contains 16,448 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. Pursuant to Federal Rules of Appellate Procedure 32(a)(5)(A) and 32(a)(6), this Principal Brief uses a proportionally spaced serif font of 14-point or larger in a plain, roman style. Specifically, it was written in Microsoft Word 2010 using 14-point Times New Roman.

*/s/  Daniel R. Scardino*

DANIEL R. SCARDINO
REED & SCARDINO LLP
301 Congress Ave., Ste. 1250
Austin, Texas 78701
512-279-7904
dscardino@reedscardino.com

*Counsel for Cross-Appellant,*
*EON Corp. IP Holdings LLC*

May 29, 2015